No. 22-3170

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

————————————

Madeline Krasno,

*Plaintiff–Appellant,*

v.

Jennifer Mnookin, et al.,

*Defendants–Appellees.*

————————————

On appeal from the United States District Court for the
Western District of Wisconsin — No. 3:21-CV-00099-slc (Crocker, S.)

**BRIEF OF *AMICI CURIAE* THE KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY, THE FOUNDATION FOR
INDIVIDUAL RIGHTS AND EXPRESSION, AND PEOPLE FOR THE
ETHICAL TREATMENT OF ANIMALS IN SUPPORT OF APPELLANT**

Katherine Fallow
Stephanie Krent
Alexia Ramirez
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-3170</u>

Short Caption: <u>Krasno v. Mnookin, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> ☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 <u>The Knight First Amendment Institute at Columbia University, The Foundation for Individual Rights and Expression,</u>

 <u>and People for the Ethical Treatment of Animals (Amici Curiae)</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 <u>The Knight First Amendment Institute at Columbia University</u>

(3)     If the party, amicus or intervenor is a corporation:

  i)     Identify all its parent corporations, if any; and

   <u>None.</u>

  ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>None.</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 <u>N/A</u>

Attorney's Signature: <u>/s/ Katherine Fallow</u>          Date: <u>03/17/23</u>

Attorney's Printed Name:  <u>Katherine Fallow</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑  **No** ☐

Address:  <u>475 Riverside Drive, Suite 302</u>

 <u>New York, NY 10115</u>

Phone Number: <u>(646) 745-8500</u>          Fax Number:  <u>(646) 661-3361</u>

E-Mail Address: <u>katie.fallow@knightcolumbia.org</u>

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-3170

Short Caption: Krasno v. Mnookin, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Knight First Amendment Institute at Columbia University, The Foundation for Individual Rights and Expression,

and People for the Ethical Treatment of Animals (Amici Curiae)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Knight First Amendment Institute at Columbia University

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Stephanie Krent    Date: 03/17/23

Attorney's Printed Name: Stephanie Krent

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: 475 Riverside Drive, Suite 302

New York, NY 10115

Phone Number: (646) 745-8500    Fax Number: (646) 661-3361

E-Mail Address: stephanie.krent@knightcolumbia.org

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3170

Short Caption: Krasno v. Mnookin, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Knight First Amendment Institute at Columbia University, The Foundation for Individual Rights and Expression,

and People for the Ethical Treatment of Animals (Amici Curiae)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Knight First Amendment Institute at Columbia University

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Alexia Ramirez    Date: 03/17/23

Attorney's Printed Name:  Alexia Ramirez

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address:  475 Riverside Drive, Suite 302

New York, NY 10115

Phone Number: (646) 745-8500    Fax Number:  (646) 661-3361

E-Mail Address: alexia.ramirez@knightcolumbia.org

rev. 12/19 AK

# **Table of Contents**

Table of Authorities ..................................................................................... ii

Statement of Interest ................................................................................... 1

Summary of Argument ................................................................................ 4

Argument ...................................................................................................... 7

    I.    Government-operated social media accounts play a vital role in
        public discourse in the digital age. .................................................. 7

    II.   Proper application of the public forum doctrine to speech
        restrictions in government-operated social media accounts is
        essential to protect against unconstitutional viewpoint censorship. ......... 10

    III.  The University's use of keyword blocking to suppress speech related
        to animal advocacy on its social media accounts violates the First
        Amendment. ....................................................................................... 16

        A.    The University's keyword blocking impermissibly
            discriminates based on viewpoint. ................................... 19

        B.    The University's keyword blocking is unreasonable. ....................... 22

Conclusion .................................................................................................... 26

Certificate of Compliance ........................................................................... 28

Certificate of Service .................................................................................... 29

# Table of Authorities

## Cases

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .......................................................... 17

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144 (7th Cir. 1995) ......................................................... 23

*Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314 (D.C. Cir. 2018) ......................................................... 25

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ............................................. 17

*Blackwell v. City of Inkster*, 596 F. Supp. 3d 906 (E.D. Mich. 2022) .......................... 14

*Charudattan v. Darnell*, 834 F. App'x 477 (11th Cir. 2020) ...................................... 24

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) .................................. 22

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ......................................................... 5, 13, 18

*Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 WL 407651 (N.D. Ill. Feb. 10, 2022) ......................................................... 14

*Davison v. Plowman*, 247 F. Supp. 3d 767 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018) ......................................................... 24

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) .................................... 1, 5, 14

*Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020) ............................................. 14

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022) .................................. 5, 14

*Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911 (W.D. Wash. 2021) .................. 14

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (Mem.) (2021) ................. 1, 5, 14

*Liverman v. City of Petersburg*, 844 F. 3d 400 (4th Cir. 2016) .................................. 10

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................. 17

*Matal v. Tam*, 582 U.S. 218 (2017) ........................................................ 15, 22

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) .................................. 25

*One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019) ...............................14

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).........................................7, 10

*Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ...................13

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) ................................................22

Report & Recommendation, *People for the Ethical Treatment of Animals, Inc. v. Banks*, No. 4:20-cv-2913, 2022 WL 4021938 (S.D. Tex. Sept. 2, 2022) ...............................................................................14, 18

*Robinson v. Hunt Cnty., Texas*, 921 F.3d 440 (5th Cir. 2019) ...............................5, 14

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)...............13, 15

*Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) ......................................................17

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)..........................................13, 15

*Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080 (E.D. Ark. Sept. 30, 2021) ..............................................................................12, 14

*Texas v. Johnson*, 491 U.S. 397 (1989).......................................................................15

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)........................................................................................................13

*Women's Health Link, Inc. v. Fort Wayne Pub. Tranp. Corp.*, 826 F.3d 947 (7th Cir. 2016)..................................................................................23

## Other Authorities

*Animal & Dairy Servs.*, Univ. of Wis.–Madison, https://perma.cc/H8A9-RN22.....................................................................................................21

Bradford Fitch & Kathy Goldschmidt, #*SocialCongress 2015*, Cong. Mgmt. Found. (2015), https://perma.cc/TX32-2CME.............................................10

Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Res. Ctr. (Apr. 7, 2021), https://perma.cc/237M-AA9B.........................................9

Charlie Savage, *Trump Can't Block Critics from His Twitter Account, Appeals Court Rules*, N.Y. Times (July 9, 2019), https://perma.cc/GT6A-EVUS .................................................................11

City of Chicago, *Social Media*, https://alpha.chicago.gov/social (last visited Mar. 15, 2023) ................................................................8

City of Madison, *Outreach*, https://perma.cc/T7YK-5P7M ............................8

*Hide comments or message requests you don't want to see on Instagram*, Instagram Help Center, https://help.instagram.com/ 700284123459336 ...............................................................................24

*How do I block certain words from appearing in comments on my Facebook Page?*, Facebook Help Center, https://perma.cc/YDZ3-B6SF ..............................................................................................23, 24

Indiana University (@IndianaUniversity), Facebook, https://www.facebook.com/IndianaUniversity (last visited Mar. 16, 2023) ........................................................................................................8

Jacob Liedke & Katerina Eva Matsa, *Social Media and News Fact Sheet*, Pew Res. Ctr. (Sept. 20, 2022), https://perma.cc/E8KC-QSLA ....................9

Jocelyn Kaiser & Meredith Wadman, *NIH Sued for Blocking Social Media Comments from Animal Rights Advocates*, Science (Sept. 10, 2021), https://perma.cc/ML2X-34A4 .......................................................12

Kellen Browning & Taylor Lorenz, *Lawyers Demand the Military Stop Violating Free Speech on Twitch*, N.Y. Times (July 22, 2020), https://perma.cc/LSA3-2MNT ...........................................................11

Michael Gold, *Ocasio-Cortez Apologizes for Blocking Critics on Twitter*, N.Y. Times (Nov. 4, 2019), https://perma.cc/KAM5-SXJT .....................................11

Milwaukee County, *Social Media*, https://perma.cc/9T5L-MUKE ...............................8

National Institutes of Health (@NIH), Twitter (Feb. 14, 2023), https://twitter.com/NIH/status/1625573807955263488 ...........................................8

National Institutes of Health (@nihgov), Instagram (Feb. 24, 2023), https://www.instagram.com/reel/CpDtwOOgvt1 .......................................8

National Institutes of Health Office of Extramural Research (@NIHgrants), Twitter (Mar. 1, 2023), https://twitter.com/NIHgrants/status/1630933306609942529 ...............................8

Nicole Cobler, *Sen. Cornyn Unblocks Twitter Critic After Lawsuit*, Austin Am.-Statesman (May 1, 2020), https://perma.cc/RY7L-KRVL .................11

*No Comment: Public Universities' Social Media Use and the First Amendment*, Found. for Individual Rts. & Expression (Apr. 22, 2020), https://perma.cc/3G4E-86WY .............................................................2, 12, 13

Patrick Van Kessel, et al., *Congress Soars to New Heights on Social Media*, Pew Res. Ctr. (July 16, 2020), https://perma.cc/S8PJ-VVA5 .....................9

Purdue University (@LifeAtPurdue), Twitter, https://twitter.com/lifeatpurdue (last visited Mar. 16, 2023) ................................8

Renee Oxner, *Texas Attorney General Ken Paxton Agrees to Stop Blocking People on Twitter, Ending Lawsuit Over First Amendment*, Tex. Tribune (July 12, 2021), https://perma.cc/Z2XW-TT79 ...............................11

U.S. Digital Registry, https://perma.cc/A5E8-B67N .....................................7

University of Illinois (@UofIllinois), Twitter, https://twitter.com/UofIllinois (last visited Mar. 16, 2023) ....................................8

*Wright State University: Facebook Comments Restricted During Faculty Union Strike*, Found. for Individual Rts. & Expression, https://perma.cc/6F8S-WQ5T ......................................................................2

### Statement of Interest[1]

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute is particularly committed to protecting the integrity and vitality of online forums in which citizens communicate with each other and government representatives about matters of public concern. The Institute is currently representing plaintiffs, including Appellant Madeline Krasno, in a social media blocking case in the United States District Court for the District of Columbia, *People for the Ethical Treatment of Animals v. Tabak*, No. 1:21-cv-02380 (D.D.C.), and it has also represented plaintiffs in two First Amendment challenges to government officials' practice of blocking critics from social media accounts used for official purposes. *See Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as*

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) while the Knight Institute represents Appellant Madeline Krasno in another matter, this brief was authored entirely by *amici* and its counsel and not by counsel representing any party in this appeal, in whole or in part; (2) no party or counsel representing any party in this appeal contributed money to preparing or submitting this brief; and (3) apart from *amici* and its counsel, no other person contributed money to the preparation or submission of this brief. All parties have consented to the filing of this brief.

*moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220
(Mem.) (2021).

      The Foundation for Individual Rights and Expression (FIRE) is a non-partisan,
not-for-profit organization dedicated to defending the individual rights of all
Americans to free speech and free thought—the essential qualities of liberty. Since
1999, FIRE has successfully defended First Amendment rights on campuses
nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in
cases that implicate expressive rights. For example, after Wright State University
censored student and faculty supporters of a January 2019 faculty strike by hiding
and removing comments from its official Facebook account, FIRE successfully
advocated for a change to the university's social media policy. *See Wright State
University: Facebook Comments Restricted During Faculty Union Strike*, Found. for
Individual Rts. & Expression, https://perma.cc/6F8S-WQ5T. Additionally, FIRE has
collected and reported on public records from over 200 state colleges and universities,
demonstrating that these educational institutions widely use keyword filtering and
blocking tools on social media sites that constitute public forums for speech. *See No
Comment: Public Universities' Social Media Use and the First Amendment*, Found.
for Individual Rts. & Expression (Apr. 22, 2020), https://perma.cc/3G4E-86WY. In
June 2022, FIRE expanded its mission to protect expression beyond colleges and

universities.[2] It currently represents various plaintiffs in lawsuits seeking remedies for First Amendment violations.

People for the Ethical Treatment of Animals (PETA) is a not-for-profit animal rights organization based in Norfolk, Virginia. Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA's public education and campaign activities have a particular focus on animal mistreatment in laboratories, the food industry, the clothing trade, and the entertainment industry. PETA frequently launches social media campaigns in order to pressure public and private entities to change their animal treatment practices. For this reason, keyword blocking technology policies like the one at issue here—which record evidence suggests were implemented in concert with monitoring PETA campaigns, *which bar references to and attempts to notify PETA*, and which bar keywords regularly used in PETA campaigns—are of particular concern to PETA. Specifically, both by targeting PETA and by discriminating against animal rights advocacy on the basis of viewpoint, they burden the ability of PETA and its supporters to participate in public forums and hear other animal advocates' speech.

---

[2] Formerly known as the Foundation for Individual Rights in Education, FIRE recently changed its name to reflect its expanded mission.

## Summary of Argument

The University of Wisconsin–Madison ("the University") has engaged in illicit viewpoint discrimination by attempting to cleanse the comment threads on its Facebook and Instagram accounts of criticism of its involvement in controversial animal testing.[3] That viewpoint discrimination violates the First Amendment, because the comment threads on the University's social media accounts are public forums within the meaning of the First Amendment. The University has responded by arguing that its use of keyword blocking technology to prevent commenters from posting comments containing certain words—like "@peta," "primate," "animal testing," and "cruelty"—is a permissible implementation of its requirement that any comments stay "on-topic." But as *amici* argue below, the University's use of keyword blocking to censor speech related to animal advocacy discriminates based on viewpoint and is an unreasonable way of implementing an off-topic rule in a limited or nonpublic forum.

This case presents the Court with the opportunity to join numerous other circuit courts in recognizing that government-operated social media accounts that allow members of the public to post comments in the accounts' comment threads are public forums that must remain free from viewpoint discrimination. *See, e.g., Garnier*

---

[3] As used in this brief, "comment threads" refers to the spaces on the University's Facebook and Instagram accounts where members of the public can publish comments that appear under a message, or "post," made by the University. Courts sometimes refer to comment threads as the "interactive components" of government-operated social media accounts, which numerous courts have held are spaces opened up for speech by members of the public.

*v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (Mem.) (2021); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440 (5th Cir. 2019). Over the past two decades, government actors—including elected representatives, appointed officials, government agencies, and public institutions like state universities—have adopted social media accounts as important tools for speaking to, and hearing from, members of the public. But the vibrancy and integrity of these spaces as sites for public discussion and engagement are threatened when government actors exclude disfavored views. Careful application of the public forum doctrine to speech restrictions in government-operated social media accounts plays a crucial role in ensuring that these spaces live up to their promise as sites of open public communication and political engagement.

The University's use of keyword blocking to exclude speech relating to animal advocacy from the comment threads on its social media accounts violates the First Amendment. Even accepting the district court's conclusion that the University's social media accounts function as limited or nonpublic forums, its keyword blocking fails both requirements for regulation of speech in these forums: first, that speech restrictions be viewpoint-neutral, and second, that the restrictions be reasonable in light of the purpose of the forum. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

The University's keyword blocking is neither. First, the University's decision to use Facebook's and Instagram's optional keyword blocking features to automatically hide any comments containing words and phrases commonly used by animal advocates (including, in one instance, *amicus* PETA's name) discriminates based on viewpoint. Under the guise of using keyword blocking to prohibit off-topic comments, the University has singled out for censorship speech commonly used by animal advocates who criticize the University.

Second, the University's keyword blocking is not a reasonable means of implementing its rule prohibiting off-topic comments. It is illogical and unreasonable to assume that words commonly used by animal advocates will always be off-topic, without regard to the specific content of each of the University's posts. And, indeed, the University concedes that it has hidden comments by animal advocates even when those comments were relevant to the original post. Further, the University's use of keyword blocking to ban speech related to animal advocacy, while not similarly targeting other types of off-topic speech, is further evidence that its keyword blocking is an unreasonable way to enforce an off-topic rule.

This Court should make clear that the government may not evade its First Amendment obligations when operating a public forum by systematically suppressing critical speech under the guise of enforcing an ostensibly neutral rule prohibiting off-topic comments.

**Argument**

**I.    Government-operated social media accounts play a vital role in public discourse in the digital age.**

Social media platforms are the "most important places . . . for the exchange of views" today. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (cleaned up). Government actors have harnessed the power of social media to perform an essential function of their jobs: communicating with their constituents and other members of the public about—and in service of—their official duties. The digital public forums created by government-operated social media accounts have grown increasingly crucial to our democracy.

Social media has been a transformative tool for government actors seeking to engage directly with members of the public. Indeed, public officials and entities across the country and at all levels of government have increasingly used social media platforms to engage with their constituents. Over 10,000 social media accounts for federal agencies and sub-agencies have been registered with the United States Digital Service; agencies use these accounts to promote new policy initiatives and educate the public.[4] For example, the National Institutes of Health ("NIH") has registered over 300 social media accounts,[5] which the NIH uses to provide updates on

---

[4] U.S. Digital Registry, https://perma.cc/A5E8-B67N (public database of social media accounts managed by U.S. government agencies, organizations, and programs).

[5] *See id.*

its research,[6] discuss its grant funding,[7] and seek input from constituents.[8] Public universities also commonly use social media accounts to discuss campus life, announce administrative changes, and highlight new initiatives and programs.[9] And state and local governments commonly manage multiple social media accounts to connect with different cross-sections of their communities about matters ranging from public safety to sustainability to transportation.[10]

Social media is attractive to government actors because it offers the ability to reach wide audiences. According to a survey conducted by the Pew Research Center,

---

[6] *See, e.g.*, National Institutes of Health (@nihgov), Instagram (Feb. 24, 2023), https://www.instagram.com/reel/CpDtwOOgvt1 (a reel providing the "weekly roundup of NIH's research news").

[7] *See, e.g.*, National Institutes of Health Office of Extramural Research (@NIHgrants), Twitter (Mar. 1, 2023), https://twitter.com/NIHgrants/status/1630933306609942529 (sharing a blog post about NIH grant funding and success rate data for fiscal year 2022).

[8] *See, e.g.*, National Institutes of Health (@NIH), Twitter (Feb. 14, 2023), https://twitter.com/NIH/status/1625573807955263488 (soliciting "input on challenges affecting retention in the postdoctoral trainee community").

[9] *See, e.g.*, Indiana University (@IndianaUniversity), Facebook, https://www.facebook.com/IndianaUniversity (last visited Mar. 16, 2023); Purdue University (@LifeAtPurdue), Twitter, https://twitter.com/lifeatpurdue (last visited Mar. 16, 2023); University of Illinois (@UofIllinois), Twitter, https://twitter.com/UofIllinois (last visited Mar. 16, 2023).

[10] *See, e.g.*, City of Chicago, *Social Media*, https://alpha.chicago.gov/social (last visited Mar. 15, 2023) (listing over 100 social media accounts, including accounts for the Department of Planning and Development, the Department of Public Health, and the Department of Water Management); City of Madison, *Outreach*, https://perma.cc/T7YK-5P7M (listing over 70 social media accounts associated with the city, including accounts for the clerk's office, the fire department, and the public library); Milwaukee County, *Social Media*, https://perma.cc/9T5L-MUKE (listing over 80 social media accounts, including accounts for Milwaukee County parks, the sheriff, and the Office of Emergency Management).

seven in ten U.S. adults regularly use at least one social media platform.[11] Additionally, one in two U.S. adults report that they get some news from social media platforms and one in three U.S. adults report that they regularly get news specifically from Facebook.[12] Government actors leverage this audience to engage directly with constituents. As an example of the potential reach of government-operated social media accounts, in the first five months of 2020 alone, members of Congress collectively produced an average of 73,924 tweets and 33,493 Facebook posts per month, which generated a total of over 476 million reactions and "favorites" as well as over 112 million shares and retweets.[13]

Government-run social media accounts also offer unique opportunities for public discourse because they are not subject to traditional space or time constraints. Through social media, government actors can engage in multiple back-and-forth conversations with members of the public, without being limited to disseminating one-way messages via press releases or advertisements. They can converse with constituents, activists, and other members of the public irrespective of location or schedules. Government actors are drawn to social media precisely because of these communicative benefits: in a survey of members of Congress and their staff, for example, 76% of respondents reported that social media enabled more meaningful

---

[11] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Res. Ctr. (Apr. 7, 2021), https://perma.cc/237M-AA9B.

[12] Jacob Liedke & Katerina Eva Matsa, *Social Media and News Fact Sheet*, Pew Res. Ctr. (Sept. 20, 2022), https://perma.cc/E8KC-QSLA.

[13] Patrick Van Kessel, et al., *Congress Soars to New Heights on Social Media* 12, Pew Res. Ctr. (July 16, 2020), https://perma.cc/S8PJ-VVA5.

interactions and 70% found that social media made them more accountable to their constituents.[14] For their part, constituents use social media to "petition their [government] representatives and otherwise engage them in a direct manner"—that is, they can interact with government actors in much the same way as they could at a town hall. *Packingham*, 137 S. Ct. at 1735; *Liverman v. City of Petersburg*, 844 F. 3d 400, 407–08 (4th Cir. 2016) (recognizing that "a social media platform amplifies the distribution of the speaker's message . . . on matters of public import"). Unlike a town hall, though, political discourse online can occur for longer periods of time, across multiple physical places, and with a greater number of participants. Conversation and access to information, for both government entities and their constituents, now exist at their fingertips.

## II.    Proper application of the public forum doctrine to speech restrictions in government-operated social media accounts is essential to protect against unconstitutional viewpoint censorship.

Unfortunately, the rise in government use of social media has been accompanied by numerous attempts by government actors to exclude critical and dissenting views from the interactive components of these accounts. Public officials from across the political spectrum, ranging from former President Trump to Representative Alexandria Ocasio-Cortez to Senator John Cornyn, have blocked their critics from the social media accounts that they used in furtherance of their official

---

[14] Bradford Fitch & Kathy Goldschmidt, #*SocialCongress 2015* 10–11, Cong. Mgmt. Found. (2015), https://perma.cc/TX32-2CME.

duties.[15] Officials at the state and local levels have also blocked individuals who criticized them from their social media accounts.[16] Public agencies are no different; the U.S. Army, for example, has blocked individuals from posting anti-war comments on Army-run social media accounts associated with video games.[17]

Government actors are not just blocking individual critics; many are also deploying keyword blocking—an optional feature offered by both Facebook and Instagram that allows an account holder to prevent comments containing certain words from appearing publicly on the account—to suppress critical comments.[18] The NIH has created a list of banned words that may not be used in the comments on its Facebook and Instagram accounts; as in this case, the list of banned words effectively

---

[15] *See* Nicole Cobler, *Sen. Cornyn Unblocks Twitter Critic After Lawsuit*, Austin Am.-Statesman (May 1, 2020), https://perma.cc/RY7L-KRVL; Michael Gold, *Ocasio-Cortez Apologizes for Blocking Critics on Twitter*, N.Y. Times (Nov. 4, 2019), https://perma.cc/KAM5-SXJT; Charlie Savage, *Trump Can't Block Critics from His Twitter Account, Appeals Court Rules*, N.Y. Times (July 9, 2019), https://perma.cc/GT6A-EVUS.

[16] *See, e.g.*, Renee Oxner, *Texas Attorney General Ken Paxton Agrees to Stop Blocking People on Twitter, Ending Lawsuit Over First Amendment*, Tex. Tribune (July 12, 2021), https://perma.cc/Z2XW-TT79.

[17] *See* Kellen Browning & Taylor Lorenz, *Lawyers Demand the Military Stop Violating Free Speech on Twitch*, N.Y. Times (July 22, 2020), https://perma.cc/LSA3-2MNT.

[18] When an account holder using keyword blocking adds a word to their list of blocked words, any comment that contains the blocked word on any post will be automatically hidden from public view. On Facebook, a hidden comment will remain visible to the account holder, the commenter and the commenter's Facebook friends; other users will be unable to read or engage with the comment. *See* A-1 at 9. On Instagram, a hidden comment will remain visible only to the account holder and the commenter; no other user, including those who follow the commenter, will be able to read or engage with the comment. This deals a double injury to the commenter: they are both censored and hobbled in their ability to contest that censorship, as they are deterred from ever learning that their comment has been removed.

excludes speech critical of animal testing from appearing on the NIH's social media accounts.[19] The Arkansas state police department, for its part, once blocked words like "pig," "pigs," and "copper," leading a district court to observe that there was no "plausible explanation" for the suppression of these words "other than impermissible viewpoint discrimination." *Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080, at *4 (E.D. Ark. Sept. 30, 2021).

In 2020, *amicus* the Foundation for Individual Rights and Expression conducted a survey of over 200 public universities and colleges and found that 87% blocked users, 78% used Facebook's "profanity" filter—deploying a list of words users frequently flag as offensive—and 30% crafted their own list of blocked keywords, often to squelch criticism unique to that institution.[20] For example, the University of Kentucky blocked the words "birds," "chicken," and "chickens" from its Facebook account to limit animal advocacy regarding their dining service provider.[21] The University of North Carolina at Chapel Hill revealed that it blocked comments mentioning "Silent Sam," a confederate monument on campus that was removed in

---

[19] *See* Jocelyn Kaiser & Meredith Wadman, *NIH Sued for Blocking Social Media Comments from Animal Rights Advocates*, Science (Sept. 10, 2021), https://perma.cc/ML2X-34A4.

[20] *See No Comment: Public Universities' Social Media Use and the First Amendment* 7–12, Found. for Individual Rts. & Expression (Apr. 22, 2020), https://perma.cc/3G4E-86WY (discussing specific examples of the keyword filters public colleges and universities use to restrain speech critical of the institutions themselves, their corporate partners, and matters of public concern).

[21] *Id.* at 10.

2018.[22] And Clemson University blocked a professor's name, seeking to hide comments criticizing the professor for referring to Republicans as "racist scum."[23]

A growing number of courts have applied the First Amendment's longstanding public forum doctrine in striking down attempts by government actors to suppress criticism from the comment threads on their social media accounts. Under the First Amendment, a public forum is established when the government makes space that it owns or operates available for speech by members of the public. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975). The forum may be physical, or it may be "metaphysical," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995), such as a "channel of communication," *Cornelius*, 473 U.S. at 802, or a funding stream, *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46–47 (1983). The government's intent to open a forum for public discourse is the touchstone of forum analysis. *Cornelius*, 473 U.S. at 802. To determine intent, courts look to objective factors, like "the nature of the property," its "compatibility with expressive activity," and "the policy and practice of the government" in operating the forum. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) (quoting *Cornelius*, 473 U.S. at 802).

Four circuit courts, and numerous district courts around the country, have recognized that the public forum doctrine applies to government-run social media

---

[22] *Id.* at 10–11.

[23] *Id.* at 11.

accounts. *See, e.g.*, *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022) (finding interactive components of school board trustees' social media accounts were a public forum); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (same with respect to interactive components of then-President Donald Trump's Twitter account), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (Mem.) (2021); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) (same with respect to interactive components of a county supervisor's Facebook account); *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440 (5th Cir. 2019) (applying public forum doctrine to interactive components of a local sheriff's office Facebook account).[24] These decisions have emphasized that social media is "inherently" compatible with expressive activity, *see Garnier*, 41 F.4th at 1178; *Davison*, 912 F.3d at 682, and that, in allowing comments on public posts, the government has intentionally opened up a space for discussion and interaction by members of the public, *see Knight First Amend. Inst. at Columbia Univ.*, 928 F.3d at 237; *see also One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 954 (W.D. Wis. 2019) ("Having opted to create a [social media] account, however, and benefit from its broad, public reach, defendants cannot now divorce themselves from its First Amendment

---

[24] *See also Blackwell v. City of Inkster*, 596 F. Supp. 3d 906 (E.D. Mich. 2022); *Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911 (W.D. Wash. 2021); *Tanner*, 2021 WL 4502080; *Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020); *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 953 (W.D. Wis. 2019). Greater still is the number of courts that have adopted this reasoning in the course of rejecting motions to dismiss by government actors. *See, e.g.*, *Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 WL 407651 (N.D. Ill. Feb. 10, 2022); Report & Recommendation, *People for the Ethical Treatment of Animals, Inc. v. Banks*, No. 4:20-cv-2913, 2022 WL 4021938 (S.D. Tex. Sept. 2, 2022) (assuming Texas university's comment threads were public forums).

implications and responsibilities as state actors."). As these courts have recognized, the First Amendment protects speech that occurs in these forums, and speech restrictions must survive heightened scrutiny.

These courts have carefully scrutinized government actors' practices to ensure that the forums created on government-operated social media accounts are free from viewpoint discrimination, which is unconstitutional in any type of forum. *See, e.g.*, *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination can manifest on government-operated social media accounts in a variety of forms, such as when a government actor selectively deletes comments, preemptively blocks comments that use certain keywords, or completely bans individual users from posting comments to the account. Regardless of the technical way in which it is accomplished, excluding speech from a public forum based on viewpoint violates the "fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in the judgment in part); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Se. Promotions, Ltd*, 420 U.S. at 563 (Douglas, J., concurring in part and dissenting in part) ("As soon as municipal officials are permitted to pick and choose . . . the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be.").

As these court decisions exemplify, independent judicial scrutiny of speech restrictions in digital public forums is crucial to preserving these spaces for open dialogue and political engagement. Even innocuous-seeming policies may be used in practice to discriminate against dissenting or critical comments. Left unchecked, government-imposed speech restrictions on a social media account may skew conversation in the account's interactive spaces in the government's favor, warping public discourse and turning these vibrant spaces into nothing more than pro-government cheerleading sections.

### III.    The University's use of keyword blocking to suppress speech related to animal advocacy on its social media accounts violates the First Amendment.

In denying Appellant Madeline Krasno's motion for summary judgment, the district court failed to properly apply the public forum doctrine to the University's systematic suppression of speech relating to animal advocacy. The court first concluded that the comment threads on the University's Facebook and Instagram accounts are limited or nonpublic forums, citing evidence that the University engaged in ongoing manual review of the comments made in response to the University's posts. *See* A-1 at 20–31. Second, the court concluded that as a general matter, the University's rule prohibiting off-topic comments is reasonable and viewpoint-neutral. *Id*. at 32–38. But the court did not address whether the University's keyword blocking violates the First Amendment. Instead, it concluded that Ms. Krasno lacks standing to challenge this practice. *Id*. at 41–45.

The district court's standing decision was erroneous. Members of the public like Ms. Krasno have standing to challenge speech restrictions like the University's keyword blocking under the First Amendment. *See* Appellant Br. 41–49. The "irreducible constitutional minimum" of standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), requires that a commenter show the government's keyword blocking places them "under threat of an actual and imminent injury" to their speech. *Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010). In this context, the standing requirement is satisfied where a commenter wants to speak in the forum using keywords that remain blocked by the University. A rule requiring a clearer threat of injury would destroy the public's ability to vindicate speech rights online, because the government could always point to a possibility that it may modify keyword blocking lists in the future or may manually unhide comments. Here, the University has blocked Ms. Krasno's animal advocacy in the past and continues to use keyword blocking to suppress such speech. Ms. Krasno's assertion that she wishes to continue advocating for animals on the University's comment threads, including by using blocked keywords, is sufficient to confer standing. *See Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012) (finding standing to challenge a protest-related ordinance where the plaintiff's "past participation in a protest buttresses his representation that he wishes to participate in protests or assemblies in Chicago in the future, and his past arrest under [the ordinance] supports his claim that the enforcement of the ordinance has chilled his willingness to participate again"); *ACLU v. Alvarez*, 679 F.3d 583, 590–94 (7th Cir. 2012) (finding standing where "[t]he ACLU claims a First Amendment

right to undertake this recording, but the eavesdropping statute prohibits it from doing so"); *see also* Report & Recommendation, *People for the Ethical Treatment of Animals, Inc. v. Banks*, No. 4:20-cv-02913, 2022 WL 4021938, at *5–8 (S.D. Tex. Sept. 2, 2022) (holding animal rights organization had standing to challenge suppression of speech from social media comment threads based on allegation of future intention to post similar messages).

Had the district court analyzed the University's use of keyword blocking as a means of enforcing its off-topic rule, it would not matter whether it concluded the University's commenting threads were designated forums, limited forums, or nonpublic forums. In any type of public forum, speech restrictions must be both reasonable and viewpoint-neutral. *See Cornelius*, 473 U.S. at 806. But the keyword blocking in this case is neither: it is both under- and overinclusive, suppressing speech related to animal advocacy even when it is on-topic and failing to suppress other types of off-topic speech. It is both discriminatory in its targeting of animal advocacy for disfavor and unreasonable in light of the University's stated goal of reducing off-topic comments.[25]

---

[25] Should the Court consider forum analysis, *amici* agree with Ms. Krasno that the district court erred. The district court placed undue weight on the University's written policies, including "interim guidance" that the University drafted only after litigation commenced, and that contained "a number of confusing statements." A-1 at 24; *see also* Appellant Br. 37. And it ultimately overlooked the evidence that the University had only selectively enforced its off-topic rule, holding instead that "perfect enforcement is not required," A-1 at 25–26. But there is a gulf between "perfect enforcement," an undoubtedly impractical standard in the age of social media, and evidence that a rule is intentionally over-enforced against certain types of disfavored speech and under-enforced against other equally violative types of speech. *See* Appellant Br. 38–39.

### A. The University's keyword blocking impermissibly discriminates based on viewpoint.

The most fundamental problem with the University's keyword blocking is that it suppresses disfavored speech related to animal advocacy, in violation of the First Amendment's prohibition on viewpoint discrimination in any kind of public forum.

It is obvious that the list of keywords that the University has blocked targets animal advocacy. The vast majority of the words on the University's keyword blocking list for Instagram are related to animal advocacy, as are a significant percentage of the words on its list for Facebook. For example, the lists prohibit many terms associated generally with animal advocacy, including "barbaric," "cruelty," and "torture." *See* SA-6, 7. And they prohibit many words associated with criticism of the University's participation in animal testing, including "#releasecornelius" and "WNPRC," references to a primate and the University facility in which he is being held. *Id.* Likewise, the University's decision to block "PETA," as well as "@PETA" on Instagram, appears designed to prevent commenters from mentioning or even notifying PETA of any discussions or controversies occurring on the University's social media accounts. The University's lists do not appear to similarly target any other ostensibly off-topic speech.[26]

---

[26] Indeed, even beyond the University's keyword blocking lists, record evidence suggested that the University's conduct is motivated by a specific desire to suppress animal advocacy, not general concern for off-topic speech. *See* SA-4, 5 (University social media team discussions on "monitor[ing] anti-animal research comments" or "animal rights" as part of daily plan); R. 25 at 143:1–12 (deposition testimony in which the Vice Chancellor for University Communications stated that he actively monitors PETA's social media accounts).

The University tried to escape the patently discriminatory nature of its keyword blocking at summary judgment by characterizing speech related to animal advocacy as a particularly pernicious form of off-topic spam, but the evidence in the record makes clear that the University targets political speech critical of animal testing directly, rather than merely suppressing it as a byproduct of even-handed attempts to enforce an off-topic rule.

To begin, the University concedes that its content moderation practices, which include keyword blocking as well as manual blocking, have "hidden some comments relating to animal advocacy even though they probably were on-topic." *See* A-1 at 11. For example, one member of the public commented on a University post about technology that detects pneumonia to ask, "Did you figure that out by using abused monkeys?" *See* R. 38-24. This comment relates to the topic of the University's post, yet it was hidden from public view automatically, because "monkeys" is a word on the University's keyword blocking list. *See* SA-7.

Relatedly, although the University claimed it would update its keyword blocking lists to be responsive to the topics of each of its posts and the types of frequently off-topic comments it was receiving, *see* A-1 at 9, it did not remove terms related to animal advocacy from its keyword blocking lists when its own posts introduced topics relevant to animal testing. In September 2020, for example, the University posted about its Dairy Cattle Center, yet its keyword blocking lists remained static, blocking comments relating to animal advocacy even though they would be indisputably on-topic. *See* A-1 at 12; R. 54 ¶ 87. Indeed, Ms. Krasno's own

comment on that post, urging the University to "stop exploiting animals" and "shut down the labs" was hidden from view, *see* A-1 at 12 & n.9, although it was relevant to the post because the Center is used for "teaching and research."[27] And in December 2020, the University posted about treatments at its veterinary college, *see* A-1 at 14, while its keyword blocking continued to automatically block words related to animal advocacy.

Further, the record shows "several examples" of other types of off-topic comments that were not similarly suppressed through either keyword blocking or manual comment suppression, *see id.* at 11, strongly indicating that the University's real concern was criticism of its animal testing practices, not off-topic speech as a general matter. As the district court recognized, in many instances where comments relating to animal advocacy had been hidden automatically or manually, the comment threads continued to display numerous off-topic comments on other issues. *Id.* For example, under a University post discussing the impact of COVID-19 social distancing orders, at least four comments critical of the University's animal research were hidden, while another off-topic comment asking about the University's experience with certificate programs was left visible. R. 38-23. And under the September 2020 post about the Dairy Cattle Center, Ms. Krasno's on-topic comment was hidden while an off-topic comment about whether the commenter would be

---

[27] According to the University, the Dairy Cattle Center is used "for both teaching and research," which "allows students to have hands on access to cows during all lab practical sessions." *Animal & Dairy Servs.*, Univ. of Wis.–Madison, https://perma.cc/H8A9-RN22.

admitted to the University was left visible. SA-20. The University's decision to single out animal advocacy "is strong evidence that the [off-topic] policy has not been applied in a viewpoint neutral way." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 866 (7th Cir. 2006) (holding that a school group demonstrated a likelihood of success on the merits of its First Amendment claim based on its argument that the school failed to apply its nondiscrimination policy to other groups that discriminated in their membership, like the Muslim Students' Association, the Adventist Campus Ministries, and the Young Women's Coalition).

Through its use of keyword blocking, the University is automatically suppressing speech related to animal advocacy wherever it appears, not only when it can reasonably be deemed "off-topic," and is doing so without similar concern for other types of off-topic speech. This is unconstitutional viewpoint suppression, not the evenhanded application of a viewpoint-neutral off-topic rule. This practice violates the First Amendment's prohibition on viewpoint discrimination in public forums. *Matal*, 582 U.S. at 243; *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 394 (1992) ("Selectivity of this sort creates the possibility that the city is seeking to handicap the expression of particular ideas.").

### B. The University's keyword blocking is unreasonable.

Even if the University's keyword blocking were not a transparent effort to suppress a particular viewpoint, it would still be unreasonable in light of the purposes of the forum. Keyword blocking is a cudgel, enabling account administrators to ban scores of comments on topics they can predict and those they cannot. It lacks any of

the nuance that human content moderators might use to approach their work. Whether or not a government social media account administrator could create a keyword blocking practice that complies with the First Amendment's requirements, the University's haphazard and ill-considered keyword blocking in this case does not.

First, the University's keyword blocking is unreasonable because it automatically suppresses comments without regard to whether or not they are actually on- or off-topic. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1159 (7th Cir. 1995) (explaining that the reasonableness standard requires the government to determine whether speech "would actually interfere with the forum's stated purposes" (cleaned up)); *see also Women's Health Link, Inc. v. Fort Wayne Pub. Tranp. Corp.*, 826 F.3d 947, 952 (7th Cir. 2016) (holding transit company's rejection of an ad unconstitutional because the ad was not "political, religious or moral—types of ad [the transit company] bans, whether validly or invalidly, from its buses."). As discussed above, the University has conceded its keyword blocking can and has hidden on-topic comments. *See* Part IIIA *supra*; *see also* A-1 at 11. It has not attempted to ameliorate this problem by, for example, reviewing and manually unhiding comments that were automatically hidden but are relevant to the topic of the post. *See id.*[28] While some courts have upheld government restrictions on off-topic speech within the context of a government-operated social media account, these cases have involved only manual deletion or hiding of

---

[28] This feature is available on Facebook. See *How do I block certain words from appearing in comments on my Facebook Page?*, Facebook Help Center, https://perma.cc/YDZ3-B6SF.

comments, not automatic keyword blocking of speech regardless of whether it is on-topic. *See Charudattan v. Darnell*, 834 F. App'x 477, 480–81 (11th Cir. 2020); *Davison v. Plowman*, 247 F. Supp. 3d 767, 777 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018). This sort of context-specific application of viewpoint-neutral commenting rules is wholly absent from the University's keyword blocking.

Second, the University's overbroad suppression of speech through keyword blocking is unreasonable because keyword blocking applies not only to individual posts, but to all comments containing the selected words in *any* post on the entirety of the social media account.[29] While the University might feel reasonably confident that comments containing "PETA" will not be relevant to a post about its COVID-19 protection measures, the same is not true for posts on the same account discussing University job fairs.[30] Similarly, whatever the merits of the University's decision to suppress words like "animal testing" from posts about matriculation statistics, comments referencing "animal testing" are undoubtedly likely to be relevant to its posts about its own Dairy Cattle Center. In the context of social media, where discussion is not time-limited and can continue even on older posts, this poses a particularly acute risk that on-topic comments will be suppressed due to overly broad

---

[29] *See How do I block certain words from appearing in comments on my Facebook Page?*, Facebook Help Center, https://perma.cc/YDZ3-B6SF (explaining that keyword blocking applies to the entire Facebook page); *Hide comments or message requests you don't want to see on Instagram*, Instagram Help Center, https://help.instagram.com/700284123459336 (explaining that keyword blocking applies to all comments "in [Instagram] posts you share").

[30] Nor is it necessarily true of all posts about COVID-19. *See* R. 38-24 (hiding on-topic post asking about the role of animal testing in developing test for determining whether pneumonia was caused by COVID-19).

keyword filters. Because the University does not, and—given the manner in which Facebook and Instagram enable keyword blocking—cannot apply unique keyword filters that are sensitive to the topics relevant to each post, its keyword blocking is not a reasonable means of limiting off-topic speech.

Third, the University's keyword blocking is an unreasonable way of enforcing its off-topic rule because it is vastly underinclusive, apparently targeting only one type of off-topic speech—animal advocacy. The University thus applies its off-topic rule aggressively to animal advocacy, and only rarely (if at all) to other types of similarly off-topic speech. This type of "unfair or inconsistent enforcement" is evidence of unreasonableness. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018); *see also Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314, 330 (D.C. Cir. 2018) ("[A] challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced.").

The district court downplayed the risk posed by this type of selective enforcement, noting that perfectly consistent enforcement on social media is difficult to achieve, A-1 at 25–26, but the difficulty of enforcing commenting rules perfectly is no excuse for such nakedly selective enforcement. As discussed above, the University uses keyword blocking overwhelmingly to hide speech related to animal advocacy, not to hide all types of off-topic speech. *See* Part IIIA *supra*. And, as Appellant has argued and the district court noted, it does not compensate by manually hiding or deleting other types of off-topic speech with any sort of vigor. *See* Appellant Br. 25, 38–39.

If the University is permitted to censor animal advocacy by selectively enforcing its off-topic rule, then any government actor could do the same to suppress criticism or shut down important topics of public debate. President Biden could shut down discussion of inflation on his official social media account, then–President Trump could have suppressed any comments relating to impeachment, and then–President Obama could have done the same regarding Benghazi. A local school board could permanently prohibit discussion of "Black Lives Matter" or "CRT," which may also inhibit efforts to alert relevant advocacy groups when debate on these topics occurs on social media. The public forum doctrine is designed to prevent the government from using its power in this way to distort public debate and silence the voices of its critics on controversial topics. Here, the reasonableness standard requires that the Court find the University's keyword blocking unconstitutional.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's decision and hold that the University's keyword blocking violates the First Amendment. At the very least, this Court should reverse the district court's decision on standing and remand for reconsideration of the constitutionality of the University's keyword blocking.

March 17, 2023                              Respectfully submitted,

                                            /s/ Katherine Fallow
                                           _____
                                           Katherine Fallow (Admitted 02/13/2006)
                                           Stephanie Krent
                                           Alexia Ramirez
                                           Knight First Amendment Institute
                                              at Columbia University
                                           475 Riverside Drive, Suite 302
                                           New York, NY 10115
                                           (646) 745-8500
                                           katie.fallow@knightcolumbia.org

                                           *Counsel for* Amici Curiae

**Certificate of Compliance**

This brief complies with the type-volume limitations of 7th Cir. R. 29 because it contains 6,890 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-counting function.

This brief also complies with the typeface requirements of Cir. R. 32(b) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font.

Dated: March 17, 2023

/s/ Katherine Fallow
Katherine Fallow

**Certificate of Service**

I, Katherine Fallow, certify that on March 17, 2023, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 17, 2023

/s/ Katherine Fallow
Katherine Fallow