No. 22-3170

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

MADELINE KRASNO,

     Plaintiff-Appellant,

  v.

JENNIFER MNOOKIN, et al.,

     Defendants-Appellees.

APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN,
THE HONORABLE STEPHEN L. CROCKER, MAGISTRATE JUDGE,
PRESIDING

## APPELLEES' BRIEF

JOSHUA L. KAUL
Attorney General of Wisconsin

STEVEN C. KILPATRICK*
Assistant Attorney General
State Bar #1025452

LYNN K. LODAHL*
Assistant Attorney General
State Bar #1087992

Attorneys for Defendants-Appellees

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792 (SCK)
(608) 264-6219 (LKL)
(608) 294-2907 (Fax)
kilpatricksc@doj.state.wi.us
lodahllk@doj.state.wi.us

*Counsel of Record

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ....................................................1

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .......................3

STATEMENT OF THE CASE ..........................................................4

    I.      Statement of the facts..........................................................4

          A.     The parties. ...............................................................4

          B.     The relevant social media platforms. ................6

               1.     Instagram. .....................................................6

               2.     Facebook. ......................................................9

          C.     The University's Instagram and Facebook social media accounts. ............................................. 10

          D.     The University's posts and users' comments. .................... 11

          E.     The University's moderation policy. ................................... 11

          F.     Krasno's comments and the University's responses. ............ 15

    II.      Relevant Procedural History ...................................... 17

SUMMARY OF THE ARGUMENT ................................................. 19

STANDARD OF REVIEW ............................................................. 20

ARGUMENT ................................................................................. 21

    I.      The University created a nonpublic forum in each of the interactive comment thread sections of its Facebook and Instagram pages..................................... 21

          A.     The law of the nonpublic forum. ........................................ 21

B.    The interactive comment thread sections of the University's social media pages constitute nonpublic fora..................................................... 24

C.    Krasno's arguments in favor of a designated public forum fail.................................................. 25

    1.    The general public's ability to comment does not make a comment thread a designated public forum. ........................... 26

    2.    The University's reservation of the right to remove off-topic comments does not create a designated public forum. ............................ 27

    3.    The University's "imperfect" moderation policy does not make the comment threads a designated public forum. ........................ 32

        a.    The sheer volume of posts and comments do not reasonably allow the University to moderate all off-topic comments................................ 32

        b.    Some posts, and in turn comments, become stale, not requiring immediate off-topic comment moderation. ...................................... 34

        c.    Some user comments are not easily recognized as off-topic, requiring cautious moderation. ...................................... 37

II.    The University's off-topic rule is viewpoint neutral and reasonable in light of the purpose of the forum. .................. 38

III.    Krasno has no right to a permanent injunction against the University's use of the keyword filter as a moderation tool. .......................................................... 41

    A.    Krasno lacks standing to seek a permanent injunction against the University's use of the keyword filter. .................................................. 42

1. The district court correctly concluded that Krasno lacks standing for a permanent injunction. ............................................. 42

2. Krasno's remaining standing arguments are unpersuasive. ...................................... 45

B. Even assuming standing, the University's use of the keyword filter as a moderation tool does not discriminate against Krasno's anti-animal testing viewpoint. ................................. 46

C. Even assuming standing, the district court did not abuse its discretion in denying her request for a permanent injunction. ............................... 51

IV. The Eleventh Amendment bars Krasno's official capacity claims challenging the University's Instagram account-level restriction and removal of a past comment. ....................................... 53

CONCLUSION ............................................. 57

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) .......................................................... 45

*Am. C.L. Union of Ill. v. City of St. Charles,*
  794 F.2d 265 (7th Cir. 1986) ..................................................... 34, 55

*Am. Freedom Def. Initiative v. King Cnty.,*
  904 F.3d 1126 (9th Cir. 2018) ...................................................... 30

*Ameritech Corp. v. McCann,*
  297 F.3d 582 (7th Cir. 2002) ........................................................ 53

*Bryant v. Cheney,*
  924 F.2d 525 (4th Cir. 1991) ........................................................ 44

*Chicago Bd. of Educ. v. Substance, Inc.,*
  354 F.3d 624 (7th Cir. 2003) ........................................................ 52

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ................................................. 21–22, 23

*Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.,*
  148 F.3d 242 (3d Cir. 1998) ......................................................... 28

*City of Madison Joint Sch. Dist. v. Wis. Pub. Emp. Rels. Comm'n,*
  429 U.S. 167 (1976) ................................................................. 27

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
  473 U.S. 788 (1985) ....................................................... 21–22, 24, 40

*Davison v. Plowman,*
  247 F. Supp. 3d 767 (E.D. Va. 2017) ................................................ 39

*Driftless Area Land Conservancy v. Valcq,*
  16 F.4th 508 (7th Cir. 2021) ........................................................ 53

*eBay, Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ................................................................. 51

*Eichenlaub v. Twp. of Indiana*,
   385 F.3d 274 (3d Cir. 2004) ................................................................. 36, 40

*Ex parte Young*,
   209 U.S. 123 (1908) ................................................................................. 53

*Flast v. Cohen*,
   392 U.S. 83 (1986) ................................................................................... 45

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,
   528 U.S. 167 (2000) ................................................................................. 42

*Garnier v. O'Connor-Ratcliff*,
   41 F.4th 1158 (9th Cir. 2022) ................................................................. 30

*Gregoire v. Centennial Sch. Dist.*,
   907 F.2d 1366 (3d Cir. 1990) ............................................................ 28–29

*Hague v. CIO*,
   307 U.S. 496 (1939) ................................................................................. 22

*Hopper v. City of Pasco*,
   241 F.3d 1064 (9th Cir. 2001). ................................................................ 30

*Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat.,Res.*,
   584 F.3d 719 (7th Cir. 2009) ................................................................... 21

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
   829 F.2d 1171 (D.C. Cir. 1987) ............................................................... 28

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
   994 F.3d 602 (7th Cir. 2019) ................................................................... 22

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
   508 U.S. 384 (1993) ................................................................................. 50

*Lawson v. Hill*,
   368 F.3d 955 (7th Cir. 2004) ................................................................... 44

*Liebhart v. SPX Corp.*,
   998 F.3d 772 (7th Cir. 2021) ................................................................... 51

*City of Los Angeles v. Lyons*,
   461 U.S 95 (1983). ................................................................................... 44

*MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*,
    222 F.3d 323 (7th Cir. 2000) ........................................................ 54

*Milestone v. City of Monroe, Wis.*,
    665 F.3d 774 (7th Cir. 2011) ........................................ 23, 26, 38

*Miller v. Chicago Transit Auth.*,
    20 F.4th 1148 (7th Cir. 2021) ..................................................... 20

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ................................................ 23, 39, 41

*Monsato Co. v. Geerston Seedfarms,
    Inc.*, 561 U.S. 139 (2010) ............................................................ 51

*Nat'l Org. for Women, Inc. v. Scheidler*,
    510 U.S. 249 (1994) ............................................................... 45–46

*Packingham v. N. Carolina*,
    137 S. Ct. 1730 (2017) ................................................................ 37

*Palmer v. Marion Cnty.*,
    327 F.3d 588 (7th Cir. 2003) ..................................................... 19

*Papasan v. Allain*,
    478 U.S. 265 (1986) .................................................................... 54

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983) ................................................. 22–23, 27–28

*Robertson v. Dep't of Health Servs.*,
    949 F.3d 371 (7th Cir. 2020) ..................................................... 20

*Saint Anthony Hosp. v. Eagleson*,
    40 F.4th 492 (7th Cir. 2022) ..................................................... 52

*Schirmer v. Nagode*,
    621 F.3d 581 (7th Cir. 2010) ..................................................... 42

*Sefick v. Gardner*,
    164 F.3d 370 (7th Cir. 1998) ............................................... 23, 40

*Summers v. Earth Island Inst.*,
    129 S. Ct. 1142 (2009) ................................................................ 42

*Surita v. Hyde*,
  665 F.3d 860 (7th Cir. 2011) .......................................................... 22, 54–55

*United States v. Kokinda*,
  497 U.S. 720 (1990) ................................................................................... 27

*Watkins v. Blinzinger*,
  789 F.2d 474 (7th Cir. 1986) ............................................................ 56–57

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................................. 56

## Constitutional Provisions

U.S. Const. amend. XI ................................................................................. 53

## Other Authorities

Fed. R. Civ. P. 25(d) ...................................................................................... 4

Fed. R. Civ. P. 56(a) .................................................................................... 20

Fed. R. Civ. P. 65(d)(1)(C) ......................................................................... 52

Fed. R. Civ. P. 65(d) ................................................................................... 52

## JURISDICTIONAL STATEMENT

Appellant Krasno's jurisdictional statement is complete and correct.

## INTRODUCTION

The University of Wisconsin-Madison, like other public universities in this social media age, operates official Facebook and Instagram pages. These platforms allow the University to share stories from its campus community and to facilitate and participate in discussions about information and developments related to it. Those who have Facebook and Instagram accounts can participate in the discussion by making comments to the posts the University generates. These interactive spaces, however, are not open for the discussion of any and all subjects. Instead of a speech free-for-all, the University has chosen to limit discussion to the topics of the underlying posts. If a user comment is off-topic, the University may remove it. The University has thus created, in First Amendment parlance, a "nonpublic forum" on each social media page.  Under the First Amendment, the government may limit the forum to certain subjects, as long as this speech restriction is viewpoint neutral and reasonable in light of the purpose served by the forum. That is what the University has done here.

The appellant, Madeline Krasno, a former University student employee of a primate research lab on campus, disagrees. She brings official capacity

1

claims for prospective relief against University officials, contending that she has a First Amendment right to make comments espousing her anti-animal testing and research viewpoint in response to any University post. Her position is extreme. If approved by this Court, it would undermine the very purpose of the nonpublic forum the University has created and would convert its social media pages into Krasno's own personal soapbox. The Constitution does not permit Krasno to hijack the University's social media pages.

Krasno also complains that the University's use of its moderation tools to enforce its off-topic comment rule—its current use of a keyword filter and its past use of an account-level restriction and manual removal of some of her comments—discriminates against her viewpoint. Krasno lacks standing to challenge the University's use of the keyword filter because any injury to her is too speculative, but even if this Court were to address her challenge, it would fail on its merits. And, in any event, the district court did not abuse its discretion denying her request to permanently enjoin the University from using this moderation tool against her. Finally, the Eleventh Amendment bars Krasno's First Amendment claims against the University's moderation of her comments taken years ago.

This Court should affirm the district court judgment in its entirety.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

The underlying issue is whether the University engaged in viewpoint discrimination under the First Amendment against Krasno through its creation and enforcement of its off-topic comment rule. The University considers the following to be the specific issues before this Court:

1. Whether, under the First Amendment, each interactive comment thread section of the University of Wisconsin-Madison's Facebook and Instagram pages is a nonpublic forum.

2. Whether, under the First Amendment, the University's off-topic comment rule is a viewpoint neutral speech restriction and reasonable in light of the purpose served by the forum.

3. Whether the district court properly denied Krasno's request to permanently enjoin the University's current use of a keyword filter moderation tool in furtherance of its off-topic comment rule.

4. Whether the Eleventh Amendment bars Krasno's First Amendment challenge to the University's past imposition of an Instagram account-level restriction and manual hiding and deleting of comments.

## STATEMENT OF THE CASE

### I.     Statement of the facts.

The facts of this case are largely undisputed.

#### A.     The parties.

Madeline Krasno is a former student of the University of Wisconsin-Madison. (Dkt. 40 ¶ 3; 64:11.) Krasno worked as a student primate caretaker at its Harlow Center for Biological Psychology. (Dkt. 40 ¶ 4; 64:11–12.) She now operates an Instagram account under the handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno. (Dkt. 40 ¶ 3.)     Krasno creates social media posts on her pages opposing animal research, and also comments on the University's Instagram and Facebook pages. (Dkt. 40 ¶ 4; 64:12.)

Defendant Jennifer Mnookin[1]  is the chancellor of the University of Wisconsin-Madison. (Dkt. 39 ¶ 1; 64:1 n.1.) Defendant Charles Hoslet is the Vice Chancellor for University Relations, the department that oversees University Communications. (Dkt. 40 ¶ 9.) The University (although not a named defendant) operates an official Instagram account under the username @uwmadison as well as an official Facebook Page at facebook.com/UWMadison

---

[1] Krasno sued Rebecca Blank in her official capacity, who at the time was chancellor of the University of Wisconsin-Madison. After Jennifer Mnookin replaced Blank as chancellor, the district court substituted Mnookin per Fed. R. Civ. P. 25(d). (Dkt. 64:1 n.1.) *See Office of the Chancellor*, Univ. of Wis.-Madison, https://chancellor.wisc.edu/ (last visited Apr. 20, 2023).

("@UWMadison"). (Dkt. 40 ¶ 7; 64:3.) It sees social media as an opportunity to promote the "brand" and to get information to key stakeholders quickly and publicly, and to engage with students, faculty, staff, prospective students, alumni, community members, and the public. (Dkt. 64:3–4; 40 ¶¶ 67, 73.)

The University conducts research on animals that is considered "invasive," including research on nonhuman primates at both the Harlow Center and the Wisconsin National Primate Research Center. (Dkt. 40 ¶ 5; 64:5.) The University is a frequent target of criticism and social media campaigns by animal rights groups, such as the People for the Ethical Treatment of Animals (PETA). (Dkt. 64:5; Amicus Br. 3 ("PETA frequently launches social media campaigns in order to pressure public and private entities to change their animal treatment practices.").) It monitors the social media activities of these groups to stay apprised of what they say about the University's animal testing programs and when a social media campaign may occur. (Dkt. 64:5–6; 25 (Lucas Dep. 87:21–88:15).) That is because the University discovered in the past that an anti-animal research activist group had infiltrated one of its labs and obtained materials, and later made untrue and misleading statements about animals in the lab (i.e., that the University engages in "torture"). (Dkt. 27 (Tyrrell Dep. 64:9–65:25).)

5

At all times relevant to this case, Defendant John Lucas has been Assistant Vice Chancellor for University Communications, and he oversees the University's social media account communications, including its Instagram and Facebook accounts. (Dkt. 40 ¶ 11; 64:5.) Defendant Mike Klein is Director for News Content and Editorial Projects at the University. (Dkt. 40 ¶ 12; 64:5.) Klein oversees the University's social media account communications, including its Instagram and Facebook accounts. (Dkt. 40 ¶ 12; 64:5.) Defendant Nate Moll is a Social Media Manager who has primary responsibility for overseeing operations the University's social media accounts, including its Instagram and Facebook accounts. (Dkt. 40 ¶¶ 14–16; 64:5.) Klein has ultimate responsibility for daily moderation decisions of comments on the University's Instagram and Facebook pages. (Dkt. 40 ¶ 13; 64:5.)

## B. The relevant social media platforms.

### 1. Instagram.

Instagram is a social media platform owned by Meta that facilitates interactions between users by allowing them to share photos and videos, and to comment on and to reply to other users' shared content. (Dkt. 40 ¶ 20; 64:3.)

Instagram "users" are individuals or institutions that have created an account on the platform. When users create accounts, Instagram allows them to choose a unique username or "handle," such as "@uwmadison." (Dkt. 40 ¶ 22; 64:4.) Each handle has its own unique webpage associated with

the user's account where they can publish images and videos for others to view. (Dkt. 64:3.) Each user's webpage contains its handle, a description of the user's account, and account-specific data including the amount of posts the account user has generated. (Dkt. 40 ¶ 23.)

Each post created by a user is displayed as an icon on the user's webpage. By default, the posts are organized chronologically, so that a new photo or video will be accessible on the top left of a user's webpage. (Dkt. 40 ¶ 24.)

When a user posts a new photo or video on Instagram, they may include text that will be displayed next to or below the image or video it is associated with. Other users can comment on the post and reply to comments made by other Instagram users. (Dkt. 40 ¶ 25; 64:3.)

Each time someone selects a posted image or video, beneath the accompanying text included by the user they can access the "interactive comment thread," the space displaying any comments made on the post by other Instagram users. (Dkt. 40 ¶¶ 28, 47; 64:4.) It is here that another Instagram user can participate in public debate and discourse by commenting both to the user who posted the image or video and in response to other users' comments. The Instagram user who published the post can, in turn, reply to all comments or even post their own standalone comment if they wish. (Dkt. 40 ¶ 29; 64:3.)

When an Instagram user's webpage is public, any visitor to the page can see each post made by the user. (Dkt. 40 ¶ 32; 64:3 n.2.) Posts made by public accounts are visible to anyone who visits their unique webpage on Instagram, even if the visitor does not have an Instagram account. (Dkt. 40 ¶ 33; 64:3 n.2.) Members of the public without an Instagram account are limited to the number of posts they can see without having an account and will only be able to view the photo or video of the posts they have access to. (Dkt. 40 ¶ 34; 64:3 n.2, 4.) To view all posts and associated content, such as the comment threads, a non-member must create an Instagram account and log in. (Dkt. 40 ¶ 34.)

An Instagram user may opt to exclude all comments from the posts they make on their Instagram account. To do so, they simply select "Turn off commenting" for the individual posts they shared so that no comments can be made by other users to that post. (Dkt. 40 ¶ 35; 64:3.) An Instagram user can delete a comment but not hide one. (Dkt. 39 ¶ 28.)

An Instagram user may also limit another user's interactions with an otherwise public account by "restricting" the user's comments on their posts. Restriction allows an Instagram account to hide all comments on the account's posts by specific users it chooses to restrict. Unlike blocking, restriction allows the user to choose whether to "approve" the restricted users' posts after prescreening its content and consequently allow the comment to be publicly viewable, or to continue to hide the comments from others' view.

8

(Dkt. 40¶ 37; 64:13.) Restricted users can continue to post comments that will remain unseen by anyone but themselves. (Dkt. 40 ¶¶ 39, 53; 64:13.)

### 2.    Facebook.

Facebook, also owned by Meta, is a social networking platform that allows users to connect with other members of the site and the general public by sharing messages, photos, videos, and information. (Dkt. 40 ¶ 43; 64:3.)

As with Instagram, when someone creates a Facebook account, they are given a webpage to display their posted content as well as display comments and interactions they have with other users. (Dkt. 40 ¶ 45; 64:3.) Atop a given Facebook page is an information section showing a picture chosen by the user as well as links to view content they publish, such as videos and photos, events, and a description of the account. (Dkt. 40 ¶ 46.)

Under a Facebook account's information section, the right portion of the Facebook page displays all of its posts. Like Instagram posts, Facebook posts made by an account can contain photos or videos and associated text. Like Instagram, each Facebook post contains an interactive space for other users with Facebook accounts to comment on an account's posts, reply to each other's comments, and for the original poster to reply to them in turn. (Dkt. 40 ¶ 47; 64:3.) If a Facebook account is public, any member of the public—even those who are not logged into a Facebook account—can still view a limited number of posts and associated comments on the page. (Dkt. 40 ¶ 47; 64:3 n.2.)

A Facebook account operating a page can choose to manually hide or delete user comments on its posts. (Dkt. 40 ¶ 53.) Hiding a comment removes it from view for everyone except the original user and their "friends." (Dkt. 40 ¶ 54.) Deleting a comment, in contrast, removes it from permanent display to anyone who visits the post's comment thread. (Dkt. 40 ¶ 55.)

### C.     The University's Instagram and Facebook social media accounts.

The University's @uwmadison Instagram account is its official Instagram account. (Dkt. 40 ¶ 57; 64:3.) The University also operates an official public Facebook page, @uwmadison, also found at http://www.facebook.com/UWMadison/. (Dkt. 40 ¶ 58; 64:3.) These are managed by staff of University Communications. (Dkt. 40 ¶ 71.)

These Instagram and Facebook pages are used as channels to communicate official University announcements and developments, news following the work or achievements of its student body and faculty, and public health and safety announcements for its student body and the general public. (Dkt. 40 ¶¶ 59, 73; 64:3.) The University counts as its audience current students, faculty, staff, prospective students, alumni, community members, and the public. (Dkt. 40 ¶¶ 67, 73; 64:3.)

The University's Instagram account is popular among current students. (Dkt. 40 ¶ 63.) At the time of the summary judgment motions before the district court, it had over 2,400 posts. (Dkt. 40 ¶ 69.)

### D.    The University's posts and users' comments.

The University makes posts to its social media pages on a wide range of University-related issues. (Dkt. 49 ¶ 3; 40 ¶¶ 59, 66, 70; 64:3–4.) For example, the University made a Facebook post on December 15, 2020, about its mobile COVID-19 testing facility. It generated over 50 comments that "debated the necessity, rationale, and efficacy of the University's testing." (Dkt. 64:4.) Other purposes of the pages are to discuss information and developments related to the University's specific departments, labs, or organizations and share stories from the University community. (Dkt. 49 ¶¶ 4–5; 40 ¶ 65.) The University responds to users' comments when possible. (Dkt. 49 ¶ 6; 64:4, 7.) It wants to be able to see on-topic comments made to its posts. (Dkt. 49 ¶ 9; 64:7.)

### E.    The University's moderation policy.

The University has a Social Media Statement that applies to its social media pages. It reads, in part: "UW-Madison maintains the right to remove content that is off topic, obscene, a violation of intellectual property rights or privacy laws, commercial, or otherwise illegal or not germane to the subject matter of the institutional post." *Social Media Statement*, Univ. of Wis.-Madison, https://www.wisc.edu/social-media-statement/ (last visited

11

Apr. 20, 2023); *see also* Dkt. 49 ¶ 2; 64:6–7.) "[S]ocial media managers . . . police the threads for comments that are prohibited by the Social Media Statement, either by hiding them, or by deleting them if this is deemed appropriate." (Dkt. 64:7.) These managers review thousands of comments to thousands of posts. (Dkt. 49 ¶ 23; 40 ¶ 69; 64:4.) Given the high volume of comments generated, some are not reviewed at all. (Dkt. 64:8.)

The University also issued an Interim Guidance to its social media staff. It states that social media managers "may engage in content moderation of social media pages based on one criterion: **whether posted content is on vs. off topic**." (Dkt. 64:6; 32-2.) It also states that they may remove comments that are "unrelated to the topic or purpose of the page," and that to make this determination, the manager is to "evaluat[e] the stated purpose for which the page exists, and in the context of comments, the subject, topic, or purpose of the initial post to which the comment is attached." (Dkt. 64:6; 32-2.) The managers have discretion to hide or delete a comment containing content they deem off-topic. (Dkt. 64:8.)

As an example of permissible off-topic v. on-topic comments, the Interim Guidance explains that "while the social media manager of a page dedicated to UW-Madison's animal research programs may hide a post stating 'Taylor Swift is the BOmB,' he or she cannot hide a post that states, 'Taylor Swift agrees

that all universities should stop torturing animals by using them for research. This includes UW-Madison's animal research programs!'" (Dkt. 64:6; 32-2.)

Generally, the University does not restrict or remove criticism about its policy or practices from the comment threads associate with its Facebook posts, such as holding in-person classes, expenses for guest speakers and art, "and the University's solicitation of donations to fund student fees." (Dkt. 64:4–5.)

The University currently uses a keyword filter, provided by Meta, to auto-moderate comments made to its social media pages. (Dkt. 49 ¶ 21; 64:9.) To start, the University's social media managers monitor comments to posts for words or phrases that are being repeated; these multiple comments are considered spam. (Dkt. 49 ¶ 22; 64:7, 9.) Words or phrases consistently used in off-topic comments are added to an auto-moderated keyword list—the "keyword filter"—and removed on an as-needed basis. (Dkt. 49 ¶ 24; 54 ¶ 76; 64:9.) The managers would not add a word or phrase to the keyword filter for topics the University posts about. (Dkt. 49 ¶ 25; 64:10.)

The majority of off-topic comment spam campaigns that target the University's social media pages relate to animal testing and can generate hundreds of comments. (Dkt. 49 ¶ 28; 64:9.) These campaigns pose a challenge for the University's social media managers because the large volume of comments makes manual moderation difficult. (Dkt. 64:9.) A comment that is

moderated by the keyword filter on Facebook can be manually unhidden. (Dkt. 49 ¶ 26; 64:11.)

In June 2021, after more than 200 off-topic comments were made to the University's Instagram page that included the phrase "stop animal test," the University added the phrase to the keyword filter, and later removed it. (Dkt. 64:9; 43 ¶ 3.) In April 2022, "PETA Latino ran a campaign that resulted in thousands of comments on the University's Instagram page that included the following phrases: 'noexperimentarconanimales,' 'Asesinos,' 'De los animals,' and 'No más experimentos.'" These words and phrases were added to the Instagram keyword filter and later removed once the comment campaign traffic decreased. (Dkt. 64:9; 43 ¶ 3.)

"On five occasions since January 1, 2020, the University has turned off its commenting features on Instagram or Facebook, preventing any user from commenting" altogether. (Dkt. 64:11; 49 ¶ 30.)  "Three of these occasions were due in whole or in part to spam campaigns related to the University's animal research program. On two of those three occasions, comments also were disabled because many portrayed misinformation about COVID-19." (Dkt. 64:11.) Another occasion was during the 2021–22 holiday season because vacations and holidays left it short-staffed and monitoring its social media pages was not possible. No user has the ability to make comments to certain posts during these times. (Dkt. 49 ¶ 31.)

**F.      Krasno's comments and the University's responses.**

In mid-September 2020, the University made a post on its Instagram page about the University's Dairy Cattle Center. Krasno commented: "stop exploiting animals. Get with the future and the future is consistent anti-oppression. Shut down the labs and eat plants!" Krasno's comment, and a reply to another user's comment, were not made public. (Dkt. 64:12; 42 ¶ 87.) Later that month, the University posted on its Instagram page a photo of its new recreation center on campus. In response, Krasno commented, "Thanks for continuing to delete my comments and untag yourself from my photos. Definitely showcases fear. I will continue to share the truth about what it was like working in one of your primate research labs and advocate for their closure. As I mentioned before, today is great day to shut down the primate research labs!" (Dkt. 64:12–13; 49 ¶ 48; 42 ¶ 87.) Krasno's comment was not made public.[2] (Dkt. 64:13.)

In late September 2020, the University temporarily restricted Krasno's Instagram account which prevented her comments from being publicly seen. (Dkt. 40 ¶ 8; 64:13–14; 49 ¶¶ 12, 14–15, 52.) This account-level Instagram restriction lasted through the end of January 2021. (Dkt. 39 ¶ 107.)

---

[2] Because there is no ability to manually hide Instagram comments (Dkt. 49 ¶ 10), the district court assumed that the keyword filter automatically hid these two September 2020 comments. (Dkt. 64:12 n.9). However, the University could have deleted them.

During that time, five of Krasno's comments were not published on the University's Instagram page. (Dkt. 64:13–14.) In October 2020, "in response to a post by the University about the birthday of its athletic team mascot (Bucky Badger), Krasno commented: 'close down the primate labs! @uwmadison.'" (Dkt. 64:13.) Later that month, the University posted about its COVID-19 measures. In response, Krasno commented, "@uwmadison stop testing on monkeys!" (Dkt. 64:13.) In November 2020, the University again posted about its COVID-19 measures, and in response, Krasno commented, "[C]lose down the primate labs!" (Dkt. 49 ¶ 49; 64:13.) Later that month, the University posted about Thanksgiving travel. In response, Krasno commented, "@uwmadison, close down your primate research labs!" (Dkt. 49 ¶ 50; 64:13.) In December 2020, the University made a post about a dog being treated for cancer at the University's veterinary hospital. Krasno commented: "It is really quite hypocritical the compassion shown to this dog while thousands of animals languish in laboratories at @uwmadison. I really wish you would acknowledge this and do something about it." (Dkt. 49 ¶ 50; 64:13.) These comments were not made public because of the account-level restriction. (Dkt. 39 ¶ 107.)

In December 2020, the University made a Facebook post regarding #uwgrad profile photo filters by posting a photo of a badger with "PROUD#UWGRAD" superimposed on it. In response, Krasno commented, "University of Wisconsin-Madison, are you really proud of all your graduates or just the ones

who don't object to your barbaric treatment of monkeys in your research labs?" (Dkt. 49 ¶ 51; 64:14.) This comment was manually hidden from public view based on the University's social media manager's assessment that it was "off topic." (Dkt. 54 ¶ 110; 64:14; 38-47.)

In general, Krasno typically made comments on the topics of animal testing, funding that the University is getting for animal testing, and her own experience with animal testing. (Dkt. 49 ¶¶ 8, 32; 64:12–15.) Krasno believes that any comment she makes about animal testing or research is on-topic to any post made by the University on its social media pages. (Dkt. 49 ¶¶ 11, 33.)

## II.     Relevant Procedural History

On February 10, 2021, Krasno filed a complaint against the Board of Regents of the University of Wisconsin System,[3] the chancellor and vice chancellor for University relations in their official capacities, and John Lucas, Mike Klein, and Nate Moll in their official and individual capacities. She alleged First Amendment free speech violations caused by moderation of her comments to the University's posts on its official Facebook and Instagram pages. (Dkt. 1.) The defendants answered on June 15, 2021. (Dkt. 13.) The district court, on July 2, 2021, issued an order referring the case to Magistrate Judge Stephen L. Crocker, per consent of the parties. (Dkt. 14.)

---

[3] The district court later granted Krasno's unopposed motion to voluntarily dismiss the Board of Regents as a defendant. (Dkt. 52, 57.)

Krasno filed an amended complaint on September 24, 2021, to add the allegation that keyword filters used by the University are viewpoint discriminatory. (Dkt. 17.) The defendants answered on October 8, 2021. (Dkt. 19.)

On May 18, 2021, the defendants filed a motion for summary judgment and supporting materials. (Dkt. 31–33.) Krasno filed her own summary judgment motion. (Dkt. 34–39.) The parties jointly filed proposed findings of fact. (Dkt. 40.)

After the completion of briefing, on November 2, 2022, the district court granted the University's motion for summary judgment and denied Krasno's motion. (Dkt. 64.) The court held that the University's comment thread sections of its social media pages constituted a nonpublic forum. (Dkt. 64:31.) It also held that the University's off-topic rule was viewpoint neutral and reasonable in light of the purpose of the forum. (Dkt. 64:38.) In addition, the court held that Krasno did not have standing to bring a challenge to the University's continued use of the keyword filter. (Dkt. 64:45.) Further, the court concluded that Krasno did not meet the *Ex parte Young* exception to Eleventh Amendment immunity to her other challenges to the University's past imposition of her Instagram account restriction and removal of a single Facebook comment in December 2020. (Dkt. 64:40.) Judgment was entered on November 2, 2022. (Dkt. 65.)

Krasno filed a timely notice of appeal on December 2, 2022.[4] (Dkt. 70.)

## SUMMARY OF THE ARGUMENT

The University has created a nonpublic forum in each of the interactive comment thread sections of its Instagram and Facebook social media pages. Through an off-topic comment rule, it limits discussion to subjects which it, not its followers, choose. And this off-topic rule is viewpoint neutral and reasonable in light of the purpose served by the forum. The off-topic rule does not discriminate against Krasno's viewpoint under the First Amendment.

Krasno's challenges to the University's use of specific tools used in furtherance of its moderation policy also fail. First, Krasno lacks standing to challenge the University's use of its keyword filter. Even if she has standing, the University's use of this moderation tool—and moderation practice in general—is not discriminatory against Krasno's anti-animal testing and research viewpoint. And even assuming standing, the district court did not abuse its discretion denying her vague request for a broad permanent injunction against the University's use of the keyword filter. Second, the

---

[4] On appeal, Krasno has abandoned her individual capacity claims for money damages against Lucas, Klein, and Moll—for past actions taken against her—because her opening brief does not raise a challenge to the district court's judgment in their favor based on qualified immunity. (Dkt. 64:45–50). *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (finding claim abandoned where party failed to raise it in his appellate brief). This leaves only official capacity claims against state officials in their official capacities for prospective relief.

Eleventh Amendment bars Krasno's free speech viewpoint discrimination claims against the University's past actions—the temporary restriction to her Instagram account and the manual removal of an arguably on-topic Facebook comment.

## STANDARD OF REVIEW

This Court reviews the district court's entry of summary judgment de novo and considers the record in the light most favorable to the party against whom summary judgment was entered. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). Summary judgment is proper only if no material issue of fact exists that would allow a jury to find in favor of the non-movant. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020); Fed. R. Civ. P. 56(a).

# ARGUMENT

## I. The University created a nonpublic forum in each of the interactive comment thread sections of its Facebook and Instagram pages.

The district court held that the University has created nonpublic fora[5] in the comment thread sections of its Facebook and Instagram pages for the discussion of topics it chooses. (Dkt. 64:31.) This Court should affirm.

### A. The law of the nonpublic forum.

Under First Amendment free speech jurisprudence, a forum "is a piece of public property usable for expressive activity by members of the public." *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719, 722–24 (7th Cir. 2009). The designation of a public forum is done through "purposeful governmental action" and is not satisfied by "inaction or by permitting limited discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985).

The law recognizes several different kinds of speech fora for First Amendment analysis. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865

---

[5] Before the district court, the University used the term "limited public forum." That court correctly understood that it was not referring to any subcategory of a designated public forum that would be subject to strict scrutiny. (Dkt. 64:20 (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 n.2 (7th Cir. 2006)). However, because the district court employed the term "nonpublic fora," and Krasno uses it as well in her opening brief (Appellant's Br. 31 n.5), the defendants will use the term "nonpublic fora" on appeal to avoid any confusion.

(7th Cir. 2006). This forum jurisprudence is "a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). Courts are to apply greater or lesser scrutiny to the speech restriction depending on the nature of the forum. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2019), *cert. denied*, 142 S. Ct. 711 (2021).

Traditional public fora are "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO,* 307 U.S. 496, 515 (1939)). "Designated public forums are locations or channels of communication that the government opens up for use by the public for expressive activity." *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). These are "created when the government opens a nontraditional public forum for public discourse." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006). The government may exclude speakers from these types of public fora "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius,* 473 U.S. at 800. These

government "restrictions on speech get strict scrutiny." *Christian Legal Soc'y*, 453 F.3d at 865.

Courts, like the district court below, have also recognized the "nonpublic forum." *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998). The nonpublic forum, in contrast to the traditional and designated public fora, is "public property that 'is not by tradition or designation a forum for public communication.'" *Christian Legal Soc'y*, 453 F.3d at 865 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). The nonpublic forum "is a place the government has opened only for specific purposes or subjects." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 783 n.3 (7th Cir. 2011) (citing *Christian Legal Soc'y,* 453 F.3d at 865–66 & n.2). "In a nonpublic forum, . . . the government has much more flexibility to craft rules limiting speech." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Perry Ed. Assn*, 460 U.S. at 46). This Court has described it as "considerable selectivity." *Seflick*, 164 F.3d at 372. Speech restrictions in the nonpublic forum "need only be viewpoint-neutral and reasonable in light of the purpose served by the forum." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 783 n.3 (7th Cir. 2011) (citing *Christian Legal Soc'y,* 453 F.3d at 865–66 & n.2). This is the lowest level of scrutiny applicable. *Christian Legal Soc'y,* 453 F.3d at 866.

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for

public discourse." *Cornelius*, 473 U.S. at 802. The Supreme Court has thus looked to the "policy and practice" of the government to determine whether it intended to create a designated public forum. *Id.* And courts may also "examine[] the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id.*

### B. The interactive comment thread sections of the University's social media pages constitute nonpublic fora.

Here, the University makes posts to these social media pages[6] on a wide range of University-related issues, from its receipt of COVID-19 vaccines, to congratulating its sports teams on successful seasons and lauding research breakthroughs by its scientists. (Dkt. 17 ¶¶ 20, 53; 19 ¶¶ 20, 53; 64:4.) Any comment that is unrelated to the underlying post can be removed as off-topic. (Dkt. 49 ¶ 3.) As the district court put it, the University "sets the agenda for discussion by posting about a specific topic; to the extent the public is invited to participate, it is limited to discussing the topic of that particular post." (Dkt. 64:21.)

The University has thus reserved the comment thread sections of its social media pages for the discussion of subjects of its own choosing—the subjects of

---

[6] This brief will often use "social media pages" as shorthand for the official Facebook and Instagram pages of the University. While the University has a Twitter page, that is not at issue in this case.

24

the underlying posts it makes. (Dkt. 36 ¶¶ 1–5.) And the University's policy of keeping the interactive space to the specific subjects it chooses means that it moderates—removes or prevents—off-topic comments. (Dkt. 43 ¶ 1.) Therefore, the University's unofficial "policy"—Social Media Statement and Interim Guidance—shows that it intended to create a limited public forum in the interactive space of each of its social media pages by requiring comments to be on-topic to the underlying post. (Dkt. 32-1–32-2.)

Based on the undisputed facts and binding case law, the district court properly concluded that the interactive comment thread sections of the University's social media pages are nonpublic fora. (Dkt. 64:20, 31.)

### C. Krasno's arguments in favor of a designated public forum fail.

Krasno does not complain that the district court concluded that the interactive comment threads were "expressly designed for public commentary and debate." (Appellant's Br. 31 (quoting Dkt. 64:21).) Instead, she counters that the comment threads are designated public fora because each forum is generally accessible to the public, the University's attempt to reserve the right to remove off-topic comments is too ambiguous and indefinite, and its moderation of the forum is too "loose and inconsistent." (Appellant's Br. 30–40.) Each of these arguments is unpersuasive.

### 1. The general public's ability to comment does not make a comment thread a designated public forum.

Krasno first claims that the University created a designated public forum because any member of the general public may comment in the interactive space. (Appellant's Br. 32–33.) That the general public may comment on the University's social media pages—or at least those individuals who possess a Facebook or Instagram account—does not preclude the interactive space from being nonpublic fora. In First Amendment jurisprudence, it is not solely "who" that matters but rather "what." The University, the owner of the social media pages, opened up the comment threads for discussion only of "specific purposes or subjects," as the law of the nonpublic forum allows. *Milestone*, 665 F.3d at 783 n.3. Those subjects relate only to the University. The University issues posts about University-related subjects, and on-topic comments about those subjects are encouraged and permitted. Indeed, even Krasno admits that the purpose of the interactive space "is precisely to engage with the public *about the University*." (Appellant's Br. 34 (emphasis added).)

Despite the clear law, Krasno also claims that a nonpublic forum is found only where the government's opening up of property to expressive conduct would somehow interfere with the objective use and purpose of the forum. (Appellant's Br. 33–34.) More specifically, she contends that the proper forum "inquiry is whether allowance of her animal testing criticism interferes with

26

the purpose of the forums." (Appellant's Br. 34.) This position fails as a matter of law, as well. Again, the University can create a forum for specific subjects only. *Perry*, 460 U.S. at 46 n.7 (citing *City of Madison Joint Sch. Dist. v. Wis. Pub. Emp. Rels. Comm'n,* 429 U.S. 167 (1976)). And the University does not need to submit evidence that off-topic comments actually created disruption. (Dkt. 64:34 (citing *United States v. Kokinda*, 497 U.S. 720, 733 (1990)).) In short, it is constitutionally sufficient that an off-topic comment interferes with the purpose of limiting the forum to on-topic comments.

### 2.   The University's reservation of the right to remove off-topic comments does not create a designated public forum.

Krasno next contends that the University's Social Media Statement is "too ambiguous and indefinite" to create a nonpublic forum in each comment thread. (Appellant's Br. 34–38.) That is incorrect.

The University's Social Media Statement states that the University has the right to remove comments that it deems "off-topic," among other reasons. (Dkt. 49 ¶ 2 (Defs.' Replies DPFOF).) And its Interim Guidance states: "UW-Madison social media managers may engage in content moderation of social media pages based on one criterion: whether posted content is on vs. off topic." (Dkt. 32-2 ¶ 4 (Kilpatrick Decl.).) These rules combine to form an unofficial University "policy" that user comments must relate to the underlying posts or face removal.  That is sufficient to limit the forum.

Krasno cites a Third Circuit Court of Appeals decision that requires an "unambiguous and definite" reservation to limit a public forum. (Appellant's Br. 35 (citing *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 251 (3d Cir. 1998)).) Notwithstanding that this Court is not bound by a decision of another other circuit court,[7] *Christ's Bride Ministries* is unhelpful to Krasno's position. The Third Circuit addressed whether a government transit authority's commercial advertising space created a public forum in the first instance. 148 F.3d at 248, 251. Here, despite confusingly being called a "nonpublic forum," the defendants have conceded that a public forum has been created.[8] Regardless, *Christ's Bride Ministries* also holds that a consistent practice of excluding speech under a reservation can also limit the forum. *Id.* at 251.

Moreover, the decision *Christ's Bride Ministries* cites for the "unambiguous and definite" standard provides no support for Krasno's position, either. *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1375 (3d Cir. 1990), concerned a school district's refusal to rent its high school auditorium to a religious group on the basis that school facilities could be used only by organizations that were

---

[7] *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) ("Binding precedent for all is set only by the Supreme Court") *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

[8] The district court explained that "the term 'nonpublic' does not mean a forum that is *closed* to the public, but rather one that is open to the public only for specified speakers or specified expressive activities." (Dkt. 64:19 (citing *Perry*, 460 U.S. at 49).)

compatible with the mission and function of the school system. *Id.* at 1369. The *Gregoire* court found this policy to be without any definition. *Id.* at 1375. It therefore concluded, "[i]f the concept of a designated open forum is to retain any vitality whatever, the definition of the standards for inclusion and exclusion must be unambiguous and definite." *Id.* at 1375. The court explained that "[t]he clear category of groups or clear category of subject matter required in a closed forum is absent here." *Id.*

Here, however, the University has expressly stated an unambiguous and definite standard for inclusion and exclusion. The University requires that a comment be on-topic to the underlying post to permit user participation. And it states that they may remove comments that are "unrelated to the topic or purpose of the page," and that to make this determination, the manager is to "evaluat[e] the stated purpose for which the page exists, and in the context of comments, the subject, topic, or purpose of the initial post to which the comment is attached." (Dkt. 64:6; 32-2.) Further, the guidance expressly prohibits social media managers from moderating content based on the viewpoint it expresses. (Dkt. 64:6; 32-2.) Notwithstanding that this "unambiguous and definite" reservation standard is not a constitutional requirement or controlling on this Court, the University meets that standard here anyway through its unofficial policy.

Krasno also claims that the University has an "unwritten" objective to monitor and moderate off-topic and anti-animal testing speech and it is like the unlawful "unspoken policy against repetitive comments" and the government's efforts to remove them in *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022). Far from it.

In *Garnier*, two members of a school district board of trustees blocked parents from making comments on their Facebook and Twitter pages. 41 F.4th at 1163. The Ninth Circuit Court of Appeals determined that these social media pages were designated public fora because the trustees "never adopted any formal rules of decorum or etiquette for their pages that would be 'sufficiently definite and objective to prevent arbitrary or discriminatory enforcement.'" *Id.* at 1178 (quoting *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1130 (9th Cir. 2018)). The *Garnier* court explained that the trustees merely "had an unspoken policy against repetitive comments" that "does not satisfy the requirement that '[s]tandards for inclusion and exclusion' 'must be unambiguous and definite' to create a limited public forum." *Garnier*, 41 F.4th at 1178 (citing *Hopper v. City of Pasco*, 241 F.3d 1064, 1077 (9th Cir. 2001). Here, unlike in *Garnier*, the University has two written statements that reveal a "sufficiently definite and objective" rule that user comments must be on-topic and germane to the underlying post. *Id.* This is far more than an "unspoken policy" or merely a prohibition of "repetitive comments."

Krasno relatedly complains that the documents do not go "far enough" to "supply the 'unambiguous and definite' standard necessary to create a nonpublic forum." (Appellant's Br. 35.)  And she complains that the Interim Guidance should contain a "standard explaining when off-topic posts will be removed." (Appellant's Br. 36–37.) But, again, even if this circuit were to consider the "unambiguous and definite" reservation standard, it does not mean that the University's social media pages must expressly and specifically "define how discretion will be exercised over whether to leave any comment up or remove it; how closely a comment must relate to the topic to remain 'on topic;' or how speech will be moderated," as Krasno contends. (Appellant's Br. 35.) Krasno's argument has no grounding in any binding case law.

As to Krasno's assertion that the University's policy is constitutionally insufficient because does not *require* social media moderators to *remove* off-topic comments (Appellant's Br. 37), that fails, too. The University moderators at times may be uncertain whether user comments are off-topic or not and, as a result, they are encouraged to contact the University's Office of Legal Affairs for advice. (Dkt. 28 (Moll Corp. Desig. 75:9–14, 77:20–78:3).) The lack of a rule requiring the immediate removal of off-topic comments is the result of reasonable caution by the University and nothing more.

Krasno lastly argues that the keyword filter used by the University is not a clear measure to limit off-topic content. (Appellant's Br. 38.) She is wrong,

again. The University defines "spam" campaigns as a deluge of *off-topic* comments made to a post. (DPFOF ¶ 22; 64:7, 9.) Contrary to Krasno's claim, then, the University's use of the keyword filter is specifically designed to counter off-topic comments.

### 3. The University's "imperfect" moderation policy does not make the comment threads a designated public forum.

Krasno lastly contends that the University's moderation policy is too "loose" and "imperfect" to create a nonpublic forum. She states that inconsistent results—some off-topic comments being removed while others remain—"voids [the University's] attempt to limit the public forum." (Appellant's Br. 38–39.) Although admittedly the University's moderation policy is not perfect—it is run by human beings, after all—it nonetheless properly limits the forum. There are several reasons.

### a. The sheer volume of posts and comments do not reasonably allow the University to moderate all off-topic comments.

First, there are thousands of posts and, in turn, even more comments on these two University social media pages. (Dkt. 36 ¶ 23; 40 ¶ 69.) Despite this large volume, the University social media managers moderate off-topic comments. In one instance, the University posted about a men's basketball game and moderated a comment about facing God on judgment day. (Moll Decl. ¶ 7 Ex. D.) And in another, the University posted about a veterinary

medicine student's start-up company and moderated two comments about supporting the Ukrainian army.[9] (Moll Decl. ¶ 8 Ex. E.)

Krasno's cherry-picking of a few off-topic comments that remain for public view does not mean that the University's policy is too loose and imperfect to limit off-topic comments from the interactive spaces. Krasno did not perform a comprehensive analysis of all the University's posts and all the comments—or provide a proper scientific sample—to determine what percentage of off-topic comments are being moderated. The district court recognized Krasno's shortcoming when it stated that there was "no dispute that the University's social media managers review thousands of comments made in response" to posts and "the examples submitted by each side fail to establish any degree of certainty what percentage of off-topic comments the University actually excludes." (Dkt. 64:26.) Krasno's few examples of non-moderated off-topic comments[10] are not evidence that the University's moderation is "a hopelessly underinclusive effort," (Dkt. 47:15), as she claimed below.

---

[9] There are more instances of the University moderating off-topic comments. (*See* Moll Decl. ¶¶ 3–8 Ex. A–E; Dkt. 32-5:1 (post about COVID-19; commercial comment about free "BostApp"); 38–8:2 (post about COVID-19; comment about Amazon.com book link); 38–9:2 (post about MLK Symposium; various off-topic comments); 38–11:2 (post about UW startup DataChat; comment about petition at the Rochester Institute of Technology, comment about Illuminati College with link); 38-23:2 (post about COVID-19; comment from Hamilcar Racho of a Facebook link).

[10] Krasno stretches to explain why her comments are on-topic but is quick to call other users' comments off-topic, then chastising the University for not moderating them. (Appellant's Br. 2–15.)

Nor does the simple fact that the University gives social media account managers *discretion* to discern between on and off-topic comments render the University's policy inherently problematic, as Krasno claims. (Appellant's Br. 28–30, 36–37.) There is nothing unconstitutional about government actors using discretion and common sense to moderate comments in furtherance of maintaining a nonpublic forum.

### b. Some posts, and in turn comments, become stale, not requiring immediate off-topic comment moderation.

Second, as one defendant put it, social media pages are "living documents." (Dkt. 26 (Moll Dep. 54:4–5, 55:10–11, 109:18–19, 214:13–14,); 28 (Moll Corp. Desig. 69:9–10).) After the University generates a post, users may comment to that post anytime, even months or years, afterward. (Dkt. 26 (Moll Dep. 54:4–5, 55:10–11, 109:18–19, 214:13–14); 28 (Moll Corp. Desig. 69:9–10).) And the social importance of the University's posts and attached user comments wane after a short time. Put another way, speech becomes stale. *See Am. C.L. Union of Ill. v. City of St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986) ("[P]olitical speech . . . often is addressed to transitory issues, and becomes stale when the issues pass away."). So, because University social media managers cannot possibly see every comment users publish, they must focus on the most recent University posts—that is, the most recent speech. (Dkt. 26 (Moll Dep. 54:4–5,

55:10–11, 109: 18–19, 214:13–14); 28 (Moll Corp. Desig. 69:9–10).) The result is that stale comments get less attention from the moderators.

For example, on November 17, 2020, the University issued a post asking its students who would be travelling for the holiday not to return to campus until the beginning of the spring semester the next calendar year due to the COVID-19 pandemic. (Dkt. 38 ¶ 14; 38-13:2–3.) Many of the user comments were made within a week after the November 17, 2020, post.[11] One comment, from @gbamanh stating, "Shut down the monkey laboratories [with crying face emojis]," however, was made about six weeks after the post, in January 2021.[12] (Dkt. 38-13:5.) This comment was off-topic, but by the time it was made, the underlying University post was already stale, since the Thanksgiving break was over. The University's failure to moderate this off-topic comment made to a post that was no longer relevant illustrates how socially unimportant some of the discussion can be.

Given the sheer volume of posts and comments, it is unreasonable to expect that each and every user comment will be reviewed by the University's social media managers, particularly months or years after the original post was

---

[11] The Instagram site was accessed and a screen shot taken of the post/comments on May 16, 2022. (Dkt. 38 ¶ 14.) Many comments contained "77w" under them. (Dkt. 38-13:2–5.) This means many of these comments were made 77 weeks prior to when the screen shot was taken. (Dkt. 28 (Moll Corp. Desig. 89:7–15).) That means that the comments with "77w" under them were made on or about November 23, 2020.

[12] The comment from @gbamanh shows a "71w" under it. That means this comment was made on or about January 4, 2021.

made, and that all off-topic ones will be removed. (Dkt. 28 (Moll Corp. Desig. 69:3–9).) In short, social media moderators must be free to prioritize their work.

Also, there is an easily recognizable difference between speech on social media and speech in more traditional public fora. A user making an off-topic comment to a social media post is vastly different than a citizen making an off-topic comment in real-time at a school district board meeting, for instance. In the latter scenario, it is reasonable to expect that the board chair, for example, would promptly cut-off the speaker. *See Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004) (noting that the First Amendment permits, and may in some cases even require, a government entity conducting a public meeting to stop a "speaker . . . try[ing] to hijack the proceedings"). But there cannot reasonably be the same expectation that social media manager must immediately remove an off-topic user comment. The obvious difference is that there are citizens commenting one at a time and physically present at the school board meeting and for a limited timeframe. In the social media platform, individual users are commenting outside the presence of government officials and over a timespan of months or years. As a result, the social media user's written comment can remain in the public sphere until it is removed.

The point is that moderation of social media interactive space is far more difficult than moderation of other real-time speech. Because of these clear and unique differences of the social media forum, one Supreme Court justice has warned that lower courts "should be cautious in applying . . . free speech precedents to the internet" and "should proceed circumspectly, taking one step at a time." *Packingham v. N. Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, J., concurring).

### c.    Some user comments are not easily recognized as off-topic, requiring cautious moderation.

A third reason why off-topic posts may remain on the University's social media interactive space is simply a result of reasonable caution. Krasno is correct that the University's Social Media Statement and Interim Guidance does not *require* social media managers to remove all off-topic comments that they see. (Dkt. 35:17–18.) But this does not mean the University opens up the comment thread for any and all topics when off-topic comments are not removed. Krasno fails to recognize that certain user comments are more easily understood to be off-topic than others, which can lead to questionable off-topic comments remaining on the pages. (Dkt. 41:9.) If social media managers are uncertain whether certain comments are off-topic, they are encouraged to contact the University's Office of Legal Affairs for advice rather than promptly removing them. (Dkt. 28 (Moll Corp. Desig. 75:9–14, 77:20–78:3).) And to the

extent University lawyers determine that questionable off-topic comments may remain visible, that result is merely a decision to err on the side of First Amendment free speech. This should not result in a detriment to the University through a finding that the interactive space is a designated public forum rather than the nonpublic forum that the University intends it to be.

***

The University's social media managers moderate what they believe are off-topic comments. Krasno may criticize the job the University does to keep its social media pages as a nonpublic forum, but the University's admittedly imperfect moderation policy properly sustains the nonpublic fora.

## II. The University's off-topic rule is viewpoint neutral and reasonable in light of the purpose of the forum.

Because the comment thread sections of the University's social media pages are nonpublic fora, to survive the lowest level of scrutiny applicable, "speech restrictions . . . need only be viewpoint-neutral and reasonable in light of the purpose served by the forum." *Milestone*, 665 F.3d at 783 n.3. Krasno asserts that, whether these interactive spaces constitute designated or nonpublic fora, the University's moderation is viewpoint discriminatory and violates the First Amendment. (Appellant's Br. 20–30.) She is incorrect.

For a speech restriction to be reasonable, the government must show that it: (1) furthers a "permissible objective;" and (2) contains "objective, workable

standards" that are "capable of reasoned application." *Mansky*, 138 S. Ct. at 1886, 1891–92. The University's off-topic rule does that.

The University's off-topic rule keeps discussions focused on University-related subjects about which the intended audience of its social media posts would have interest. Indeed, the purpose of the pages is to communicate University announcements and events to its students and the public. The particular viewpoints on those particular subjects expressed in the comments are irrelevant. What matters are off-topic comments, and the University can act under the Constitution to prevent them.

On-topic comment threads allow the University to see and respond to users' comments, questions, or inquiries. For example, if the University posts about upcoming public health guidance, and a student makes a comment asking specific questions, the University wants to see that comment so that it may understand and, if necessary, answer it. (DPFOF ¶ 9.) Off-topic comments clog up the comment threads and hinder the University's ability to facilitate and participate in discussions it wants to engage in, which frustrates the primary purpose of communicating via social media. (DPFOF ¶ 7.) And users are less likely to visit the University's social media pages and engage when off-topic comments clog the interactive space. (Dkt. 64:33.) This all matters because the "failure to effectively moderate a public discussion may be as deleterious to dialogue in such a forum as censorship." *Davison v. Plowman*, 247 F. Supp. 3d

767, 778 (E.D. Va. 2017). As the district court explained, "the First Amendment permits–and in some cases may require–a government entity conducting a public meeting to stop a 'speaker . . . try[ing] to hijack the proceedings.'" (Dkt. 64:33 (quoting *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004)). And, more importantly, as the Supreme Court has explained, "The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius,* 473 U.S. at 811; *Sefick,* 164 F.3d at 373.

The University's off-topic comment rule "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808. "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Id.* at 808–09. A lack of evidence that off-topic comments harmed the University is irrelevant. Whether a significant amount of off-topic "speech may or may not be disruptive is not the question; the question is whether it is *unreasonable* for the University to prohibit off-topic speech." (Dkt. 64:34.)

The University has decided to host a moderated forum for discussion on the subjects on of its posts. Thus, "off-topic comments are, by definition, more disruptive than on-topic comments." (Dkt. 64:33.) The district court described the forum best in a way the University of Wisconsin-Madison community could

understand: "There is nothing unreasonable about the University preferring that the interactive comment threads have the look and feel of a brown bag lunch discussion rather than its open air Library Mall at the foot of State Street."[13] (Dkt. 64:33.)

As to the second requirement that speech restriction is reasonable—objective, workable standards are capable of reasonable application—the University has "articulate[d] some sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888. The University respectfully directs the Court to section C.3. above.

The University's off-topic rule survives constitutional scrutiny under the nonpublic forum standard because it is viewpoint neutral and reasonable in light of the purpose of the forum. This Court should affirm and allow the University to continue administering it.

### III. Krasno has no right to a permanent injunction against the University's use of the keyword filter as a moderation tool.

In addition to her challenge to the University's off-topic rule, Krasno attacks the tools the University uses to implement the rule. (Appellant's Br. 19–30.) Krasno first brings a "challenge requesting an injunction against any use of

---

[13] The University considers the campus Library Mall a public forum to which "standards for disruption of freedom of expression are generally not applied to." *See UW-Madison Policy Library Protest Guidelines*, Univ. of Wis.-Madison, https://policy.wisc.edu/library/UW-6011#F4 (last visited Apr. 21, 2023).

the keyword filter by the University." (Dkt. 64:42, 45; Appellant's Br. 20–26.)
This challenge fails. The district court correctly denied Krasno's request for an
injunction against the University's use of the keyword filter.

### A. Krasno lacks standing to seek a permanent injunction against the University's use of the keyword filter.

#### 1. The district court correctly concluded that Krasno lacks standing for a permanent injunction.

The district court held that Krasno lacked standing to seek a permanent
injunction challenging the University's use of the keyword filter. It did so
without the parties addressing the issue. (Dkt. 64:41 (citing *Schirmer
v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010) (because standing is "an essential
and unchanging part of the case-or-controversy requirement of Article III"
courts must consider it even if parties have not raised it).) This Court should
affirm.

"A plaintiff 'must demonstrate standing separately for each form of relief
sought.'" *Schirmer*, 621 F.3d at 585 (quoting *Friends of the Earth, Inc.
v. Laidlaw Env't Servs.,* 528 U.S. 167, 185 (2000)). To establish standing *to seek
permanent injunctive relief*, Krasno must show that: (1) she is "under threat of
an actual and imminent injury in fact; (2) there is a causal relation between
that injury and the conduct to be enjoined; and (3) it is likely, rather than
speculative or hypothetical, that a favorable judicial decision will prevent or
redress that injury." *Schirmer*, 621 F.3d at 585 (quoting *Summers v. Earth

*Island Inst.,* 129 S. Ct. 1142, 1149 (2009)). The district court held that Krasno failed to fulfill the first and third requirements. (Dkt. 64:42.)

Here, the University uses a keyword filter moderation tool as a means of enforcing its off-topic rule. When it sees that a spam campaign is about to occur or is already underway, it inserts words and phrases into the filter that would appear in the spam comments. (Dkt. 49 ¶¶ 22, 24; 54 ¶ 76; 64:7, 9.) The result is that user comments containing those words do not appear in the interactive space of the University posts. (Dkt. 54 ¶ 68; 64:9.) The University adds and removes words to the keyword filter list as spam campaigns come and go. (Dkt. 49 ¶ 24; 54 ¶ 76; 64:9.) At summary judgment, Krasno did not show that any on-topic comment that she intended to post would be prohibited from appearing in the comment threads due to the University filter. Krasno is not under threat of actual injury cause by the University's use of the keyword filter moderation tool.

Krasno also fails to show that she is under a threat of imminent injury in fact. She will be unable to get her viewpoint against animal testing across by the keyword filter only if the University issues a post to which her comments would be germane and the keyword list forces her comments to be hidden. That is a very speculative scenario, given that the University would have to issue such a post, Krasno would have to attempt to comment her viewpoint, and some of the keywords in the filter would prevent Krasno's comment from

43

appearing in the interactive space. In other words, "the University changes the words on an as-needed basis, and none of us know how Krasno will phrase her input." (Dkt. 64:43.) The University has changed the words and phrases in the keyword filter since Krasno filed her suit and changes them on an as-needed basis. (Dkt. 54 ¶¶ 69, 76.) Moreover, the University has stated that it will remove relevant key words from the list if it posts about animal research so that on-topic comments will not be blocked, (Dkt. 49 ¶¶ 25, 29; 28:113–14), reducing future harm "nearly to the vanishing point." (Dkt. 64:43.) Finally, the University may manually "unhide" comments that otherwise would be on-topic but for the keyword filter. (Dkt. 64:45.)

There is simply no real threat, rather than an insufficient "conjectural" or "hypothetical" one, that any past harmful events will be repeated by the University. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). This Court has stated that "Article III of the Constitution bars a federal court from enjoining threatened action that the plaintiff has no reason to suppose even remotely likely ever to materialize; there must be a real dispute in the sense that its resolution is likely to have tangible consequences for the plaintiff." *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004)*; see also Bryant v. Cheney*, 924 F.2d 525, 529 (4th Cir. 1991)) ("injunctive powers of the federal courts are broad, but 'Article III simply precludes their empty use to enjoin the conjectural or declare the fully repaired broken.'"). Krasno suffers no actual

injury and no imminent threat by the University's continued use of its keyword filter. She lacks standing to obtain an order permanently enjoining the University from using it as a moderation tool against her.

### 2. Krasno's remaining standing arguments are unpersuasive.

In determining that Krasno lacked standing for an injunction, the district court concluded that she had to show a right to comment without exclusion. Krasno argues that the district court erred because it conflated the issue of standing with the merits of the suit. (Appellant's Br. 41.) Krasno's argument is incorrect because she fails to recognize that the district court's analysis did not focus on whether she was "seeking to get [her] complaint before a federal court," as she claims. (Appellant's Br. 41, 44 (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1986).) The cases Krasno cites were based on motions to dismiss a complaint and thus are unhelpful to her. *See Flast*, 392 U.S. at 88; *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 586 (7th Cir. 2012). Rather, the district court correctly reviewed the summary judgment evidentiary record and Krasno's request for prospective injunctive relief to determine that she was not being injured or under threat of actual or imminent injury. (Dkt. 64:41.) The Article III standing inquiry "remains open to review at *all stages of the litigation*." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994) (emphasis added).

In addition, Krasno seeks an injunction against the University's use of the keyword filter, which is separate and distinct from her challenge to the off-topic rule. Notably, the district court did not conclude that she lacked standing to challenge the University's off-topic rule, and the University does not argue that either. Indeed, the district court addressed Krasno's claim challenging the off-topic rule and issued a decision on the merits. For this reason, *as to Krasno's challenge to the University's use of a moderation tool to implement the off-topic rule and request for an injunction*, the district court properly required her to show injury through an on-topic comment. In other words, the district court already determined that the off-topic *rule* was constitutional, and it properly applied that holding to Krasno's challenge to one of the University's *tools* to enforce the rule. The district court did not conflate anything. Krasno's allegation of an *unencumbered* right to access a public forum is not sufficient to confer standing to seek an injunction against the University's ongoing use of the keyword filter.

**B.    Even assuming standing, the University's use of the keyword filter as a moderation tool does not discriminate against Krasno's anti-animal testing viewpoint.**

Even if Krasno has standing for her injunctive relief claim, it fails on its merits.

Krasno contends that the University singles out her viewpoint against animal research and testing through inclusion of words in the keyword filters

relating to her critical view. (Appellant's Brief 20–26.) Krasno attempts to paint a picture of the University being laser-focused on her and her viewpoint against its animal research program and, in turn, taking prompt action to prevent the world from seeing her comments. (Appellant's Br. 5, 8–13.) Krasno's viewpoint is not such a focus for the University as she assumes. And, most importantly, the University's use of the keyword filter tool does not discriminate against her viewpoint.

First, given the history, it is unsurprising that the University knows when social media comments and other comments are being made about it and its animal research program. (Dkt. 25 (Lucas Dep. 87:21–88:15).) The University earlier discovered that an anti-animal research activist group had infiltrated one of its labs and obtained materials, and, and later made untrue and misleading statements about animals in the lab. (Dkt. 27 (Tyrrell Dep. 64:9–65:25).) Krasno finds the University's response to this alarming, but there is nothing wrong with the University's taking measures to monitor what is said on-line about one of its programs, especially when those statements may be untrue, so that it can respond accordingly. (Dkt. 25 (Lucas Dep. 88:8–15).)

Second, as Krasno even admits, the University uses keyword filters on its social media pages that include words *not* related to her view critical of animal testing. (Dkt. 36 ¶ 21; 64:10; Appellant's Br. 6–7.) It has included terms to filter out profanity and mentions of political figures such as "biden" and "trump."

47

(Dkt. 42 ¶ 71; 64:10; Appellant's Br. 6–7.) And words related to law enforcement have been included in its Facebook filter. (Dkt. 64:10; Appellant's Br. 6–; Dkt. 42 ¶ 70.) The inclusion of words unrelated to Krasno's viewpoint on animal testing shows that she and others with similar views were not "singled out" for moderation. (Dkt. 35:42 n.5.)

Third, there is nothing viewpoint discriminatory about the University's decision *not* to add words to keyword filters that are related to topics it posts; and similarly there is nothing viewpoint discriminatory with the University's removal of words from the filters when it desires to generate a post that would include those words. Such action comports with the nature of the nonpublic fora. If the University decides to issue a post congratulating the women's volleyball team for a good season, for example, the University would of course not add words such as "volleyball," "bump," "set," and "spike" because, more likely than not, user comments would include them. The same goes for removing words from the filter lists. If the University were to post about its primate research center, for example, it would remove those terms related to that topic. (Dkt. 49 ¶¶ 25, 29; 28:113–14.) Krasno confuses viewpoint with on-topic subject matter.

Fourth, the University adds and removes animal research related search terms to its auto-moderation filters. (Dkt. 42 ¶ 76 ("The process of adding or removing words from the keyword filters is situation dependent, and words

and phrases are reviewed for potential removal on an as-needed basis.").)
Adding and removing such terms is not done to single out Krasno's viewpoint
but rather because comments about animal testing and research constitutes
the majority of spam campaigns against its social media pages. (Dkt. 49 ¶ 28;
43 ¶¶ 3–4; 25 (Lucas Dep. 87:21–88:7); 26 (Tyrrell Dep. 64:15–65:25); 36 ¶ 28.)
If most of the spam campaigns relate to one particular subject, the University's
response will necessarily tackle that one particular subject. The University
seeks to limit the topics of discussion in the comment sections of its social
media pages. The volume of off-topic comments made to the University's social
media pages prevents other users from engaging with the University or
receiving information about its programs or services. (Dkt. 49 ¶ 7.) This
keyword filter tool provides an effective and efficient way to prevent off-topic
comments from inundating the interactive space—which in turn impede the
purpose of that space. Krasno's viewpoint is not the problem. The number of
off-topic comments is the problem. And the keyword filter is a tool the
University uses to help solve it. Thus, there is a "plausible explanation" for the
keyword filters to include words or phrases that social media managers have
previously seen in anti-animal testing spam campaigns. (Appellant's Br. 25–
26.)

Lastly, Krasno's use of *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), in support of her viewpoint discrimination argument is inapt. There, a public school generally barred use of its property for religious purposes, but specifically barred a church from showing a child-rearing film. *Id.* at 387–89. The Supreme Court concluded that the school district engaged in viewpoint discrimination because there was evidence that the school allowed other viewpoints on the same subject matter. *Id.* at 391–97. That is not the case here. The University does not affirmatively permit views through its use of the keyword filter. Yes, there is evidence that off-topic comments *supporting* animal testing were made on the University's Instagram page and not removed, but so were Krasno's comments *opposing* animal testing comments in the same discussion. (Appellant's Br. 14–15, 23–24; Dkt. 54 ¶ 109; 64:43, n.17). The only reason Krasno's final comment did not appear publicly was because that one contained the word "labs," which happened to be on the keyword filter list at the time. (Appellant's Br. 14–15; Dkt. 54 ¶ 109; 64:43, n.17). Had the other user written, "Animal testing in labs saves lives," that comment would have been hidden by the keyword filter, too. This particular situation does not prove that the University discriminated against Krasno's anti-animal testing viewpoint through its use of the keyword filter.

The keyword filter is certainly not a perfect moderation tool, but, as employed by the University, it is viewpoint neutral. The University's use of keyword filters is not viewpoint discriminatory.

### C. Even assuming standing, the district court did not abuse its discretion in denying her request for a permanent injunction.

The district court held that, even if standing were present, it would not grant a permanent injunction "based merely on the ability to hypothesize scenarios in which the filters might have a viewpoint discriminatory effect on Krasno or others not party to this lawsuit." (Dkt. 64:45.) This decision was not an abuse of discretion.

A permanent injunction is a drastic and extraordinary remedy. *Monsato Co. v. Geerston Seedfarms, Inc.*, 561 U.S. 139, 165–66 (2010). "[T]he decision whether to grant or deny [permanent] injunctive relief within the equitable discretion of the district court." *eBay, Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 394 (2006). "A permanent injunction is not available as a matter of course; it remains a creature of equity, and so the district court has discretion to decide whether that relief is warranted." *Liebhart v. SPX Corp.*, 998 F.3d 772, 774 (7th Cir. 2021). Reversal of the district court's decision to deny an injunction will occur only for an abuse of discretion. *Id.*

Here, lack of standing aside, Krasno could not point to any concrete scenario in which her speech would be infringed by the University's moderation practice

of off-topic comments. And the injunction Krasno seeks is vague. The district court had to guess as to its scope: "Although Krasno has not specified what kind of injunctive relief she is seeking, I presume she is seeking an order prohibiting the University from using the keyword filter at all, or at least from populating its list with words likely to be employed by users like her who oppose the use of animals for research." (Dkt. 64:41.)

Further, under the Federal Rules of Civil Procedure, an injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C); *see also Saint Anthony Hosp. v. Eagleson*, 40 F.4th 492, 512 (7th Cir. 2022). That did not happen here. And courts have "an independent duty . . . to assure that the injunctions it issues comply with the directive of Fed. R. Civ. P. 65(d)." *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 632 (7th Cir. 2003).

With only hypothetical harms, and the vague injunction sought, it was not an abuse of discretion for the district court to deny Krasno's request for permanent injunctive relief against the University's use of its keyword filter against her particularly.

**IV.  The Eleventh Amendment bars Krasno's official capacity claims challenging the University's Instagram account-level restriction and removal of a past comment.**

Krasno asks this Court to address the University's imposition of an Instagram account restriction against her from September 2020 through January 2021 and its manual removal of a past Facebook comment in December 2020. She claims these University actions were First Amendment free speech violations. (Appellant's Br. 49–53.) Krasno claims that the Eleventh Amendment bar is avoided because of the *Ex parte Young*, 209 U.S. 123 (1908), exception. (Appellant's Br. 50–51.) The district court correctly held that the Eleventh Amendment bars these official capacity claims.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."  U.S. Const. amend. XI. State officials acting in their official capacities benefit from the amendment. *See Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002). However, *Ex parte Young* holds that a plaintiff may proceed in federal court against a state official "for the limited purpose of obtaining prospective relief against an ongoing violation of federal law." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 518 (7th Cir. 2021), *reh'g denied* (Nov. 16, 2021).

To meet this exception, "[t]he plaintiff must allege that the [state] officers are acting in violation of federal law, and must seek prospective relief to address an *ongoing violation*." *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000) (emphasis added). The *Ex parte Young* exception is "focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past." *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986).

Here, the University restricted Krasno's Instagram account, preventing her from publishing comments on its Instagram page, and manually hid an arguably on-topic Facebook comment from public view. (Dkt. 54 ¶ 110 (proud grad post/comment); 49 ¶ 15.) Even assuming these actions were First Amendment violations by the University, they are certainly not ongoing. The University lifted the account restriction in January 2021—well over two years ago. And the summary judgment record shows that last time it manually hid an arguably on-topic comment from public view was on December 9, 2020. These undisputed facts sink Krasno's claims. Because there is no *ongoing* violation of a federal law, Krasno's First Amendment claims challenging these particular past University moderation activities are barred by the Eleventh Amendment.

Despite this, Krasno claims an ongoing violation because the comments she attempted to publish remain hidden from public view. (Appellant's Br. 50.) This argument also lacks merit.

Using the basic facts of the case of *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011) as an analogy reveals the folly of Krasno's argument. In *Surita*, local government officials prohibited citizens from speaking at a city council meeting, despite the rule allowing citizens to speak up to three minutes on any subject. *Id.* at 865. That restriction was not ongoing simply because the plaintiffs had intended to comment at the meeting but was not heard. And if the violation were considered ongoing, for prospective relief purposes, would the government officials be ordered to reconvene the public meeting years later and allow the plaintiffs to make their comments? That all would be absurd, but that is essentially what Krasno argues here. The fact that the University did not allow her to speak at a specific point of time in the past—September 2020 to January 2021 (Instagram) and on December 9, 2020 (Facebook)—does not mean that it continues to restrict her speech merely because her comments are not made public now.

Furthermore, as the district court explained, "the online conversations in which Krasno wanted to participate while her account was restricted are all but over." (Dkt. 64:40.) In other words, speech becomes stale. *See Am. C.L. Union of Illinois v. City of St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986)

("political speech . . . often is addressed to transitory issues, and becomes stale when the issues pass away."). The staleness of the comment threads, combined with Krasno's ability to issue comments related to University posts for the past two years, makes pointless the prospective injunctive relief she seeks. (Dkt. 64:40.) *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (court should not issue injunction "to restrain an act the injurious consequences of which are merely trifling.").

Krasno also claims that "her right to participate in the comment threads is as burdened as the continued exclusion of an improperly terminated employee, a harm deemed ongoing for purposes of *Ex parte Young*. (Appellant's Br. 50.) Nonsense. Since the Instagram account restriction was lifted in January 2021, Krasno has been free to publish on-topic comments to those University posts on which she sought to comment, and she has been and is also free to make on-topic comment on more recent University posts. In contrast, an improperly terminated employee has no way to get her job back without court intervention.

Krasno also contends that *Ex parte Young* applies on the theory there is a threat that the University will impose an account restriction upon her again. But the University "has not pledged to retain [that] policy." *Watkins v. Blinzinger*, 789 F.2d 474, 483 (7th Cir. 1986). Krasno merely states that the University's practices have not changed and guidelines don't advise about specific restriction on individual users. (Appellant's Br. 52–53.) That is

insufficient. The Eleventh Amendment bar applies even assuming the underlying claim is not moot. *Watkins*, 789 F.2d at 483–84.

The Eleventh Amendment bars Krasno's First Amendment free speech challenge to the University's past moderation practices. This Court should affirm the district court's order.

## CONCLUSION

Appellees respectfully ask this Court to affirm the judgment of the district court.

Dated this 21st day of April 2023.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

<u>s/ Steven C. Kilpatrick</u>
STEVEN C. KILPATRICK
Assistant Attorney General
State Bar #1025452

LYNN K. LODAHL
Assistant Attorney General
State Bar #1087992

Attorneys for Defendants-Appellees

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792 (SCK)
(608) 264-6219 (LKL)
(608) 294-2907 (Fax)
kilpatricksc@doj.state.wi.us
lodahllk@doj.state.wi.us

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 7th Cir. R. 32, typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

This brief contains 13,283 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 21st day of April 2023.

s/ Steven C. Kilpatrick
STEVEN C. KILPATRICK
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on April 21, 2023, I electronically filed the foregoing *Appellees' Brief* with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 21st day of April 2023.

s/ Steven C. Kilpatrick
STEVEN C. KILPATRICK
Assistant Attorney General