No. 22-3170

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

MADELINE KRASNO,

*Plaintiff-Appellant,*

*v.*

JENNIFER MNOOKIN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin
Case No. 3:21-cv-00099-slc
The Honorable Stephen L. Crocker, Judge Presiding

APPELLANT'S REPLY BRIEF

Caitlin M. Foley
Animal Legal Defense Fund
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
(707) 795-2533

Christopher Berry
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533

Joseph S. Goode
Mark M. Leitner
Laffey, Leitner & Goode LLC
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003 Phone
(414) 755-7089 Facsimile

*Counsel for Appellant Madeline Krasno*

May 12, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ............................................................................................. 1

ARGUMENT ...................................................................................................... 2

I.    The University's Censorship of Krasno's Speech Removes an Anti-Animal Testing Perspective from the Forums. .................................... 2

II.   The Comment Threads of the University's Social Media Pages are Designated Public Forums. ................................................................. 7

      A.    The University does not explain how Krasno's criticism of its animal testing is incompatible with a forum dedicated to interacting with the public about the University. ................................. 7

      B.    The University's litigation posture does not limit the forums. ............. 9

      C.    Practical difficulties of moderating speech do not fill the gaps in the University's purported attempts to limit the forums. .................... 11

III.  It Is Not Reasonable to Solve a Purported Problem with Off-Topic Speech with a Remedy Aimed at Addressing Government Time Constraints. ....................................................................................... 15

IV.  Krasno has standing to seek injunctive relief for the keyword filters' continued censorship of her speech. ................................................. 18

      A.    Standing is Not Merits, Even on a Motion for Summary Judgment. .......................................................................................... 18

      B.    The University Continues Filtering Anti-Animal Testing Speech Like Krasno's, Establishing Ongoing Injury. ......................................... 20

      C.    Injunctions Follow First Amendment Harms Such as Krasno's. ......... 23

V.   An Ongoing Policy Justifying the Removal of Krasno's Speech is an Ongoing Violation of Her First Amendment Rights, Meeting *Ex parte Young.* ............................................................................................... 25

CONCLUSION .............................................................................................. 26

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(a)(7)(B)..................................................................... 28

CERTIFICATE OF SERVICE ...................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*ACLU of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ........................................................ 22

*ACLU of Ill. v. City of St. Charles,*
794 F.2d 265 (7th Cir. 1986) ........................................................ 15

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chicago,*
45 F.3d 1144 (7th Cir. 1995) .................................................... 10, 11

*Apter v. Richardson,*
510 F.2d 351 (7th Cir. 1975) ........................................................ 23

*Arkansas Educ. Television Comm'n v. Forbes,*
523 U.S. 666 (1998) ...................................................................... 8

*Attwood v. Clemons,*
818 F. App'x 863 (11th Cir. 2020) ................................................ 25

*Aurora Loan Servs., Inc. v. Craddieth,*
442 F.3d 1018 (7th Cir. 2006) ...................................................... 19

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ........................................................................ 6

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n,*
429 U.S. 167 (1976) ...................................................................... 3

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) .................................................................. 8, 16

*Davison v. Randall,*
912 F.3d 666 (4th Cir. 2019) ........................................................ 21

*DeBoer v. Vill. of Oak Park,*
267 F.3d 558 (7th Cir. 2001) ........................................................ 17

*Doe v. Prosecutor, Marion Cnty., Indiana,*
705 F.3d 694 (7th Cir. 2013) ........................................................ 24

*Dombrowski v. Pfister,*
380 U.S. 479 (1965) ...................................................................... 25

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ................................................................... 23

*Eichenlaub v. Twp. of Indiana,*
    385 F.3d 274 (3d Cir. 2004) ....................................................... 14

*Ent. Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ...................................................... 25

*Freedom From Religion Found. v. Abbott,*
    955 F.3d 417 (5th Cir. 2020) ...................................................... 25

*Greer v. Spock,*
    424 U.S. 828 (1976) ..................................................................... 8

*Gregoire v. Centennial Sch. Dist.,*
    907 F.2d 1366 (3d Cir. 1990) ..................................................... 13

*Hopper v. City of Pasco,*
    241 F.3d 1067 (9th Cir. 2001) .................................................... 14

*Keister v. Bell,*
    29 F.4th 1239 (11th Cir. 2022) ................................................... 19

*Knight First Amend. Inst. at Columbia Univ. v. Trump,*
    302 F. Supp. 3d 541 (S.D.N.Y. 2018) ........................................ 22

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ..................................................................... 4

*Lebron v. Nat'l R.R. Passenger Corp. (Amtrak),*
    69 F.3d 650 (2d Cir.) ................................................................. 13

*Lehman v. City of Shaker Heights,*
    418 U.S. 298 (1974) ................................................................... 13

*Lynch v. Huberman,*
    No. 10 C 1783, 2010 WL 3156006 (N.D. Ill. Mar. 26, 2010) .................................. 13

*Milestone v. City of Monroe, Wis.,*
    665 F.3d 774 (7th Cir. 2011) ....................................................... 7

*Minn. Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) .................................................. 15, 17, 18

*Nat'l People's Action v. Vill. of Wilmette,*
    914 F.2d 1008 (7th Cir. 1990) .................................................... 23

iv

*New York Magazine v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998) ................................................................ 12

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) ................................................................................ 7

*Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*,
767 F.2d 1225 (7th Cir. 1985) .......................................................... 8, 13

*Protect Our Parks, Inc. v. Chicago Park Dist.*,
971 F.3d 722 (7th Cir. 2020) .............................................................. 19

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ............................................................................ 5, 7

*Republican Party of Minnesota v. White*,
536 U.S. 765 (2002) .............................................................................. 6

*Riggs v. City of Albuquerque*,
916 F.2d 582 (10th Cir. 1990) ............................................................ 22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .............................................................................. 5

*Smith v. Exec. Dir. of Indiana War Memorials Comm'n*,
742 F.3d 282 (7th Cir. 2014) .............................................................. 24

*Steinburg v. Chesterfield Cnty. Plan. Comm'n*,
527 F.3d 377 (4th Cir. 2008) .............................................................. 16

*Surita v. Hyde*,
665 F.3d 860 (7th Cir. 2011) .............................................................. 26

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................................ 22

*Texas v. Johnson*,
491 U.S. 397 (1989) .............................................................................. 6

*United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) .............................................................. 13

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
783 F.3d 607 (7th Cir. 2015) .............................................................. 19

*United States v. Cunningham*,
429 F.3d 673 (7th Cir. 2005) .............................................................. 23

*United States v. Jordan*,
    485 F.3d 982 (7th Cir. 2007) ................................................................. 23

*United States v. Kokinda*,
    497 U.S. 720 (1990) ............................................................................. 16

*Watkins v. Blinzinger*,
    789 F.2d 474 (7th Cir. 1986) ........................................................... 25, 26

## OTHER AUTHORITIES

11A Wright & A. Miller, Federal Practice and Procedure § 2944............................. 24

## INTRODUCTION

The University has opened a square to the public where it hangs various posters displaying University messages. Anyone can enter the square at any time and are in fact encouraged to write messages beneath the posters in unlimited space reserved for this function. Except the rules work differently for people like Madeline Krasno. When Krasno writes a message criticizing the University's animal testing, it is automatically hidden even if it is relevant to the University's poster. This is because the University has a list of words that have been used in previous messages criticizing its animal testing. When the University hangs another poster and Krasno writes another message criticizing testing, the University again removes it. But this time it bans her from hanging messages, hiding them every time she attempts to speak like other individuals in the square. The University does not stop there. It monitors Krasno's private speech and activities outside the square for four months. Eventually it allows her to submit messages again for public view. It continues, however, to subject Krasno to its censored words list, forcing her to try to distort her anti-animal testing messages if she wants them to be on public view.

The University's special regulation of Krasno's speech plainly amounts to viewpoint discrimination. Though it attempts to shield its actions by suggesting Krasno seeks a right to participate in the relevant forums—the comment threads of the University's Facebook and Instagram pages—without limit, or by distorting this case into a facial challenge, its arguments rest on empty rhetoric. Krasno's as-applied claims seek to vindicate constitutional rights cemented by precedent: the right to participate

1

in the forums on the same footing as other members of the public who voice their own perspectives on the University's messages.

The University offers an alternative dangerous to free speech. Under its theory, the government can exclude specific perspectives under the guise of moderating a neutral category, like off-topic speech, that it implements aggressively for disfavored topics and half-heartedly for others. It can *recommend* but not require that off-topic speech be removed, letting officials decide whether something is off-topic based on intuition. In this regime, the government can select, consciously or subconsciously, certain viewpoints—pro-police, anti-vaccination, or anti-animal testing—for automatic exclusion regardless of whether they are in fact "off-topic." As Krasno argued in her opening brief, the University's position is an untenable breeding ground for viewpoint discriminatory censorship. Its Response provides no basis to question this, warranting reversal of the district court's decision.

## ARGUMENT

### I.    The University's Censorship of Krasno's Speech Removes an Anti-Animal Testing Perspective from the Forums.

The University's briefing is notable in what it does not say. It does not argue its imposition of an account restriction on Krasno or manual deletion of her comments was not viewpoint discriminatory. (*See* Appellees' Br. at 46–51.) By retreating to generalities, the University also avoids contention with Krasno's specific speech.

The University agrees that the comment threads are open for discussion "about the University," yet it ignores Krasno's argument that anti-animal testing speech is a perspective from Krasno, an alumna, that is inherently "about the University."

(Appellees' Br. at 26.) Or that its keyword filters have deleted Krasno's comments despite them responding to posts about animal testing or animal care at the University. (R-38-26 at 2–3 (SA-13–14)); (R-38-37 at 2 (SA-11)); (*see also* R-37 at 2–4, ¶¶ 12, 16.) Krasno is as entitled to have her perspective on University life voiced as any other member of the public applauding the results of the University's animal research. (*See, e.g.*, R-40-3 at 2–7) (comments applauding vaccine development); (*see also City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175–76 (1976) ("To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees.").)

Sidestepping this, the University instead justifies the keyword filters' use. (*See* Appellees' Br. at 46–51.) The University claims the filters cannot target viewpoints since it would change the filtered words when it posts about topics like animal testing. The record shows that this does not occur in practice. The University has barely changed the keyword filters through the years of this litigation and failed to remove them when posting about animal testing and care. (A-1 at 43–44) (the University has posted about animals); (*id.* at 43) ("[T]he first post [Krasno] commented on . . . was about cows returning to the University's Dairy Cattle Center, yet her 'stop exploiting animals' comment was hidden because she used the word 'labs.'").

Even if it did change the filters, the University cannot predict how words will be used. Relevancy is not capable of determination prior to speech being made, yet the filters preclude perspectives on the University's posts about animal testing from

ever being voiced. (*See, e.g.,* R-38-37 at 2 (SA-11).) Taking the University's hypothetical post "congratulating the women's volleyball team for a good season," the University states it would "not add words such as 'volleyball,' 'bump,' 'set,' and 'spike' because, more likely than not, user comments would include them." (Appellees' Br. at 48.) But keyword filters would exclude a comment stating, "the volleyball team opposes animal testing." (R-55-2 (SA-6)) (Instagram); (R-38-22 at 2 (SA-7)) (Facebook). This disparity is why *Lamb's Chapel* supports Krasno's claim of viewpoint discrimination: it existed in that case when a religious perspective on child-rearing was prohibited, but "there was evidence that the school allowed other viewpoints on the same subject matter." (Appellees' Br. at 50) (citing *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993).) The University's hypothetical mirrors its exclusion of critical animal testing *perspectives* about the University, but its allowance of alternative views about the same.

The University insists that its moderation imposes limits on "subject matter," (Appellees' Br. at 48), ignoring Krasno's argument that phrases and words like "cruelty" and "abusing," "torturing" and "kill animals" are associated with and selected from the past comments of anti-animal testing speakers. (R-55-2 (SA-6)) (Instagram); (R-38-22 at 2 (SA-7)) (Facebook); (Appellant's Br. at 24.) The University's own briefing shows the disparity in operation—that "[y]es, there is evidence that off-topic comments *supporting* animal testing were made . . . and not removed," while Krasno's critical speech containing the keyword "lab" was censored. (Appellees' Br. at

4

50.) In fact, the record contains *no* evidence that the University has ever censored any comments that support animal testing.

Further, even if the filters captured an array of opinions on animal testing, that too is viewpoint-based discrimination, as it singles out for disfavored treatment speech advocating perspectives on animal testing in response to the University's posts. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) (exclusion of "religious editorial viewpoints" which provided "a perspective, a standpoint from which a variety of subjects may be discussed and considered" unconstitutional). "[E]xclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831.

Even considered in the context of the University's purported "off-topic" moderation, the selective exclusion of anti-animal testing words among other off-topic speech is an impermissible content-based distinction. The disfavored treatment is akin to the "fighting words" at issue in *R.A.V. v. City of St. Paul*, where the Supreme Court found an ordinance restricting displays containing fighting words that evoked "race, color, creed, religion, or gender," amounted to content and viewpoint discrimination since it isolated a particular subset of topics for "special prohibition." 505 U.S. 377, 391 (1992) (citation omitted). The uneven application was telling in its allowance of "[d]isplays containing abusive invective . . . unless they are addressed to one of the specified disfavored topics." (*Id*. at 391.) Like *R.A.V.*, Krasno's use of anti-animal testing words is specially prohibited for disfavored treatment, singled out regardless of

relevancy despite the prevalence of non-animal related off-topic comments in the forums.

The University justifies its admitted exclusion of anti-animal testing speech as a means to "[un]clog" the comment threads, but First Amendment violations cannot obtain its purported goal. *See Texas v. Johnson*, 491 U.S. 397, 418 (1989) ("It is not the State's ends, but its means, to which we object."). As Krasno argued in her Brief, the volume of anti-animal testing comments does not excuse the University's censorship, as it is indistinguishable from the harms on-topic comments cause. (Appellant's Br. at 25–26.) To the contrary, the University's underinclusive moderation of "off-topic comments" raise more concerns about viewpoint discriminatory ends since that underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech." *City of Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994); *see also Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002) ("As a means of pursuing the objective of open-mindedness . . . , the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous."). The University's moderation of anti-animal testing speech does not advance any of its stated goals, and the University does not address this discrepancy.

Finally, it is true the University singles out more than just animal testing through its keyword filters, largely on its Facebook page. (*See* R-55-2 (SA-6)) (Instagram); (R-38-22 at 2 (SA-7)) (Facebook). Yet the exclusion of multiple subject matters or viewpoints does not render the government's restriction viewpoint neutral. (Appellees' Br. at 47–48.) If it did, the statute at issue in *R.A.V.,* would not have been deemed

viewpoint discriminatory, though it prohibited signs evoking multiple forms of bias. 505 U.S. at 391. The University offers no caselaw showing that it can avoid constitutional scrutiny by employing viewpoint-based censorship at scale.

## II.  The Comment Threads of the University's Social Media Pages are Designated Public Forums.

### A.  The University does not explain how Krasno's criticism of its animal testing is incompatible with a forum dedicated to interacting with the public about the University.

The University does little to dispel the importance of access for determining the nature of a forum, citing to only one case in which no forum analysis occurred. *See Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 783 (7th Cir. 2011) (declining to engage in forum analysis). Krasno's arguments as to why the district court erred in finding access restricted by the University thus stand unchallenged. (Appellant's Br. at 31–34.)

The University instead argues, without legal support, that it does not matter for forum determination whether restrictions on expressive activity in a nonpublic forum preserve the forums' purposes. (Appellees' Br. at 27.) This misunderstands the very nature of a nonpublic forum, where a limitation is in and of itself a means to achieve a stated purpose. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (a limited forum exists where the state "reserve[s] the forum for its intended purposes, communicative or otherwise") (citation omitted).

The need to preserve the purpose of the forums is not present here, and the University does not suggest otherwise. Instead, the University offers a blanket statement that off-topic comments disrupt the purpose of the forums, and this is sufficient

to justify its restriction. (Appellees' Br. at 27.) Though this analysis concerns more whether the exclusion of prohibited speech is reasonable under a forum already deemed to be nonpublic,[1] the University's wrongly asserts that there is no inquiry into a forum's incompatibility with excluded speech.

This Court has stated that when determining whether the government has created a public forum, courts consider "whether the proposed speech is inconsistent or incompatible with the primary use of the government facility." *Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*, 767 F.2d 1225, 1232 (7th Cir. 1985) (citations omitted). Forum analysis concerns this very issue, serving "as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). This makes sense; when speech is restricted from a forum *not* to advance the forums' purposes, there is little reason to restrict it at all.

Indeed, restrictions on speech in nonpublic forums continually find allowance of other subjects or speakers would hamper the government's purpose in creating the forums. *See, e.g., Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 681 (1998) (public debate opened to all would undermine educational purpose and value of event); *Greer v. Spock*, 424 U.S. 828, 838 (1976) (avoidance of partisanship through

---

[1] And is therefore addressed below, *infra* Part III.

exclusion of political speech on military base proper where its "business" is "to train soldiers, not to provide a public forum").

It is undisputed the University created and opened the forums to serve an expressive function that Krasno's speech furthers.

**B.     The University's litigation posture does not limit the forums.**

The parties agree a forum can be limited given the government's policy and practice of excluding such speech. The University believes it has done so since its officials have discretion to remove some off-topic speech, and they sometimes exercise it. Even under the University's position, this halfhearted attempt is insufficient.

During litigation, the University has attempted to create an operative limitation by molding together an internal guidance and its Social Media Statement. (Appellees' Br. at 27.) These documents fail to show an actual policy of limiting speech. One purports to allow (but not require) removal based on "one criterion: whether posted content is on vs. off topic." (*Id*.) The other permits removal for anything from promotional materials to content deemed "profane," "threatening" or "injurious" or "for any reason." (R-38-1 at 2 (SA-1).) No limitation on speech exists on the social media pages themselves. (R-54 at 5–6, ¶¶ 9–11); (R-38-2 at 2) (showing Instagram page.) The lack of clarity over what is excluded resulted in Krasno being forced to litigate her exclusion to discover the rationale behind it.

Even if a "reservation" exists, it is problematic for its discretionary quality. There is no requirement to remove—and hence no prohibition on making—off-topic or anti-animal testing comments. (R-54 at 9, ¶ 20); (Appellees' Br. at 37) ("[T]he

University's Social Media Statement and Interim Guidance does not *require* social media managers to remove all off-topic comments.").

The University relies on this "reservation" to distinguish its moderation from *Christ Bride Ministries* and *Gregoire*, decisions that required the government to identify a "definite standard for inclusion and exclusion" to show a forum is limited. (Appellees' Br. at 29.) As proof of this, the University identifies its Interim Guidance, (Appellees' Br. at 27), a document adopted after Krasno filed suit and which it admitted "is not a model of clarity." (A-1 at 24) (it "includes a number of confusing statements"). The document does not mention the range of moderation decisions the University employs, such as account restrictions and keyword filters. (*See* R-38-5 at 2–3 (SA-2–3).) This has resulted in University officials moderating speech for a range of rationales, some not reflected in any guidance at all. (*See* R-54 at 7, ¶¶ 15–17.) The University waives this problem away with the balm of contacting the University's Office of Legal Affairs when uncertainty arises, (Appellees' Br. at 31), but the promise is illusory: University's moderators have not done so despite being unsure if comments relate to University posts. (R-50 at 1–2, ¶¶ 1–2); (*see also* Appellees' Br. at 31 (under the informal policy, "moderators at times may be uncertain whether user comments are off-topic").)

Whatever guidance it points to, they comprise post-hoc policy formation that does not establish government intent, as this Court discussed in *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chicago*, 45 F.3d 1144, 1153–54 (7th Cir. 1995). The Interim Guidance is a policy adopted after Krasno filed suit, "'creat[ed]' to implement

its newly-discovered desire to suppress a particular message." (*Id.* at 1153) (citation omitted). The University invoked its Social Media Guidance, "an otherwise unenforced policy," to justify suppression of Krasno's speech. (*Id.*) But "[a] stated or paper policy, without more, does not negate public forum status." (*Id.* at 1154.)

More is required to show the University reserves the forums for an intended use.

### C.    Practical difficulties of moderating speech do not fill the gaps in the University's purported attempts to limit the forums.

"Objective indicia of intent" show an effort to eliminate speech like Krasno's, but otherwise an open forum created for expressive purposes. *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1154. Krasno contends this is the relevant inquiry for determining intent: in practice, access to the forums is not restricted to any members of the public, who are freely able and invited to use the comment threads for expressive purposes. (Appellant's Br. at 31–34.)

The University resists this outcome by arguing it moderates some off-topic speech following the grant of access and asking the Court to excuse its inconsistency by noting its pledged efforts. (Appellees' Br. at 32–36.) There is little uncertainty in the record that would complicate a forum analysis. The presence of visible comments Krasno made during litigation shows the inconsistency. Purporting to capture off-topic speech, the keyword filters do not hide words or phrases when misspelled or typed with gratuitous spacing. (*See, e.g.*, R-54 at 40–41, ¶¶ 116–117.) Yet when Krasno deploys these workarounds to submit a comment with her anti-animal testing perspective, they remain visible and unmoderated. (*Id.*) This either suggests the

11

University considers comments containing filtered speech "on topic" and thus uncon-
stitutionally prescribed, or that it does not in fact moderate content it deems off-topic.
It is not surprising, since the University admits it does not know whether many com-
ments are off-topic or not. (Appellees' Br. at 37.)

Nor can the keyword filters, which the University offers as a means of limiting
the forum of "spam," serve as a permissible restriction of off-topic content. (Appellees'
Br. at 31–32.) Spam is not even mentioned in its informal policies as a prohibited
category. (*See* R-38-1 at 2 (SA-1)); (R-38-5 at 2–3 (SA-2–3).) The University can also
never know if a comment containing prohibited words such as "cruelty" or "animal
testing" will be relevant to its posts, and has no process to ensure automatically hid-
den comments are off-topic. (*See* R-54 at 29, ¶ 79.) Regardless, "it cannot be true that
if the government excludes any category of speech from a forum through a rule or
standard, that forum becomes ipso facto a non-public forum." *New York Magazine v.
Metro. Transp. Auth.*, 136 F.3d 123, 129–30 (2d Cir. 1998). "This reasoning would
allow every designated public forum to be converted into a non-public forum the mo-
ment the government did what is supposed to be impermissible in a designated public
forum, which is to exclude speech based on content." (*Id.*)

The University attempts to dodge its inconsistent moderation by asserting that
a scientific showing of imperfect moderation is required. It cites no legal basis for this
argument. (Appellees' Br. at 32.) It cannot. Decisions finding the government's exclu-
sion resulted in a nonpublic forum do so not from comprehensive analyses of every
past exclusion, but the government's showing of almost non-existent departure from

12

the limitation on access. *See, e.g.*, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302 (1974) (plurality) (no public forum where exclusion of political and public-issue advertising consistently enforced for twenty-six years); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 654 (2d Cir.) (not designated forum where "in the twenty-six years of its existence, the Spectacular has never been used for any type of advertising other than commercial promotions"), *opinion amended on denial of reh'g*, 89 F.3d 39 (2d Cir. 1995).

Countless courts have resolved the distinction without resorting to scientific analysis. *See, e.g.*, *Planned Parenthood Ass'n*, 767 F.2d at 1232 (public forum where through "laissez-faire policy, CTA has allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads."); *See also Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) ("access to many diverse groups" evinced intent to create designated public forum); *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) ("[I]n accepting a wide array of political and public-issue speech, SORTA has demonstrated its intent to designate . . . a public forum."); *Lynch v. Huberman*, No. 10 C 1783, 2010 WL 3156006, at *7 (N.D. Ill. Mar. 26, 2010) (St. Eve, J.) (designated public forum where "over forty-eight community, educational, civic, and commercial organizations routinely employ school mailboxes to disseminate flyers"); (Appellant's Br. at 39.)

No comprehensive review is required to see the University's application of its "informal" off-topic policy is underinclusive of non-animal testing speech, (*see, e.g.*, R-

54 at 14–15, ¶¶ 37–38); (R-50 at 1–2, ¶¶ 1–2), and overinclusive of an anti-animal testing sentiment, (*see, e.g.*, R-54 at 13–14, ¶¶ 35–36.) Even the University's examples of off-topic moderation show this disparity. (*See* Appellees' Br. at 33 n.9.) "Having effectively opened its doors to all comers, subject only a standardless standard," the University "has failed to exercise the clear and consistent control" over access to the comment threads "require[d] to maintain a [nonpublic] public forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001).

The University's remaining arguments fare no better. The "sheer volume" of speech the University disagrees with is irrelevant to determining whether it consistently limited the forums. (Appellees' Br. at 32–33.) Not one case is cited in support of its position that imperfect limitations on a forum are sufficient if the government's objective to exclude speech is practically difficult.

Even so, social media is not the same as physical public forums. Social media pages host unlimited debate. There is no need to "cut-off the speaker" within comment threads since, as compared to physical town-halls, the University's speech is never hidden by comments; a user is never prevented from commenting; and there is no difference in any burden imposed by the volume of comments that depends on whether they are on or off-topic to a post. (Appellees' Br. at 36) (quoting *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004)). There is no risk a comment will "hijack the proceedings." (*Id*.) Social media comments are more akin to displaying a message on a button pinned to one's shirt than using up shared time in front of a microphone.

Nor are inconsistencies in limiting a forum excused because past speech is involved. The University cites *ACLU of Ill. v. City of St. Charles* to suggest past speech is less worthy of constitutional protections, (Appellees' Br. at 34), but in *ACLU*, this Court writes that "speech delayed may be speech destroyed" to emphasize that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 794 F.2d 265, 274 (7th Cir. 1986) (citation omitted). Even if "stale" speech excused inconsistent moderation, it is inapplicable to a primary means the University removes anti-animal testing speech. Keyword filters apply the moment such a comment is made, at the height of what the University contends is its social importance. (R-54 at 24–25, ¶ 68.)

## III.    It Is Not Reasonable to Solve a Purported Problem with Off-Topic Speech with a Remedy Aimed at Addressing Government Time Constraints.

To be found "reasonable," the University's moderation of Krasno must work toward a "permissible objective," *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018), and be cabined in application through "objective, workable standards," *id*. at 1891. The University argues it meets this test since it would like to tailor users' comments to material that interests its audience, (Appellees' Br. at 38–39), something it cannot do if anti-animal testing speech it deems off-topic "clog[s]" the comment threads. (Appellees' Br. at 39.) Taking its rationale at face value, the University does not establish how off-topic comments are inherently more disruptive than on-topic comments, and thus its blanket restriction of animal advocacy related comments is reasonable. Its citation that off-topic comments clog up the comment threads is the

district court's opinion, which is based on nothing in the record. (*See* Appellees' Br. at 39); (A-1 at 32–33.)

Though disruptive speech can be excluded in nonpublic forums, none of the considerations supporting their exclusion exist here. In *Kokinda*, for example, a plurality of the Supreme Court found "it is not unreasonable to prohibit solicitation" from post office sidewalks since "it is unquestionably a particular form of speech that is disruptive." *United States v. Kokinda*, 497 U.S. 720, 733 (1990) (plurality). Evidence of actual disruption was not needed because: (1) the sidewalk's purpose was for mail delivery, not expressive communication, and (2) solicitation occupied a historical category of conduct deemed disruptive. (*Id.*) In comparison, speech on issues of public concern, like Krasno's, are core forms of First Amendment activity excluded from forums designed for expressive purposes.

Further, the considerations that underpin reasonable, viewpoint neutral restrictions in nonpublic forums are often supported by a need to control (and a history of controlling) the scope of public participation to conduct official business, *see Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 387 (4th Cir. 2008) (public meeting agenda), or achieve a government aim, *Cornelius*, 473 U.S. at 806 (minimize workplace disruptions). None of these needs are present on social media platforms.

The University is aware of this, finding no issue with posts that contain hundreds of (non-animal testing related) comments. (*See, e.g.*, R-40-3 at 2–7); (R-38-29 at 2–53); (R-50 at 2–3, ¶¶ 2–3, 5.) If volume was an issue, it could turn off commenting after receiving a threshold number of comments. (R-40 at 9, ¶ 35); (R-54 at 1–2, ¶ 2.)

16

It could heed notifications it receives when a user mentions the University in a comment. (*See* R-45 at 6, ¶ 11.) But it doesn't. It instead spends resources and time monitoring and removing anti-animal testing speech.

The exclusion is not "capable of reasoned application." *Mansky*, 138 S. Ct. at 1888 n.14. When restricting speech, the reasonableness inquiry demands that the government "articulate some sensible basis for distinguishing what may come in from what must stay out," *id*. at 1888, and guide discretion in making that distinction through "objective, workable standards," *id*. at 1891. Yet the University admits this does not exist, resulting in conflicting judgment calls on excluding speech that rely on confusing, unclear guidance. *See supra* Part II.B–C; (*see also* Appellees' Br. at 37) ("Some user comments are not easily recognized as off-topic."). There are "no concrete standards or guideposts" to guide University officials in removing off-topic speech. *See DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 573 (7th Cir. 2001) (requirement that use of village hall "benefits the public as a whole" unconstitutional since policy had "no concrete standards or guideposts . . . [to] gauge whether an event satisfies this precondition"). The keyword filter that eliminates most anti-animal testing comments cannot even predict their off-topic nature.

The University's moderation echoes *Mansky* itself, where the Supreme Court found the state's "unmoored use of the term 'political'" in barring political apparel at polling places incapable of reasoned application, particularly "combined with haphazard interpretations . . . in official guidance and representations to th[e] Court." *Mansky*, 138 S. Ct. at 1888. The University's exclusion of anti-animal testing speech

is similarly the result of an ill-defined rule, causing it to fail even reasonableness' "forgiving test." *Id.*

## IV. Krasno has standing to seek injunctive relief for the keyword filters' continued censorship of her speech.

The University attempts to contort Krasno's claims to conform to the district court's ruling, saying Krasno facially challenged the off-topic rule and had standing to do so. (*See generally* A-1.) But Krasno brought as-applied claims of content and viewpoint discrimination against the University for its exclusion of her speech from the forums, restrictions *the University* argued where made for purportedly being off-topic.

The University also mischaracterizes Krasno's requested relief as seeking a prohibition against moderation. (Appellees' Br. at 41–42.) As Krasno articulated, her challenge seeks to enjoin use of the filter to censor her anti-animal testing viewpoint and declare that censorship unconstitutional. (R-34 at 1.)[2] She has shown standing to seek this prospective relief.

### A. Standing is Not Merits, Even on a Motion for Summary Judgment.

Adopting the district court's conclusion that Krasno could only have standing if she had "a right to comment without exclusion," the University posits the court correctly applied the "evidentiary record" when assessing Krasno's injury from the keyword filters. (Appellees' Br. at 45.) The proposal ignores this Court's caselaw

---

[2] The University incorrectly states the parties did not brief standing. Krasno did so, which the University did not address. (*See* R-35, at 57–58.)

segmenting when merits and standing determinations are made. (*See Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006) (standing inquiry does not include showing "a right . . . has been infringed" but "a colorable *claim* to such a right").)

Contrary to the University's contention, the notion that a merits determination follows a showing of injury is true at all stages of litigation, including on motions for summary judgment. *See, e.g., Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 736 (7th Cir. 2020) (finding standing on appeal of summary judgment, noting "when the existence of a protected property interest is an element of the claim, deciding whether the interest exists virtually always goes to the merits rather than standing"); *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 616 (7th Cir. 2015) (same) (cleaned up). Even in those few cases where a party argues standing depends on the nature of the forum—something not put forth by the University—the merits of the governments' exclusion is not decided until resolving standing's threshold issue. *See, e.g., Keister v. Bell*, 29 F.4th 1239, 1254 (11th Cir. 2022) (deciding forum analysis and standing before assessing merits of government's speech restriction), *cert. denied*, 143 S. Ct. 1020 (2023).

This makes sense. If Krasno had to show a "constitutionally-guaranteed right to comment about animal testing regardless of the topic of the University's posts," no litigant challenging their restriction from a public forum would proceed to a merits determination. (A-1 at 42.) The argument posits that a court can decline to assess viewpoint discrimination if the merits of another claim confine the interests that

support standing. The conflation is particularly problematic for assessing viewpoint discrimination since it can occur in any forum, making unreviewable challenges that speakers are excluded from nonpublic forums not because of the limitations but a disagreement with their views.

### B. The University Continues Filtering Anti-Animal Testing Speech Like Krasno's, Establishing Ongoing Injury.

The University offers two main arguments to show why Krasno is not under threat of censorship from its keyword filters. The first claims the filters change, making it uncertain that, though her past comments were censored, (*see* R-38-26 at 2 (SA-13)); (A-1 at 43 n.17), Krasno's speech will be caught. (Appellees' Br. at 42–43.) It is undisputed that throughout litigation, the keyword filters have hardly budged. The anti-animal testing words on the University's Facebook filters have not changed. (*See* R-38-22 at 2 (SA-7).) On Instagram, three anti-animal testing words have been removed, while "PETA," "WNPRC," "animal testing," "kill animals," "testing cats," "testing on animals," "vivisection" and "cruelty" have been consistently listed, among others. (*Compare id*. at 3 (Instagram list), *with* (R-55-2 at 2 (SA-6)) (updated Instagram list).)

That her speech is likely to be caught again is shown in her need to employ workarounds in spelling to evade the filters' censorship. (*See* Appellant's Br. at 14.) Or in Krasno's continued advocacy on social media about "the unknown harms of primate testing," including "on the University's @uwmadison Instagram and Facebook pages." (R-40 at 2, ¶ 4.) Yet the University offers no legal analysis as to why these

20

injuries are not ongoing or pose a threat of future reoccurrence, distinguishing none of Krasno's cases on this point. (*See* Appellees' Br. at 42–45.)

The University's second argument that future injury is unlikely relies on its assertion that it does not post about animal testing, and thus Krasno's comments advocating an anti-animal testing perspective will never be relevant. (Appellees' Br. at 43–44.) To make this argument, the University ignores the first post Krasno commented on which concerned animal testing and was censored. (*See* R-38-26 at 2 (SA-13).)

The University's position raises the bar on injury to anyone suffering from a constitutional violation, demanding the near certainty of future censorship. It is contrary to how courts have decided standing in similar cases. In *Davison v. Randall*, the Fourth Circuit evaluated injury in the context of social media censorship on an appeal from a bench trial. 912 F.3d 666 (4th Cir. 2019), *as amended* (Jan. 9, 2019). The Court affirmed plaintiff Davison's preenforcement standing after he was barred from a government official's Facebook Page, finding Davison "continues to engage in a course of conduct—namely, posting about alleged municipal corruption" that are "likely to be impacted by [the official's] allegedly unconstitutional approach to managing the page." (*Id*. at 678.) The fact the official previously blocked Davison established "a credible threat of enforcement" in addition to the official's testimony that she could continue to do so in the future. (*Id*. at 678–79.) This sufficed to establish "an injury in fact sufficient to justify the prospective declaratory relief." (*Id*. at 679); (*see also Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp.

3d 541, 557–58 (S.D.N.Y. 2018) ("future harms are not only certainly impending as required for standing purposes, but they are in fact virtually certain because the individual plaintiffs continue to be blocked" from President's Twitter account), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021).)

Like preenforcement cases, Krasno knows she will be subject to the University's practice of using keyword filters to target anti-animal testing speech. She has been repeatedly censored by the filters. (*See, e.g.,* Appellant's Br. at 23–24, 45); (*cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not '"chimerical."')) (citation omitted). And the threat is latent is the University's commitment to using keyword filters to target speech like Krasno's. (*See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) ("The 'existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III], because a probability of future injury counts as 'injury' for the purpose of standing.'") (citation omitted); *Driehaus*, 573 U.S. at 165 (threat of future injury found where government had "not disavowed enforcement if petitioners make similar statements in the future").)

A finding of future injury is further counseled by the University's pains to penalize Krasno's speech in particular. (*See* Appellant's Br. at 28.) This ongoing attempt to censor Krasno demonstrates a threat of reoccurrence. (*See Riggs v. City of Albuquerque*, 916 F.2d 582, 586 (10th Cir. 1990) (distinguishing *Lyons*' speculative future

injury with allegation that "defendants continue to conduct illegal surveillance of plaintiffs' activities.")); (*cf. Apter v. Richardson*, 510 F.2d 351, 354 (7th Cir. 1975) (allegation that agency action "carried out with the actual purpose and effect of injuring her" evidenced "not merely . . . an 'abstract injury' common to all," nor "only a possible but unlikely future injury.").)

## C.  Injunctions Follow First Amendment Harms Such as Krasno's.

Krasno set forth why deprivation of her First Amendment rights warrants prospective relief, (*see also* Appellant's Br. 48–49), resting on historic recognition that "[e]ven a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm." *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990); (*see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (defining the four factor test for granting permanent injunctions, including irreparable harm).)

The University fights this by invoking the district court's *dicta* that it would decline to issue an injunction even if standing were present, a conclusion unsupported by any legal analysis by the court, (Appellees' Br. at 51–52), or a merits analysis of Krasno's claims, (A-1 at 45.) The University urges its adoption nevertheless, arguing it can only be overturned for abuse of discretion.

Abuse of discretion is only afforded when the record "reflect[s] an exercise of discretion based on the evidence and the applicable legal standard," something entirely missing from the district court's summary determination that injunctive relief would not be rewarded. *United States v. Jordan*, 485 F.3d 982, 985 (7th Cir. 2007); *see also United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005) (noting "we

have to satisfy ourselves, before we can conclude that the judge did not abuse his discretion, that he exercised his discretion, that is, that he considered the factors relevant to that exercise."). Without a merits determination, the court's decision declining to award relief is nothing but a hypothetical opinion.

The district court could not have assessed whether to award injunctive relief, as that determination is intertwined with a ruling on the merits. It follows, for example, that "if a constitutional violation is established, usually no further showing of irreparable injury is necessary." 11A Wright & A. Miller, Federal Practice and Procedure § 2944. This is due to the unique nature of First Amendment injuries where the "main obstacle" to obtaining prospective relief is success on the merits. *Smith v. Exec. Dir. of Indiana War Memorials Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014) (citation omitted).

The University also throws in the argument that the prospective relief Krasno seeks is vague. (Appellees' Br. 51–52.) Krasno had requested an injunction against the University's practice of "blocking keywords associated with animal research on the UW Madison Facebook Page and UW-Madison Instagram Account,"[3] a request overlooked by the district court (and University). (R-34 at 1.) Krasno's requested relief is hardly vague, and follows injunctions this Court has granted to bar enforcement of unconstitutional government action. *See, e.g., Doe v. Prosecutor, Marion Cnty., Indiana*, 705 F.3d 694, 703 (7th Cir. 2013) (statute prohibiting class from social media

---

[3] Krasno also sought declaratory relief. (*See* R-34 at 1.)

use unconstitutional and remanding for entry of permanent injunction); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 643 (7th Cir. 2006) (same); (*see also Dombrowski v. Pfister*, 380 U.S. 479, 497 (1965) (remanding for consideration of scope of injunctive relief for threatened violations of constitutional rights).)

## V.  An Ongoing Policy Justifying the Removal of Krasno's Speech is an Ongoing Violation of Her First Amendment Rights, Meeting *Ex parte Young*.

The University attempts to avoid the *Ex parte Young* exception for ongoing violations of Krasno's constitutional rights by ignoring its undisputed fidelity to the same moderation practices that have censored and continue to burden Krasno's speech. Past exclusion from a forum under an ongoing policy constitutes ongoing conduct. *See, e.g., Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020) (exception applied for plaintiff's past exclusion from exhibit display, where it "sought prospective . . . relief, including a declaration 'that the criteria to approve exhibits . . . facially and/or as applied by the Defendants, violate' the First Amendment and an injunction preventing 'the Defendants from excluding the Plaintiff's exhibit at issue from future display'") (cleaned up); *Attwood v. Clemons*, 818 F. App'x 863, 868 (11th Cir. 2020) (*Ex parte Young* exception applied to declaratory relief that government official engaged in viewpoint discrimination when he blocked plaintiff from social media pages, as well as injunctive relief ordering unblocking).

This is why the University's argument that the account restriction is confined to past conduct fails. The University attempts to distinguish its use through *Watkins v. Blinzinger*, 789 F.2d 474, 483 (7th Cir. 1986). It cites—out of context—that because it "has not pledged to retain [its] policy" of moderating speech like hers, Krasno has

not shown moderation will reoccur. (Appellees' Br. at 56–57.) But that is a misstate-ment of *Watkins*, which found a government actor had *not* shown mootness when they adopted a new policy following the prior policy's challenge. Even then, this Court re-jected that the challenge to the former policy was moot "because the state has not pledged to retain the [new] policy." *Watkins*, 789 F.2d at 483. The opposite has oc-curred here, with the University pledging to continue to moderate anti-animal testing speech. (A-1 at 41.)

So to its explanation of why still hidden comments are not ongoing violations. The University raises *Surita v. Hyde*, a case that does not discuss the Eleventh Amendment, to say prospective relief for a previous free speech violation is futile. *See generally* 665 F.3d 860, 875 (7th Cir. 2011); (*see also* Appellees' Br. at 55.) The opinion sheds little light on ongoing violations: there was no allegation of repeated censorship of Surita, nor of an ongoing policy to moderate his speech. (*Id*.)

Finally, Krasno's purported ability to issue "comments related to University posts for the past two years" is a false promise. (Appellees' Br. at 56.) Krasno could not have commented with her perspective without employing laborious workarounds of keyword filters maintained by the University's practices. (A-1 at 10 n.8.) These events demonstrate the continued operation of the University's challenged conduct.

## CONCLUSION

For the foregoing reasons, Plaintiff Madeline Krasno respectfully requests this Court reverse the district court.

Respectfully submitted: May 12, 2023

By: /s/ Caitlin M. Foley

**ANIMAL LEGAL DEFENSE FUND**
Caitlin Foley
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
cfoley@aldf.org
(707) 795-2533

Christopher Berry
525 E. Cotati Ave.
Cotati, CA 94931
cberry@aldf.org
(707) 795-2533

**LAFFEY, LEITNER & GOODE LLC**
Joseph S. Goode
Mark M. Leitner
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003 Phone
(414) 755-7089 Facsimile
jgoode@llgmke.com
mleitner@llgmke.com

Attorneys for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)(B)

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c). As calculated by my word processing software (Microsoft Word for Office 365), the brief contains 6964 words.

/s/ Caitlin M. Foley
Caitlin Foley

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF No. system. Participants in this case who are registered CM/ECF No. users will be served by the CM/ECF No. system.

/s/ Caitlin M. Foley
Caitlin Foley