In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-3170

MADELINE KRASNO,

*Plaintiff-Appellant*,

*v.*

JENNIFER MNOOKIN, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 21-cv-99 — **Stephen L. Crocker**, *Magistrate Judge.*

———————————

ARGUED SEPTEMBER 21, 2023 — DECIDED AUGUST 1, 2025

———————————

Before EASTERBROOK, ROVNER, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* After the University of Wisconsin–Madison hid Madeline Krasno's comments on its social media posts and restricted Krasno's Instagram account, Krasno sued, alleging a violation of her First Amendment rights. Krasno claimed she earned the University's disapproval for calling attention to what she believes to be animal abuse in the University's primate testing facilities. The University defended its social media moderation decisions on the ground

that it was hiding "off-topic" comments. The district court entered summary judgment for the University and denied summary judgment for Krasno. Relevant here, the district court found the University's comment threads were nonpublic forums and upheld the University's social media moderation decisions as reasonable and viewpoint neutral. It further held that Krasno lacked standing to seek an injunction against the University's ongoing use of keyword filters to implement its rule against off-topic comments.

We disagree. We find that Krasno has standing to bring this as-applied challenge. We also conclude that the interactive comment threads attached to the University's posts are limited public forums, such that speech restrictions imposed by the University on the comment threads must be reasonable and viewpoint neutral. Because the University's ill-defined off-topic comment rule is neither reasonable nor viewpoint neutral, we find it unconstitutional under the First Amendment.

## I.  BACKGROUND

"We review de novo a district court's decision on cross-motions for summary judgment, construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016). The following facts are undisputed.

### A.  Factual Background

#### 1.  *Social Media Platforms*

"Social-media platforms … have gone from unheard-of to inescapable." *Moody v. NetChoice, LLC*, 603 U.S. 707, 716

(2024). They now represent one of the "most important places … for the exchange of views" in modern life. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). The University of Wisconsin–Madison operates social media accounts on Instagram and Facebook. Instagram and Facebook are social media platforms that allow people and institutions to interact with one another, including by sharing photos, videos, and messages. Once a person or entity creates an account on either platform, the platform generates an account-specific webpage where the account holder can "post" (*i.e.*, publish) content. When the account holder posts content—whether in the form of photos, videos, or text—the content is automatically accompanied by an interactive space immediately adjacent to the content, where other accounts can write comments and reply to comments from others. This space is known as a "comment thread."

Comment threads on Instagram and Facebook are attached to, but separate from, an account holder's original post. Within a comment thread, a commenter's unique Instagram or Facebook username appears immediately prior to the comment. In other words, a comment is attributed to the commenter.

Instagram and Facebook offer tools for an account holder to limit how commenters can interact in the comment threads attached to the account holder's posts. For instance, on Instagram, an account holder can disable the comment thread entirely for the account's posts. Additionally, an Instagram account holder can "restrict" another account. If Account A "restricts" Account B, then all of Account B's comments will be automatically hidden from the comment threads attached to Account A's posts, unless Account A affirmatively approves

a specific comment. Restricted accounts are not notified that they have been restricted.

On Facebook, an account holder can manually hide from public view, or delete entirely, specific comments of others. A hidden comment can be seen only by the commenter and the commenter's "friends,"[1] while a deleted comment cannot be seen by anyone.

Finally, both Instagram and Facebook allow account holders to implement "keyword filters" that automatically hide any comments containing specific words or phrases the account holder selects.

### 2. *The University's Social Media Accounts and Comment Moderation*

The University's Instagram and Facebook accounts bear the username "UWMadison." The University uses its accounts to communicate official announcements, events, and policies; they are considered "the official voice of the University." The University chose to make both accounts "public," which by default allows anyone with an Instagram or Facebook account to view and comment on the University's posts. The University's audience includes current and prospective students, faculty, staff, alumni, community members, and the public.[2] To engage its audience, the University has created more than 2,400 Instagram posts covering a wide range of

---

[1] On Facebook, accounts can "friend" one another, thereby gaining access to one another's non-public posts.

[2] (Dkt. 40, Joint Statement of Undisputed Facts, ¶¶ 67, 76).

topics. It also frequently shares information, announcements, and anecdotes on its Facebook account.

The University's Office of University Communications oversees these social media accounts, including by moderating comments on the University's posts. John Lucas is the Assistant Vice Chancellor for University Communications; Mike Klein is the Director for News Content and Editorial Projects; and Nate Moll is a Social Media Manager. Klein and Moll make daily moderation decisions regarding comments on the University's posts, while Lucas oversees compliance with the University's social media guidelines for comment moderation.

The University has a public "Social Media Statement" which it published to its website before this litigation began. It provides:

> While UW–Madison does not regularly review content posted to social media sites, it shall have the right to remove any content for any reason, including but not limited to, content that it deems threatening, profane, obscene, a violation of intellectual property rights or privacy laws, off-topic, commercial or promotion of organizations or programs not related to or affiliated with the university, or otherwise injurious or illegal. Users are fully responsible for the content they load on any of UW–Madison's social media sites.

After the start of this litigation, the University distributed interim guidance to its social media staff. The guidance instructs that the University's "social media managers may

engage in content moderation of social media pages based on one criterion: whether posted content is on vs. off topic." It provides that social media managers have discretion to "remove posts that are unrelated to the topic or purpose of the page." As an example, it explains that "while the social media manager of a page dedicated to UW–Madison's animal research programs may hide a post stating 'Taylor Swift is the B0mB,' he or she cannot hide a post that states, 'Taylor Swift agrees that all universities should stop torturing animals by using them for research. This includes UW–Madison's animal research programs!'"

In addition to manual moderation, the University employs keyword filters on its Instagram and Facebook accounts to enforce the University's social media guidelines. The University programmed its keyword filter on Instagram to automatically hide comments that include the following words or phrases: #freebabycocoa, #releasecornelius, @peta, Cornelius,[3] WNPRC,[4] abusing, animal testing, biden, cruelty, kill animals, killers, lab, monsters, rot in hell, shame on, testing on animals, testing on cats, tests on cats, torture, torturing, trump, vivisection, you guys are sick. Its keyword filter on Facebook automatically hides comments that include, among other phrases: peta, macaques, animal laboratories, testing on animals, animal testing, barbaric, wnprc, primate, primates, experimenting on, research animals, cruelty, torturing, torture, vivisection, monkeys, and experimenting.

---

[3] Cornelius is one of the primates at the University's research labs.

[4] "WNPRC" stands for the Wisconsin National Primate Research Center.

Much of the University's content moderation decisions are left to its employees' discretion. The University has no formal practice for adding or removing terms from its keyword filters; the process is "situation dependent" and occurs on an "as-needed basis." Nor has it provided written guidance to help staff decide whether to "ban" a user on social media; it instead does so on a "case-by-case basis." Similarly, Moll, Klein, and Lucas have discretion to hide, respond to, or ignore comments left by users. The University does not conduct audits or compliance reviews regarding the application and enforcement of its social media guidelines.

### 3. Krasno's Advocacy and the University's Response

While a student at the University of Wisconsin–Madison, Krasno worked as a primate caretaker at the Harlow Center for Biological Psychology. Through the Harlow Center and the Wisconsin National Primate Research Center, the University conducts invasive research on animals, including nonhuman primates.

Krasno's background working for the Harlow Center inspired her to become an animal rights advocate and educate others about the treatment of primates. She does this, in part, by using social media to highlight her experiences at the Harlow Center.

In September 2020, Krasno began commenting on the University's social media posts to advocate for animal rights. For instance, on September 18, 2020, she commented on a University Instagram post about dairy cows at the University's Dairy Cattle Center: "stop exploiting animals. Get with the future and the future is consistent anti-oppression. Shut down the labs and eat plants!" She also responded to another user's

comment, explaining that she "used to work in one of their labs." Krasno's comments were hidden. Another user commented on the same post, stating, "Hopefully I will be admitted next year, fingers crossed!" That comment was not hidden.

Ten days later, Krasno commented on a University Instagram post about a new recreation center. Krasno wrote, "Thanks for continuing to delete my comments … I will continue to share the truth about what it was like working in one of your primate research labs and advocate for their closure. … [T]oday is a great day to shut down the primate research labs!" This comment, too, was hidden. At the time Krasno posted, the post had 179 other comments.

At the end of September 2020, the University restricted Krasno's Instagram account, thereby automatically hiding her comments on the University's posts. When questioned about the account restriction, Moll explained that he had noticed a "consistent pattern of off-topic comments" by Krasno. By the time Krasno filed suit, Krasno was the only person the University had restricted on Instagram. Moll removed the restriction on Krasno's Instagram account in late January 2021.

While Krasno's Instagram account was restricted, she commented on five of the University's posts; each comment was hidden automatically due to the restriction. Four of the posts she commented on concerned the University's mascot, COVID-19 efforts and measures, and Thanksgiving travel. Krasno's comments on these four posts urged the University to stop testing on monkeys or to close its primate labs. The fifth post concerned a dog being treated for cancer at the University's veterinary hospital. On that post, Krasno commented on December 22, 2020, "It is really quite hypocritical

the compassion shown to this dog while thousands of animals languish in laboratories at @uwmadison. I really wish you would acknowledge this and do something about it." None of these comments were unhidden after the University lifted Krasno's account restriction in January 2021, though the University does not dispute that the December 22 comment was on topic.

The University also manually moderated Krasno's comments on Facebook. For example, on December 9, 2020, Krasno commented on a University Facebook post about proud alumni, stating, "University of Wisconsin–Madison, are you really proud of all your graduates or just the ones who don't object to your barbaric treatment of monkeys in your research labs?" The University manually hid Krasno's comment for being off topic.

On December 13, 2020, Krasno commented on a University Facebook post about winter commencement and the future, remarking, "I wish you would think about the future in new ways too and stop testing on monkeys. Working in one of those labs during college showed me how important it is that we create a just world. Animal research is not the way to accomplish this." This comment, which included a word on the University's keyword filter list ("monkeys"), was hidden.

Once Krasno discovered the University's use of keyword filters, she began modifying the spelling of certain words to avoid the filters. On May 9, 2021, she responded to a University Instagram post about Mother's Day, commenting "What about all the mothers you have in cages on campus? Celebrating them too after ripping their babies away from them? A n l m a l t e s t l n g is cruel." On March 24, 2022, in response to a University Facebook post announcing a "Cool Science

Image contest," Krasno commented, "Considering much of the 'science' done at the university is research without consent AKA t e s t l n g o*n a n l m a l s, let's see some footage [of] the a l n m a l s in your l a b s. After all, y'all are all about transparency right?" Both comments remain publicly visible.

### B. Procedural History

On February 10, 2021, Krasno sued the University of Wisconsin–Madison's Board of Regents alongside Jennifer Mnookin,[5] the University's Chancellor; Charles Hoslet, the Vice Chancellor for University Relations; John Lucas, the Assistant Vice Chancellor for University Communications; Mike Klein, the Director for News Content and Editorial Projects; and Nate Moll, a Social Media Manager. Krasno alleged the University violated her First Amendment rights by censoring her speech in the University's comment threads. Krasno sought injunctive relief, declaratory relief, and nominal damages.

Each side moved for summary judgment. The parties disputed, among other things, the nature of the forum the University created in its comment threads and the corresponding standard to apply in assessing the University's moderation decisions. They also disputed whether Krasno had standing and whether certain relief Krasno requested was barred by the Eleventh Amendment. While briefing was ongoing, Krasno voluntarily dismissed the Board of Regents as a defendant, leaving only the individual defendants in the case.

---

[5] Krasno initially sued Rebecca Blank, then-Chancellor of the University of Wisconsin–Madison. When Jennifer Mnookin became Chancellor during the pendency of this lawsuit, the district court substituted Mnookin for Blank under Federal Rule of Civil Procedure 25(d).

The district court entered summary judgment for the defendants and denied summary judgment for Krasno. It began by applying the Supreme Court's forum jurisprudence. Finding nonpublic and limited public forums substantively equivalent, the court determined that the comment threads attached to the University's posts were nonpublic forums, such that any restrictions to speech were required to be reasonable and viewpoint neutral. The court then held the University's off-topic comment rule satisfied this standard.

Next, the district court concluded that the Eleventh Amendment barred Krasno's official capacity claims against the individual defendants insofar as they related to the decision to restrict her Instagram account and hide her December 9, 2020, Facebook comment. In particular, the district court determined that the *Ex parte Young* limitation on sovereign immunity did not save her claims because any violation was no longer ongoing. As for Krasno's request to enjoin the University's use of keyword filters, the district court held that Krasno lacked standing because she did not have a right "to comment about animal testing regardless of the topic of the University's posts" and had not shown she was likely to be harmed by the keyword filter in the future. Finally, the court concluded that Krasno's individual capacity claims failed because the defendants were entitled to qualified immunity.

Krasno timely appealed.

## II.   ANALYSIS

On appeal, Krasno challenges the dismissal of her official-capacity claims against the individual defendants. Krasno argues the University's off-topic comment rule—as implemented through keyword filters, an Instagram account

restriction, and manual moderation of individual comments pursuant to the University's Social Media Statement and interim guidance—is unconstitutional as applied to her.

We first address the jurisdictional issues relevant to this appeal. We then turn to the merits of Krasno's First Amendment challenge.

## A. Jurisdictional Issues

### 1. Standing

Article III of the United States Constitution limits the judicial power to deciding "cases" and "controversies." U.S. CONST. art. III. § 2. To establish a case or controversy, the plaintiff must demonstrate a "personal stake" in the matter. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In other words, the plaintiff must establish standing to sue. *Id.* Standing requires a plaintiff to show "(i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The district court concluded that Krasno lacked standing to seek injunctive relief against the University's continued use of keyword filters. In the district court's view, Krasno was unable to show she faced an actual and imminent injury because she had no "constitutionally-guaranteed right to comment about animal testing regardless of the topic of the University's posts." Nor could she show redressability, in the district court's view, because the possibility that Krasno would make an off-topic comment that would be caught by the University's keyword filters was speculative.

But the district court erred by collapsing its standing inquiry into its assessment of the merits. Standing does not require a plaintiff to prove success on the merits. *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006). Rather, it requires demonstrating "a colorable *claim*" to a right that the defendant allegedly infringed. *Id*. The conclusion that Krasno lacked standing was based on the court's merits determination that Krasno had no right to comment on the University's social media posts. But whether Krasno in fact has a right to comment on the University's posts cannot answer the question of whether she raised a colorable claim to relief. "Otherwise every losing suit would be dismissed for lack of jurisdiction." *Owsley v. Gorbett*, 960 F.3d 969, 971 (7th Cir. 2020).

Krasno has standing to seek relief against the University's moderation of her comments. She claims the University is barring her speech from the interactive portions of its social media pages by enforcing its off-topic comment rule in a discriminatory manner. That is a cognizable injury. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984). The University continues to implement its off-topic rule through keyword filters that block the speech Krasno wants to engage in, such that the alleged harm is ongoing and could warrant injunctive relief. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 238–39 (7th Cir. 2015).

Krasno has demonstrated that her comments have been suppressed by the University's implementation of its off-topic comment rule in the past, that she wants to continue commenting in the future, and that the University's filters have largely remained stagnant over time. As such, she has shown that the off-topic comment rule poses an ongoing threat of actual or

imminent injury. *See Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012); *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004). Such injury is redressable because an injunction against the use of the keyword filters would remedy the injury allegedly caused by the filters blocking Krasno's speech. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

### 2. Sovereign Immunity

As confirmed by the Eleventh Amendment, states are sovereigns and are therefore immune from suit. *Va. Off. for Prot. and Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). While "the Eleventh Amendment is not 'jurisdictional' in the same way as Article III's case-or-controversy requirement," it is "'jurisdictional' in the sense that a defendant invoking its sovereign immunity deprives a federal court of jurisdiction over the claims against that defendant." *McHugh v. Ill. Dept. of Trans.*, 55 F.4th 529, 533 (7th Cir. 2022).

The doctrine of *Ex parte Young* provides an "important limit on the sovereign-immunity principle." *Stewart*, 563 U.S. at 254. It "allows suits … for declaratory or injunctive relief against state officers in their official capacities." *Reed v. Goertz*, 598 U.S. 230, 234 (2023). In particular, private parties may sue state officials in their official capacities "for prospective relief to enjoin ongoing violations of federal law." *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023) (citation and quotation omitted).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the]

complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Com'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (citation and quotation omitted).

*Ex parte Young* permits Krasno's request for an injunction against the University's use of keyword filters, which qualifies as prospective relief against an allegedly ongoing violation of federal law. Likewise, Krasno may seek injunctive relief against the University's ongoing implementation of its off-topic comment rule through the manual moderation of its comment threads. The sources of the University's rule—*i.e.*, its Social Media Statement and interim guidance—continue to afford moderators discretion to manually moderate comments.

The district court, however, found barred by sovereign immunity Krasno's request for a declaration that the restriction of her Instagram account and hiding of a December 2020 Facebook comment violated the First Amendment.[6] As it observed, the University lifted the restriction on Krasno's Instagram account in January 2021 such that any violation of federal law was not ongoing; rather, the restriction occurred only in the past. It also reasoned that the University's act of hiding the December 2020 Facebook comment was past conduct.

---

[6] Although the district court and Krasno frame the University's action on December 9, 2020, as the deletion of a Facebook comment, the record reflects that the Facebook comment was hidden by the University; it was not deleted. For accuracy, we refer to the December 9 comment as being hidden, not deleted.

We agree with the district court that *Ex parte Young* does not allow Krasno to seek relief for either event. The Instagram account restriction was lifted in January 2021. Krasno is therefore free to comment on the same posts on which she previously commented; this time, her comments will not be automatically hidden pursuant to any account restriction. Similarly, the hiding of a Facebook comment in December 2020 occurred in the past. Because these actions are not "continuing conduct" that must be "change[d] to comply with federal law," they do not amount to alleged ongoing violations of federal law and *Ex parte Young* does not apply. *Sherwood*, 76 F.4th at 694 (quoting *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986)).

The relief Krasno sought in relation to the account restriction and hiding of her December 2020 Facebook comment also cannot be "properly characterized as prospective." *Verizon Md., Inc.*, 535 U.S. at 645. In particular, Krasno sought an order declaring that "Defendants' practice of restricting [her] Instagram account" and "deletion of [her] comments from the UW–Madison Facebook page … [are] unconstitutional." But an order declaring that these past actions violated the Constitution would not require the University to act prospectively. *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (*Ex parte Young* "does not permit judgments against state officers declaring that they violated federal law in the past"). And while Krasno proposes on appeal that she could *also* be entitled to an injunction requiring the University to "unhide" the comments that were hidden, she does not identify where she requested this form of injunctive relief before the district court. As far as we can tell, the prospective action she sought from the University concerned its ongoing implementation of its off-topic comment rule through

keyword filters and discretionary manual moderation deci-
sions. She cannot advance new claims for relief for the first
time on appeal. *Gerlach v. Rokita*, 95 F.4th 493, 498 (7th Cir.
2024).

## B. First Amendment Analysis

Having established our jurisdiction and the relief Krasno
may seek in view of the Eleventh Amendment, we turn to the
merits of Krasno's First Amendment challenge to the Univer-
sity's off-topic rule, as applied to her. The First Amendment
provides, in relevant part, that "Congress shall make no law
… abridging the freedom of speech." U.S. Const. amend. I. It
applies to the states (and, by extension, state universities) via
the Fourteenth Amendment's Due Process Clause. *Gitlow v.
New York*, 268 U.S. 652, 666 (1925) (states); *Widmar v. Vincent*,
454 U.S. 263, 267–69 (1981) (state universities).

The parties agree the comment threads attached to the
University's social media posts are government-controlled
property. When the government restricts private speech on
property it controls, the Supreme Court's forum caselaw
guides our assessment of whether the restrictions are consti-
tutional. *Hague v. CIO*, 307 U.S. 496, 515–16 (1939); *Perry Educ.
Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45–46 (1983);
*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–112
(2001); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 n. 11
(2010). By contrast, "forum analysis is misplaced" when the
government is "speaking on its own behalf" on its property,
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S.
200, 215 (2015), as the government is "entitled … to take a po-
sition" when it speaks, *id*. at 208. Accordingly, before under-
taking any forum analysis, we must assure ourselves that
comments within the comment threads are private speech

rather than speech of the University. We do this by applying the government-speech doctrine. *Shurtleff v. City of Boston, Mass.*, 596 U.S. 243, 252–53 (2022).

### 1. *Government-Speech Doctrine*

Our evaluation of "whether the government intends to speak for itself or to regulate private expression" on its property "is not mechanical" nor guided by "the rote application of rigid factors"; rather, "it is driven by a case's context." *Shurtleff*, 596 U.S. at 252. Speech may be attributed to the government where, for example, the government has "actively shaped or controlled" the messaging on its property to a meaningful extent, *id.*, or where "the public would tend to view the speech at issue as the government's," *id.* at 255.

For instance, in *Pleasant Grove City, Utah v. Summum*, the Supreme Court found that Pleasant Grove City's display of donated monuments in its park constituted the City's expressive conduct, as the City actively selected certain monuments "for the purpose of presenting the image of the City that it wishe[d] to project," and because "persons who observe[d] donated monuments" on the City's property would reasonably "interpret them as conveying some message on the [City's] behalf." 555 U.S. 460, 471–73 (2009).

Likewise, in *Walker*, the Supreme Court held that specialty license plate designs offered by Texas for use by its citizens conveyed Texas' speech, even though some of the designs were created and proposed by private groups. 576 U.S. at 204–05, 208, 214–15. To that end, it was relevant that a proposed design would not be offered to the public until the design received affirmative approval from the Texas Department of Motor Vehicle Board. *Id.* at 205, 213–14. In both *Summum* and

*Walker*, then, the government was actively involved in selecting content to display on its property, such that the government effectively adopted its selections as its own expression.

In contrast, the Supreme Court in *Shurtleff* found that the city of Boston was not engaged in government speech when, "[f]or years," it "allowed private groups to request use of the flagpole [outside Boston City Hall] to raise flags of their choosing." 596 U.S. at 248. While the Court acknowledged Boston's tradition of displaying flags on its City Hall Plaza to "convey the city's messages," *id*. at 254, and further recognized the possibility that the public might "ordinarily associate a flag's message with Boston," *id*. at 255, it found "most salient" that Boston lacked "meaningful involvement in the selection of flags or crafting of their messages," *id*. at 256, 258. For instance, the Court noted that the city employee tasked with handling flag-raising applications never viewed the flags prior to the flag-raising events, and that Boston offered no guidance as to the permissible messages that flags could communicate. *Id*. at 257. As such, the flag raising was deemed private speech. *Id*. at 258.

Because the comment threads here operate similarly to Boston's flag-raising program and differently from a government's display of donated statues in its park or curated offering of license plate designs, we find that the comments are private speech. Most critically, the University is not actively involved in the selection of the comments displayed on its comment threads, as the University does not sift through submissions of comments to feature only those comments that "present[] the image of the [University] that it wishes to project." *Summum*, 555 U.S. at 473. Were Moll or another social media moderator to screen all comments prior to publication

and then publish only those comments that aligned with the University's preferred image, the comments could more reasonably be attributed to the University. But that is not how the comment threads operate. Comments are published without the University taking any action, such that "the degree of government involvement" in shaping the comments' messaging is nearly imperceptible. *Shurtleff*, 596 U.S. at 257.

We acknowledge that the keyword filters employed by the University do amount to *some* government involvement in the messages that ultimately appear on the comment threads. But the nature and extent of that involvement is not meaningful enough to transform the comments into the University's speech. The keyword filters operate passively, not actively, as they only suppress comments that happen to contain certain phrases or words. *See Shurtleff*, 596 U.S. at 252. The filters do not evaluate the substance of a comment to display only comments that convey University-approved messages. *See id.* at 258. In fact, that a commenter may circumvent the filters to publish a comment antithetical to the University's messaging (*e.g.*, by editing the spacing of letters in a word) underscores that the filters do not actively select messages the University wishes to feature. Because the keyword filters are not meaningfully or actively involved in selecting comments or shaping a comment's message, they do not supply a basis on which we can find the comments constitute the University's speech.[7] *See id*.

---

[7] The dissent portrays our reasoning as finding it "significant" that the University uses an automated program rather than human curation in suppressing comments from its comment threads. But our conclusion that the University's keyword filters do not transform the comments into

Given this absence of meaningful involvement by the University in selecting comments, we disagree with our dissenting colleague that the comments are materially analogous to letters to the editor featured in the University's alumni magazine. As the dissent acknowledges, in an alumni magazine, each letter is *chosen* by the editor. That being the case, we take no issue with the dissent's position that a selection of letters to the editor in the University's magazine (whether in an online or paper format) could constitute government speech. But this case does not concern an alumni magazine, nor any other online publication of the University. The comment threads also do not function like an alumni magazine. Each letter in an alumni magazine is chosen by the University; each comment on the comment threads is not.

We also disagree with the dissent's application of *Shurtleff* as suggesting that the mere existence of a policy governing speech transforms any speech subject to that policy into the government's own speech. Were we to accept the dissent's application, policies restricting speech on government property would become unreviewable: So long as the government had some policy regulating speech, the policy would be protected from First Amendment scrutiny under the government-speech doctrine. We cannot agree with this result, nor do we find this result supported by *Shurtleff*. In applying the government-speech doctrine, *Shurtleff* did not instruct courts to ask the binary question of whether the government had a policy regulating speech or not. Rather, *Shurtleff* instructed that

---

government speech does not rest on the distinction between automated and human curation. To the contrary, our conclusion rests on the fact that the *degree* of the keyword filters' involvement in the comment threads is minimal at best. *See Shurtleff*, 596 U.S. at 257.

courts conduct a "holistic inquiry" not driven by "the rote application of rigid factors." 596 U.S. at 252. That inquiry, it explained, may include an assessment of "the extent to which the government has actively shaped or controlled the expression" on its property, *id.*, and whether that involvement is "meaningful," *id.* at 258. Where there is no policy nor other effort at shaping speech whatsoever, then the degree of government involvement will not be sufficiently meaningful to warrant finding that the regulated speech is government speech. *See id.* at 257. But that does not mean that the existence of a policy compels finding that any speech subject to that policy is government speech. What mattered in *Shurtleff* was not the existence or absence of a policy, alone, but the *extent* of government involvement in shaping speech. *Id.* at 256–58. Here, the University's minimal involvement in shaping the comments on its comment threads weighs against finding that the comments constitute the University's speech.

The University's representations as to how it uses its comment threads, and the nature of social media more generally, reinforce that the University is not "enlist[ing] private [persons] to convey [the University's] own message" through the private persons' comments. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). For example, the University represents that it does not generally "remove or restrict criticisms from the comment threads" on Facebook (dkt. 40 at 17 ¶ 78) and that it has replied to comments that criticized the University (id. at 14 ¶ 64); (dkt. 54 at 17–18 ¶ 46). The University also recognizes that its comment threads allow social media users to engage with one another, including by debating issues such as the University's research initiatives, the campus community's willingness to wear face masks, and the necessity and efficacy of a mobile COVID-19

testing facility. (Dkt. 40 at 16 ¶¶ 74–75). Moreover, the University's Social Media Statement places responsibility on the commenter for the content of a comment, reflecting that the University does not intend to "take[] ownership" of each comment on its comment threads or otherwise "associate[] itself" with the comments. *Walker*, 576 U.S. at 216. Collectively, these representations illustrate that the University opened its comment threads to facilitate discourse among and with its audience, but not to display its audience's comments "for the purpose of delivering a [University]-controlled message." *Summum*, 555 U.S. at 468.

The University's discourse-oriented use of its comment threads aligns with qualities inherent in social media, as well. Indeed, the Supreme Court has acknowledged social media as among "the most important places … for the exchange of views," likening it to a "modern public square" where individuals engage in protected First Amendment activities such as speaking, listening, and debating topics "as diverse as human thought." *Packingham*, 582 U.S. at 104, 105, 107. Because individuals use social media with the expectation that they will see and participate in debate and other discourse, we see "little chance that observers will fail to appreciate the identity of the speaker." *Summum*, 555 U.S. at 471. The speaker is the commenter. Should the University comment within a comment thread attached to one of its posts (*e.g.*, when replying to a comment critical of the University), then the speaker will be the University. But a comment published by a private person constitutes the speech of that person, whose username is displayed immediately prior to the person's comment. We are therefore confident that the public is unlikely to perceive those comments as conveying a message on behalf of the University. *See Shurtleff*, 596 U.S. at 252. Accordingly, under the

"holistic inquiry" mandated by *Shurtleff*, the public's likely perception presents another reason to find the comments constitute private speech. *Id*.

Because we find the University does not display the comments of others as its *own* speech, but instead opens its comment threads for private expression, we proceed to assess the constitutionality of the University's speech restrictions on its comment threads by looking to "the nature of the relevant forum," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985), and the government's action, *see Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018).

### 2. *The Supreme Court's Forum Jurisprudence*

The Supreme Court has identified several types of government property, including: the traditional public forum, designated public forum, limited public forum, and nonpublic forum. *Mansky*, 585 U.S. at 11; *Walker*, 576 U.S. at 215–16; *Martinez*, 561 U.S. at 679 n.11.

A traditional public forum is public property—for instance, streets and parks—that "ha[s] immemorially been held in trust for the use of the public, and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (citation and quotation omitted). A designated public forum encompasses "government property that has not traditionally been regarded as a public forum" but "is intentionally opened up for that purpose." *Summum*, 555 U.S. at 469. In both traditional and designated public forums, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions

based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Mansky*, 585 U.S. at 11.

The government has considerably greater leeway in restricting speech in the remaining forums: limited public forums and nonpublic forums. A limited public forum is established when the government "open[s] property 'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" *Martinez*, 561 U.S. at 679 n.11 (quoting *Summum*, 555 U.S. at 470). And a nonpublic forum is a "space that 'is not by tradition or designation a forum for public communication.'" *Mansky*, 585 U.S. at 11 (quoting *Perry*, 460 U.S. at 46). Rather, it exists "[w]here the government is acting as a proprietor, managing its internal operations." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *see also Women's Health Link, Inc. v. Fort Wayne Pub. Trans. Corp.*, 826 F.3d 947, 951 (7th Cir. 2016) (describing a nonpublic forum as property "that could be and sometimes [is] used for private expressive activities but [is] not primarily intended for such use"). Speech restrictions applied to limited public forums and nonpublic forums need only be reasonable and viewpoint-neutral; there is no strict scrutiny analysis involved. *Martinez*, 561 U.S. at 679; *Mansky*, 585 U.S. at 11–12.

### 3. *Determining the Type of Forum*

Krasno argues the University's comment threads are designated public forums, while the University contends they are either nonpublic or limited public forums.

When considering how to classify a forum, the government's intent in establishing the forum matters. *Cornelius*, 473 U.S. at 802. Ascertaining the government's intent requires that we look to "the nature of the property and its compatibility

with expressive activity," as well as the government's "policy and practice." *Id*.

The comment threads attached to the University's posts are inherently compatible with expressive activity because they are designed to facilitate that purpose. At the same time, the University's policy and practice demonstrate that in deciding to open to the public the comment threads on its posts, the University did not intend the public's expressive activity to proceed entirely unchecked. Instead, the University reserved the right to remove any content for, among other things, being off topic.[8] This policy was not a hidden or post hoc rationale to support the University's comment moderation decisions. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of the City of Chi.*, 45 F.3d 1144, 1153–54 (7th Cir. 1995). Rather, the Social Media Statement was publicly posted on the University's website before this litigation began, and it constitutes "[o]bjective indicia" of the University's intent. *Id*. at 1154.

The University's Social Media Statement and efforts at enforcing that statement reflect that the University did not intend to create a designated public forum without limits on discussion, but instead intended to open the comment sections for the discussion of certain subjects—principally, those that relate to its posts. *See Cornelius*, 473 U.S. at 802–03 ("We will not find that a public forum has been created in the face of clear evidence of a contrary intent" or based on mere "inaction" by the government). Accordingly, we find the

---

[8] Krasno does not challenge the portions of the University's Social Media Statement that reserve the right to remove content for reasons other than being off topic.

University's comment threads are best characterized as limited public forums.[9]

Our conclusion aligns with the few circuit courts that have applied the Supreme Court's forum jurisprudence to government-run social media accounts. In general, courts have found "that the comment threads of government social media pages are designated public forums when the pages are open for comment without restrictions and limited public forums when the government prospectively sets restrictions." *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 634 (D.C. Cir. 2024) (collecting cases). Because the University chose to promulgate and implement its Social Media Statement rather than open its comment threads without restriction, we conclude the comment threads attached to the University's posts are limited public forums. And while we acknowledge the dissent characterizes our holding as finding that Facebook itself is a limited public forum, we emphasize that our holding is narrower. We decide only that the comment threads attached to the University's social media posts—and not social media platforms more broadly—are limited public forums.

---

[9] Classifying the comment threads as nonpublic forums would not change how we assess the constitutionality of the University's speech restrictions. We have at times treated limited public and nonpublic forums as synonymous, *see Milestone v. City of Monroe*, 665 F.3d 774, 783 n.3 (7th Cir. 2011), while in other cases we have treated them as distinct, *see Women's Health Link, Inc.*, 826 F.3d at 951. Regardless of whether the comment threads are deemed limited public or nonpublic forums, the University's regulation of speech must be reasonable and viewpoint neutral. *See Summum*, 555 U.S. at 470 (limited public forums); *Mansky*, 585 U.S. at 13 (nonpublic forums).

### 4. *Applying the Reasonable-and-Viewpoint-Neutral Test to the Off-Topic Comment Rule*

Because the University's comment threads are limited public forums, we must determine whether the speech restrictions within these spaces are reasonable and viewpoint neutral. *See Martinez*, 561 U.S. at 679 n.11; *Rosenberger*, 515 U.S. at 829.

We find unconstitutional the University's off-topic rule as applied to Krasno because it is not viewpoint neutral, but instead discriminates against Krasno's anti-animal testing and pro-animal rights viewpoint. The terms the University selected for filtering are terms that one would reasonably expect to be used by individuals opposed to animal testing. That the University also chose to program its keyword filters to hide words and phrases that are unrelated to animal testing does not change the fact that many of the keywords selected by the University align significantly with Krasno's anti-animal testing and pro-animal rights viewpoint. And the University's admission that it *has* hidden an on-topic comment by Krasno suggests that the University's moderation decisions were spurred not by the relevance of Krasno's commentary to the underlying posts, but by the views her commentary conveyed.

We also find the off-topic comment rule unconstitutional because it is unreasonable. To assess reasonableness, we consider the University's justifications for its off-topic rule. *Mansky*, 585 U.S. at 13; *Martinez*, 561 U.S. at 687. Recall that the off-topic comment rule, which affords the University's social media staff discretion to moderate comments it deems off topic, is rooted in the University's public Social Media Statement and was reaffirmed by the University in its interim guidance.

The University claims the rule keeps its comment threads un-clogged, enabling its audience to interact with its posts and the University to respond to questions and comments. We agree this is a permissible objective given the communicative purpose of the comment threads.

But lines drawn by the University to further this permissible objective must be reasonable. In other words, "the [University] must be able to articulate some sensible basis for distinguishing what may come in from what must stay out" of its comment threads. *See Mansky*, 585 U.S. at 16. While the University need not be perfectly clear and precise, an "indeterminate prohibition" enforced through sheer discretion without "objective, workable standards" is not reasonable. *Id.* at 21.

The University's bare instruction in its Social Media Statement that comments may be removed if "off-topic" and its discretion-based practice of enforcing that statement through manual moderation decisions and keyword filters fail this test. The University has neither clarified what it means to be "off-topic" nor provided "objective, workable standards" to guide its social media managers' discretion. *Id*. To be sure, after this litigation began, the University's interim guidance provided staff a single example of what is "on vs. off topic"—*i.e.*, its Taylor Swift example. But even that limited guidance refers to the "topic … of the page"—seemingly referring to the webpages associated with the University's accounts—which conflicts with the University's assertion in this litigation that comments must relate to the topic of the "post." Moreover, by its own terms the guidance does not mandate consistent moderation of off-topic comments, and the University admits moderation decisions are discretionary. In sum, the

University has not supplied a "sensible basis for distinguishing what may come in from what must stay out." *Id.* at 16.

"It is 'self-evident' that an indeterminate prohibition carries with it '[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation.'" *Id.* at 21 (quoting *Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)). The unreasonableness of the off-topic comment rule and potential for abuse is cemented by the University's admission that it *has* hidden certain comments of Krasno that were on-topic comments. Such missteps demonstrate that the University has not "respect[ed] the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829.

The off-topic comment rule is also unreasonable because, "as implemented by the keywords, … it is inflexible and unresponsive to context"—meaning it does not really operate as an "off-topic" rule in the first place. *Tabak*, 109 F.4th at 637–38. The keyword filters apply automatically to comments on the University's posts, regardless of a given post's topic. In other words, Krasno could not today renew her comment on the University's December 22, 2020, Instagram post about a dog being treated for cancer, even though the University admitted such a comment would be on topic. The record contains no evidence that the University manually approves on-topic comments initially hidden by its filters.

In short, the University's inflexible and context-blind keyword filters do not reasonably further its "off-topic" justification when there is no way to know before a post is created whether a given phrase will be on- or off-topic in relation to the post. *See id.* at 636 (finding unreasonable a highly similar off-topic comment rule that "consider[ed] words related to

animal testing categorically 'off-topic'"). We therefore conclude that the University's off-topic comment restriction, as currently written and enforced against Krasno, is unreasonable under the First Amendment.

### III.    CONCLUSION

For these reasons, we REVERSE the entry of summary judgment for the University and REMAND with instruction to the district court to enter judgment for Krasno consistent with this opinion.

EASTERBROOK, *Circuit Judge*, dissenting. *On Wisconsin* is the alumni magazine of the University of Wisconsin-Madison. Some of its articles bear bylines of the staff, some of alumni, some of faculty members, and some of third parties. No matter the author, each article is chosen by the editor. *On Wisconsin* also carries letters to the editor, which appear at pages 6 and 7 of the current issue (Summer 2025). These letters discuss the University, its sports teams, and its graduates. None mentions animal research.

The magazine's contents are governmental speech. Articles and letters may be written and signed by private parties, but the University as the publisher decides what to print. See *Hosty v. Carter*, 412 F.3d 731 (7th Cir. 2005) (en banc) (student paper is speech by the school if teachers act as editors, but by the students if the school supplies only a financial grant). In this respect an alumni magazine is no different from a newspaper. The paper's owner does not write the stories, but the publisher decides what to print—something as true of the news pages, and the letters to the editor, as it is of the editorials. See *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) (state cannot compel a newspaper to engage in "balanced" coverage of political campaigns by running letters opposed to the paper's views). No one believes that a byline on a story or letter strips a magazine's or newspaper's editor of the right to decide what appears.

A governmental body has the same right to speak as any private entity. "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work. Boston could not easily congratulate the Red Sox on a victory

were the city powerless to decline to simultaneously transmit the views of disappointed Yankees fans. The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff v. Boston*, 596 U.S. 243, 251–52 (2022) (citation omitted). See also, e.g., *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015); *Pleasant Grove v. Summum*, 555 U.S. 460, 467–69 (2009); *University of Wisconsin v. Southworth*, 529 U.S. 217, 235 (2000); *Rosenberger v. University of Virginia*, 515 U.S. 819, 833 (1995).

In *Summum* the Court held that a monument was governmental speech, even though a private party submitted and paid for the monument. That's equally true of letters to the editor. "[E]xpressive activity includes presenting a curated compilation of speech originally created by others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024). See also *id*. at 728–33 (collecting cases), 781 (Alito, J., concurring). So too the selection of speakers to appear on public TV is a form of governmental expression, no matter who produces or submits the shows. *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 674 (1998). Similarly, the choice of floats in a parade represents the speech of the organizer, not of the clubs that submit the floats, even though each float bears its sponsor's name. *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995).

Given the power of a magazine's editor to choose which letters (if any) to publish, there can't be any problem if the editor delegates this task to another member of the staff, with guidelines to ensure that the staff follows the editor's preferences. The editor might tell the staff: (1) letters collectively cannot exceed two pages of the magazine; (2) letters must not

undermine the University (so no praise of the Ohio State football team or requests for contributions to Northwestern); (3) no letters on the topic of animal research, a topic the editor wants to reserve for commissioned articles.

Delegation to a subordinate can't matter to constitutional analysis, nor does the physical format of the magazine. Suppose *On Wisconsin* appears as a PDF file on a website in addition to a printed version. (It does. See onwisconsin.uwalumni.com/issues.) Suppose the University also produces the magazine as a website with clickable links to articles, letters, and other materials. (It does. See onwisconsin.uwalumni.com.) The "extra space" of a website might lead the editor to relax Guideline 1—or maybe not, as the editor might not want to change the balance between commissioned articles and readers' submissions (now apt to be called "comments" or "posts" rather than letters). But the magazine's existence as a website would not be likely to change Guidelines 2 and 3, nor would the Constitution compel the editor to change those Guidelines. If Boston need not praise the Yankees, the University of Wisconsin need not publicize disgruntled graduates' proposals that alums send their donations to Northwestern. Nor does the fact that each letter (or post, or comment) is signed compel the University to publish it. Likewise the fact that *On Wisconsin* does not publish the Guidelines would not compel it to print everything submitted. Authors and editors need not explain their policies to the general public.

Next step: Instead of hosting the magazine on its own website, the University decides to host the magazine, or its equivalent, on Facebook, and to use the Guidelines to select which comments will appear there. This should not make a

constitutional difference. The University remains the speaker and editor. It labels its Facebook page "the official voice of the University." Neither the University nor Facebook censors private speech; any would-be speakers can say whatever they want on their own websites, Facebook pages, other social media, or letters to the editor of the *Madison Capital Times*.

If there is to be a legal difference, the University ought to have *greater* editorial latitude on Facebook. For Facebook is a private entity, which controls what can be posted on its platform and how content filters work. Publishing *On Wisconsin*, by contrast, is a governmental operation from start to finish. When the University uses the tools of social media, it is a state actor (see *Lindke v. Freed*, 601 U.S. 187 (2024)), but as a state actor the University remains entitled to select its own speech. As long as "expressive activity includes presenting a curated compilation of speech originally created by others", *Moody*, 603 U.S. at 728, it is hard to see why the University's selectivity is more problematic on Facebook than on its own website, the PDF version of the magazine, or the paper version of the magazine. Similarly, the fact that the *Miami Herald* has "more room" on a website or Facebook page than in the printed paper would not allow a state to compel the *Herald* to offer equal time to all political candidates. The newspaper would retain its right to promote its favored causes and candidates. Cf. *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1 (1986) ("extra space" in a billing envelope cannot be conscripted by a state to undermine the mailer's political or economic views).

Yet my colleagues conclude that the move from wisc.edu or an alumni site to facebook.com flips the constitutional rule. Instead of the editors being allowed to choose, the readers get

to compel the University to include their submissions. This is so, the majority says, because Facebook is a "limited public forum." I don't understand why the University's site on Facebook is any more a public forum than is *On Wisconsin*'s web page, or for that matter the printed magazine. All of these are outlets for the University to get its ideas across. Moving from a site under the University's control to a private one (Facebook) should curtail the rights of the general public to compel the University to include what it deems anti-University speech.

*Shurtleff* is the Supreme Court's most recent effort to distinguish public forums from governmental speech. For decades Boston allowed private groups to fly their flags over the plaza of City Hall, but it balked at what one group called a "Christian Flag." In rejecting Boston's argument that the choice of flag was governmental speech, the Court emphasized that the city lacked any criteria for choosing which flags could appear and that the tradition had been first-come-first-served. That approach disabled the city from contending that the flags represented its own speech. "[T]he city's lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raisings as private, not government, speech—though nothing prevents Boston from changing its policies going forward." 596 U.S. at 258. In other words, when a governmental body *does* have policies that shape the message being presented, the government is entitled to claim editorial privilege to speak. And that is exactly what the University of Wisconsin has done. Its policies, designed to mold the views that appear on its Facebook page, mean that the page is not a public forum under *Shurtleff*. The University can curate the site to make the message its own.

My colleagues find it significant that the University uses Facebook's built-in filters rather than (or in addition to) human curation. That should not matter, any more than the delegation from *On Wisconsin*'s editor-in-chief to its staff should matter. What *does* matter under *Shurtleff* is that the University has policies about what can appear and what can't. If these policies are permissible in printed matter, where manual selection is the norm, what makes these policies constitutionally forbidden where computers do most of the work? As long as people make the rules that the computers execute, the result speaks for the University. *Shurtleff* tells us that having rules about content is what separates an open forum from governmental speech—and the University of Wisconsin assuredly has rules about what can appear on its Facebook page. My colleagues think these rules unreasonable. Maybe; maybe not; my point is that the rules *exist*, and their very existence is what nixes the assertion that the Facebook page is a public forum.

A university's Facebook page, designed to portray the university in a light of the university's choice, is no more a public forum than is the National Portrait Gallery, which is designed to present great art (of the curators' selection) rather than kitsch. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (city can select among "party animals" as street art even though all of them may be kitsch). Just so, a public library chooses what to make available on the shelves, and a decision to have Churchill's six-volume *The Second World War* does not compel it to offer Hitler's *Mein Kampf* as well. See *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc). It does not matter that the curators and librarians work under open-ended guidelines ("fine art"; "useful books"), or that the curators and librarians are not the top policy makers (they would be the Board of the Smithsonian and

the legislature of the jurisdiction paying for the library). Using those details to declare the museums and libraries are public forums would prevent them from fulfilling their missions. The constitutional point is instead that the museum and the library do not regulate anyone's speech and reading; kitsch and *Mein Kampf* are widely available. Nor would it make a difference if a visitor hangs a portrait that is removed by the Portrait Gallery's director (parallel to removing comments that find their way onto Facebook).

My colleagues' approach has support from *People for the Ethical Treatment of Animals, Inc. v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024), which declares that a Facebook account established by the National Institutes of Health is a "limited public forum" even though it implements access and topic controls through keyword filters. I do not find the court's analysis convincing. The panel in *PETA v. Tabak* did not mention the same circuit's contrary approach in *PETA v. Gittens*. More important, it did not discuss *Shurtleff*, *Moody*, or many of the other decisions on which I have relied. *Summum* received a citation, but only in passing—no analysis. The panel did not try to explain why a website differs from a newspaper or magazine published by a governmental body. The decision seems to be more a response to the Institute's concession that the Facebook site is a public forum than it is an independent analysis.

*Tabak* does mention, also in passing, *Knight First Amendment Institute v. Trump*, 928 F.3d 226 (2d Cir. 2019), rehearing en banc denied, 953 F.3d 216 (2020), vacated as moot under the name *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220 (2021). *Knight* held that a public official who posts or discusses official policy on social media is constitutionally

forbidden to use the sites' content-moderation features, such as limits on who may respond and restrictions on off-topic posts. This decision lacks precedential force, given the vacatur, and has the same problem as *PETA v. Tabak* in explaining why public officials are not entitled to express their views by curating (and sometimes excluding) words penned by third parties. Judge Park's dissent from the denial of rehearing en banc in the Second Circuit (953 F.3d at 228–31) exposes some of these problems, and *Knight* has taken its lumps from academic commentators who wonder why forum analysis is appropriate when a private actor controls the site. E.g., Noah Feldman, *Appeals Court Asks Wrong Question in Trump Twitter Blocking Case*, which appeared at bloomberg.com on July 9, 2019. Twitter (now X), the main forum in *Knight*, demonstrated its control by excluding President Trump entirely, which scotches any idea that it was a "public" forum controlled by the government. The Supreme Court did not address any substantive issue in *Knight*, given intervening mootness, but this is not a good reason for us to follow the Second Circuit down the rabbit hole.

*PETA v. Tabak* and *Knight* lack support in the Supreme Court's decisions. They cannot be reconciled with *Moody*, *Summum*, *Hurley*, *Little*, *PETA v. Gittens*, and many other decisions, which hold that choosing what private speech to present is a form of governmental speech. We should stick with *Moody* ("expressive activity includes presenting a curated compilation of speech originally created by others") and not be led astray by flawed decisions of the D.C. and Second Circuits.

Given my colleagues' recognition that the letters section of *On Wisconsin* is not a public forum, the University may

respond to today's decision by closing all comment options on Facebook, vindicating its status as "the official voice of the University"—or manually vetting all comments and posting only those that the editors like. Neither response would promote the plaintiff's goals, and both would harm other alums whose views would disappear.